# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 07-CR-0212(1) (PJS/JSM) |
| Plaintiff, | |
| v. | ORDER |
| MICHAEL FIORITO, a/k/a Michael Fiori, a/k/a Michael Fiore, a/k/a Michael Fiorto, | |
| Defendant. | |

David J. MacLaughlin, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Michael Fiorito, pro se; Douglas B. Altman, ALTMAN & IZEK, standby counsel for defendant.

Defendant Michael Fiorito was convicted by a jury of one count of conspiracy to commit mail fraud and six counts of mail fraud. Fiorito does not challenge the conviction for conspiracy to commit mail fraud. He does, however, move under Fed. R. Crim. P. 29(c) for a judgment of acquittal on all six mail-fraud counts.[1] For the reasons that follow, the Court denies the motion.

## I. STANDARD OF REVIEW

Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering a defendant's Rule 29 motion, the Court must view the evidence in the light most favorable to the jury's verdict and must grant the government the benefit of all reasonable inferences. *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999); *see also*

---

[1]Fiorito moved during trial for judgment of acquittal under Rule 29(a). He renewed his motion under Rule 29(c) after the jury returned its verdict.

*United States v. Boesen*, 491 F.3d 852, 855 (8th Cir. 2007). The Court may grant the defendant's motion only if "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *Gomez*, 165 F.3d at 654. Put another way, as long as the evidence would permit a reasonable jury to find the defendant guilty beyond a reasonable doubt, the evidence "need not exclude every reasonable hypothesis except guilt." *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir. 1992); *see also United States v. Water*, 413 F.3d 812, 816 (8th Cir. 2005) (citing *Erdman*).

## II. DISCUSSION

### *A. Counts 2, 3, and 7: HUD-1 Counts (Vallos/Fjeldseth; Lastimosas; Fitzgerald)*

Three of the mail-fraud counts in the superseding indictment — Counts 2, 3, and 7 — rest on the mailing of so-called HUD-1 forms in connection with real-estate transactions.[2] A HUD-1 form is a statement prepared in connection with the sale or refinancing of real estate, and it summarizes the buyer's and the seller's sides of the transaction. Typically, a HUD-1's "bottom line" identifies how much money is owed by the buyer, and how much money is owed to the seller.

Counts 2 and 7 relate to refinancing transactions; Count 3 relates to a sale. Specifically: Count 2 rests on the sending of a HUD-1 in connection with the refinancing in July 2005 of Elaine Vallos and Jean Fjeldseth's house in Mound, Minnesota. Count 3 rests on the sending of a HUD-1 in connection with the sale to Fiorito in October 2005 of Lorri and Darrell Lastimosa's

---

[2]The indictment alleges that these HUD-1 forms were sent by commercial carrier, not by United States mail. The Court nonetheless sometimes uses the word "mailing" and related words to refer to the sending of these HUD-1 forms.

house in Mankato, Minnesota. And Count 7 rests on the refinancing in January 2007 of Lavonne Fitzgerald's house in Vadnais Heights, Minnesota.

Fiorito asks the Court to direct his acquittal on these counts for three different reasons. First, Fiorito contends, as to each alleged mailing, that there was insufficient evidence for a jury to find beyond a reasonable doubt that the mailing occurred. Second, Fiorito contends that federal law mandates that a HUD-1 form be mailed in connection with a real-estate transaction, and that such a legally-required mailing cannot support a mail-fraud conviction under *Parr v. United States*, 363 U.S. 370 (1960). Third, Fiorito contends that the HUD-1 forms were sent after, and were insignificant to, the transactions at issue, and therefore they cannot support a charge of mail fraud under *Kann v. United States*, 323 U.S. 88 (1944)*, United States v. Maze*, 414 U.S. 395 (1974), and *United States v. Evans*, 148 F.3d 477 (5th Cir. 1998). The Court addresses each argument in turn.

### 1. Evidence of Mailing

Fiorito challenges the sufficiency of the evidence with respect to the mailing of the HUD-1s. The Court finds that the jury's verdict with respect to Counts 2, 3, and 7 is supported by sufficient evidence that the charged mailings took place.

Count 2 involved the refinancing of Elaine Vallos and Jean Fjeldseth's house. According to the HUD-1 for this transaction, the transaction closed on July 14, 2005. Gov't Ex. 5. But because it was a refinancing transaction in which the borrower has three days to rescind the transaction, the lender did not actually fund the transaction that day. Instead, the lender disbursed the funds on July 19, 2005, the day that the equity checks are dated. *Id.* In the meantime, on July 15, 2005, a package of closing documents was sent by the title company to the

lender via FedEx.  Gov't Ex. 6; Tr. at 267.  An employee of the title company, Kellie Clifford,

testified that this package almost certainly included a HUD-1 form.  Tr. at 247.  Clifford testified

that the lender would not have funded the transaction without having received an original HUD-

1.  *Id.* at 266.  And Clifford testified that it was her title company's usual practice[3] to include a

HUD-1 in a package of closing documents like the one sent on July 15, 2005.  *Id.* at 264.  This

evidence sufficed for a jury to find that a HUD-1 was sent by a commercial carrier on or about

July 15, 2005, as charged in Count 2.

Count 3 involved the sale of the Lastimosas' house.  The transaction closed on

October 14, 2005, and the government introduced a UPS receipt showing that the title company

sent a package of post-closing documents to the lender that same day.  Gov't Ex. 14; Tr. at 648-

50.  The title company's owner, Innocent Okoye, testified that the package would have included

the HUD-1 for the transaction.  Tr. at 656-59.  And Okoye testified that if the lender had not

received the HUD-1, the lender would have contacted him and told him to buy the loan from it.

*Id.* at 683 ("If they [the lender] don't get that package [with the HUD-1], the deal is not

complete.  They will call me; we don't have the package.  I will call UPS. . . .  Assuming UPS

cannot find it, I would have to buy that loan.").  This evidence sufficed for a jury to find that a

HUD-1 was sent by commercial carrier on or about October 14, 2005, as charged in Count 3.

---

[3]Obviously, a title company might mail thousands of pages of documents in connection
with hundreds of transactions every year.  It is highly unlikely that an employee of a title
company is going to remember placing a particular HUD-1 in a particular envelope in connection
with a particular transaction.  Such testimony is not required to sustain a mail-fraud connection;
rather, testimony about the general practices of a title company can suffice to sustain a
conviction.

Count 7 involved the refinancing of Lavonne Fitzgerald's house. The transaction closed on January 8, 2007, but, because of the three-day rescission period associated with refinancing transactions, the lender did not actually fund the transaction until January 12, 2007. *Id.* at 945. The government introduced into evidence a UPS receipt dated January 11, 2007, showing that documents related to this transaction were sent to the lender that day. Gov't Ex. 20. Under questioning from the government, Kenneth Bodin, the owner of the title company that worked on the transaction, testified that the package sent on January 11 included the HUD-1 for the transaction. Tr. at 963-64.

On cross-examination by Fiorito, however, Bodin backed off of his assertion that the January 11 package included the HUD-1. Specifically, Fiorito pointed to other correspondence between the lender and the title company that implied that the lender had received the original signed loan documents, including the HUD-1, *before* January 11. *Id.* at 974. And based on that correspondence, Bodin agreed with Fiorito that the loan documents must have been sent on January 9 or 10, not on January 11. *Id.* at 974-75 ("Q: So the overnight package couldn't have been sent on 1-11. It had to be sent on 1-10 or 1-9 or maybe another time, correct? A: Correct."). Bodin further acknowledged that the January 11 mailing might have included an affidavit that the lender required before disbursing the loan funds. *Id.* at 975.

In light of Fiorito's questioning of Bodin, a jury could not find beyond a reasonable doubt that the package sent by UPS on January 11, 2009 included a signed HUD-1. Indeed, given Clifford's testimony that the signed HUD-1 for the Vallos transaction was included in documents sent promptly after the transaction closed, it seems quite likely that the signed HUD-1 for the

Fitzgerald transaction was sent promptly after the transaction closed on January 8, and not three days later on January 11.

But the jury still had sufficient evidence to find Fiorito guilty beyond a reasonable doubt on Count 7. That count was based on the mailing of a HUD-1 "on or about" January 11, 2007; the government was not required to prove that the HUD-1 was mailed *on* January 11, 2007, as long as the government proved that the HUD-1 was mailed *near* January 11, 2007. Bodin testified unequivocally that the lender on the Fitzgerald transaction would not have funded the loan if the lender had not received the HUD-1 that had been signed at the January 8 closing. *Id.* at 952-53. Bodin's testimony in this respect was consistent with that of Clifford, who testified about the Vallos refinancing transaction. *Id.* at 266. In his cross-examination of Bodin, Fiorito called into question whether the package sent via UPS on January 11 included the signed HUD-1. Fiorito did not, however, cast any doubt on Bodin's assertion that the original, signed HUD-1 was provided by overnight delivery to the lender some time between January 8 and January 11. Accordingly, the evidence sufficed for a jury to find beyond a reasonable doubt that a HUD-1 was sent by commercial carrier "on or about" January 11, as charged in Count 7.

## 2. Legally-Required Mailings as Predicates for Mail Fraud

Fiorito is correct that federal regulations mandate that a HUD-1 be completed in connection with a real-estate transaction and be provided to the parties to the transaction. *See* 24 C.F.R. § 3500.10(b) ("The settlement agent shall provide a completed HUD-1 or HUD-1A to the borrower, the seller (if there is one), the lender (if the lender is not the settlement agent), and/or their agents."). But Fiorito is incorrect that a legally-required mailing, such as the mailing of a HUD-1, cannot support a mail-fraud conviction.

Fiorito relies on *Parr v. United States*, 363 U.S. 370 (1960), to support his argument that a mailing required by law cannot support a conviction for mail fraud. The defendants in *Parr* were accused of defrauding a school district by causing the district to make payments either to fictitious payees, or to actual payees who were not entitled to the payments. *Id.* at 374-76. But the mailings underlying certain counts of mail fraud charged in *Parr* had nothing to do with these fraudulent payments. Rather, the mailings at issue were "letters, tax statements, checks in payment of taxes, and receipted tax statements" that related to the school district's routine raising of revenue — that is, to revenue-raising that would have occurred whether or not the *Paar* defendants later stole some of that revenue. *Id.* at 375.[4] The Court vacated the defendants' mail-fraud convictions on these counts, holding:

> [W]e must conclude the legally compelled mailings, complained of in the first 16 counts of the indictment, were not shown to have been unlawful "step[s] in a plot," "part[s] of the execution of the fraud," "incident to an essential part of the scheme," or to have been made "for the purpose of executing such scheme," within the meaning of [18 U.S.C.] § 1341, for we think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys.

*Id.* at 391 (citations omitted).

As this passage makes clear, *Parr* did not hold that a charge of mail fraud can *never* be based on a mailing that was required by law. Rather, *Parr* held that the particular mailings at

---

[4]*Parr* also involved counts of mail fraud based on the mailing of credit-card statements to the school district for expenses that certain defendants wrongly charged to school-district-issued credit cards. 363 U.S. at 392-93. *Parr*'s discussion of those counts is not relevant to Fiorito's argument that legally-required mailings cannot support a charge of mail fraud.

issue in that case were essentially unrelated to the charged scheme to defraud. That is, the mailings themselves would have happened *regardless* of whether the defendants had later defrauded the school district of the taxes it collected by means of those mailings.

The question, then, is not whether a particular charged mailing was legally required; the question is whether the mailing was "a part of the execution of the fraud . . . ." *Kann v. United States*, 323 U.S. 88, 95 (1944); *see also Schmuck v. United States*, 489 U.S. 705, 710 (1989) (quoting *Kann*). To support a charge of mail fraud, a mailing "need not be an essential element of the scheme." *Schmuck*, 489 U.S. at 710. Rather, the mailing need only be "incident to an essential part of the scheme," *Pereira v. United States*, 347 U.S. 1, 8 (1954), or "a step in [the] plot," *Badders v. United States*, 240 U.S. 391, 394 (1916). *See also Schmuck*, 489 U.S. at 710-11 (quoting *Pereira* and *Badders*).

In this case, the HUD-1s were mailed in connection with the sale or refinancing of the victims' houses. Those real-estate transactions were an "essential part" of Fiorito's scheme, and the HUD-1s were incident to those real-estate transactions. Without the mailing of the HUD-1s, the two refinancing transactions would not have been funded by the lenders, and the sale of the Lastimosas' house would have come under close scrutiny after the closing. Tr. at 266 (testimony of Clifford about Vallos/Fjeldseth transaction); *id.* at 952-53 (testimony of Bodin about Fitzgerald transaction); *id.* at 683 (testimony of Okoye about Lastimosa transaction). The mailings of the HUD-1s were thus "incident to" the real-estate transactions at issue (as required under *Pereira* and *Schmuck*), and Fiorito caused the mailings by arranging the transactions. The fact that federal regulations also required the HUD-1s to be mailed is beside the point.

### 3. Signifance of HUD-1s

According to Fiorito, the HUD-1s were insignificant to the allegedly fraudulent real-estate transactions and were mailed after those transactions had been completed. Fiorito argues that under *Kann v. United States*, 323 U.S. 88 (1944)*, United States v. Maze*, 414 U.S. 395 (1974), and *United States v. Evans*, 148 F.3d 477 (5th Cir. 1998), such post-transaction mailings cannot support a mail-fraud conviction. The Court disagrees.

In *Kann*, the defendants cashed at a local bank two checks that they had obtained through fraud. 323 U.S. at 92. The local bank, after cashing the checks, then used the mails to forward the checks to the banks on which the checks had been drawn. The Supreme Court vacated the convictions, holding that the defendants' scheme "had reached fruition" once the local bank cashed the checks, and the subsequent mailings therefore were not "for the purpose of executing the scheme [to defraud], as the statute requires." *Id.* at 94. The Supreme Court distinguished cases in which "the mails are used prior to, and as one step toward, the receipt of the fruits of the fraud" and cases "where the use of the mails is a means of concealment so that further frauds which are part of the scheme may be perpetrated." *Id.* at 94-95.

In *Maze*, the defendant, Maze, used a stolen credit card to pay for food and lodging at various motels. 414 U.S. at 396. The government brought mail-fraud charges against Maze based on the motels' mailing of sales slips to the credit-card company for the charges incurred by Maze. *Id.* at 396-97. The appeals court vacated Maze's conviction and the Supreme Court affirmed, holding that Maze's scheme had "reached fruition" (that is, Maze had received his stolen food and lodging) before the mailings happened, and that the success of Maze's scheme

did not depend on the mailings.  *Id.* at 402.  In short, the mailings were not "sufficiently closely related to [Maze's] scheme" to support a mail-fraud conviction.  *Id.* at 399.

In *Evans*, the defendant, Evans, used her position as a parole officer to help a parolee whom she supervised evade various conditions of parole.  148 F.3d at 483.  The government charged Evans with mail fraud on the basis of the mailing of falsified travel vouchers related to Evans's supervision of the parolee.  The Fifth Circuit vacated the conviction, finding that the mailings did not further Evans's scheme to defraud because that scheme was complete (i.e., the parolee had evaded the conditions of parole) before the mailings took place.  *Id.*  The Fifth Circuit held that "the prosecution in this case, in seeking to exploit a truly marginal relation to the mails, strayed beyond the boundary established by Congress" in enacting the mail-fraud statute.  *Id.*

*Kann*, *Maze*, and *Evans* collectively stand for the same proposition:  A mail-fraud conviction cannot be based on a mailing that happens after a scheme to defraud has reached fruition unless that mailing somehow furthers the scheme by, for instance, helping to conceal or perpetuate it.  *Cf. Schmuck*, 489 U.S. at 714-15 (distinguishing *Kann, Parr*, and *Maze*).  But these cases do not stand for a general proposition a mail-fraud conviction can never be based on mailings that postdate a transaction that is part of a scheme to defraud.  Nor do these cases stand for the proposition, expressly rejected in *Schmuck*, that "routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense . . . ."  489 U.S. at 714-15.

As discussed above, the HUD-1 forms at issue in this case were not peripheral to the challenged real-estate transactions.  To the contrary, the HUD-1s were required under federal

law, as Fiorito himself pointed out. Further, with respect to the two refinancing transactions charged in Counts 2 and 7, the government presented evidence that the lenders would not have funded the transactions before receiving original HUD-1s. Tr. at 266; *id.* at 952-53. And with respect to the sale transaction charged in Count 3, the government presented evidence that the lender would have caused problems for the title company if the lender had not promptly received a signed HUD-1. *Id.* at 683. Thus, the title company would not have closed the transaction — and put itself at risk of having to buy the loan — unless it first had in hand a signed HUD-1 for mailing to the lender. The evidence thus establishes that Fiorito's scheme had not "reached fruition" before the mailings took place. Rather, the mailings of the HUD-1s were "incident to an essential part" of Fiorito's scheme, as required under *Schmuck*, 489 U.S. at 710-11.

   B. *Counts 4 and 5: Mortgage-statement Counts (Erickson-Campbell; Darrell Lastimosa)*

   Counts 4 and 5 charged Fiorito with mail fraud in connection with his mailing of bills denominated "mortgage statements" to Lori Erickson-Campbell and Darrell Lastimosa. Fiorito challenges his convictions on these counts on two grounds. First, he contends that there was insufficient evidence that the statements were sent by mail. Second, he contends that even if the statements were mailed, the mailings happened after his alleged fraud was completed and, because the mailings did not "lull" his victims, the mailings cannot support a mail-fraud conviction. Fiorito is mistaken on both points.

   The government introduced into evidence a copy of a letter from Fiorito to Erickson-Campbell dated April 26, 2006, with the subject line "Mortgage Payment." Gov't Ex. 26. Erickson-Campbell testified that she received the letter, and other letters like it, in the mail. Tr. at 1069-70. The government also introduced into evidence a copy of a letter from Fiorito to

Darrell Lastimosa dated May 30, 2006, with the subject line "Mortgage Payment."  Gov't Ex. 15 at 2.  Lastimosa testified that he received the letter in the mail.  Tr. at 702; *see also id.* at 742 ("Q [by Fiorito]: . . . We were always in contact with you, correct?  A [by Lastimosa]:  In what way?  You know, through mail you sent the letters reminding us of our payments each month.").

Fiorito denies that this evidence shows that the statements were mailed, and instead suggests that the jury could have concluded that the statements were hand-delivered.  But there was no evidence that the statements were hand-delivered.  Fiorito (who represented himself at trial) implicitly asserted, in his questions to Lastimosa and Erickson-Campbell, that he had hand-delivered the statements.  *See id.* at 742, *id.* at 1131-32.  But Fiorito's questions were not evidence.  Further, Erickson-Campbell expressly denied that Fiorito hand-delivered any statements, *id.* at 1131, and Lastimosa said that he could not recall Fiorito ever coming to his house after the sale closed, *id.* at 742.  Based on this evidence, the jury could have found beyond a reasonable doubt that the mailings alleged on Counts 4 and 5 took place.

The jury was also entitled to find that the mailings furthered Fiorito's fraudulent scheme.  It is true that by the time Fiorito mailed the statements, the underlying real-estate sales had already closed.  But with respect to these properties, the sales were not the end of Fiorito's scheme.  Rather, Fiorito perpetuated his scheme — which involved buying the houses outright from sellers who thought they were only refinancing — through his fraudulent mortgage statements, which allowed him to collect money from the sellers on an ongoing basis under the pretext that the sellers still owned their houses and Fiorito was their mortgage lender.

### C. Count 6: Discovery Requests (Jerris)

Count 6 is based on the mailing in early January 2007 of various discovery requests to Cynthia Jerris in connection with a lawsuit filed by Fiorito's wife in state court over a lien on Jerris's house.[5]  Fiorito does not dispute that the mailing happened.[6]  Instead, he contends that the mailing cannot support a mail-fraud conviction because the alleged fraud was complete when the mailing occurred and the mailing did not conceal the fraud.  The Court disagrees.

Fiorito's wife bought Jerris's house in April 2006, and the evidence showed that Fiorito stole from Jerris a portion of the sale proceeds shortly after the sale closed.  Tr. at 1246-48; Gov't Ex. 23.  Thus, a *part* of the fraud was indeed complete in April 2006.

But that was not the end of the fraud.  Fiorito and his wife never lived in Jerris's house; instead, they resold it shortly after buying it.  *Id.* at 1291, 1322-23.  The entirety of Fiorito's scheme with respect to Jerris's house thus involved not only buying the house and stealing some of the proceeds, but also reselling the house at a profit — a profit produced by Fiorito's having bought the house at below-market value.  *See* Gov't Ex. 23 (showing that Glatzmaier paid $85,000 to Jerris in April 2006), Gov't Ex. 27 (showing that a buyer offered Glatzmaier $105,000 in July 2006).

The evidence showed that in the course of engineering the sale of Jerris's house to his wife, Fiorito created a false entry in the closing papers reporting that Jerris had loaned Fiorito's

---

[5]By the time of trial, Cynthia Jerris had changed her last name to Gentry.  The Court refers to her as "Jerris" because this is the name used in the documentary evidence that was introduced at trial.

[6]In any event, a jury could have found beyond a reasonable doubt that the mailing charged in Count 6 of the indictment occurred.  *See* Tr. at 1394, 1400-01 (testimony of John Bray).

wife $8,500.  Tr. at 1247-49.  (By falsely reporting that Jerris was helping to finance the sale of

her own home, Fiorito reduced the amount of money that his wife needed to close the

transaction.)  This false entry created a lien on the house's title, and to later resell the house,

Fiorito needed to have the lien removed.  *Id.* at 1293, 1299.  When Jerris (who had grown

distrustful of Fiorito) would not cooperate by signing papers that would have removed the lien,

Fiorito caused a lawsuit to be filed in his wife's name in state court to remove the lien.  *Id.* at

1389-90.  In the course of that litigation, a lawyer for Fiorito and his wife sent discovery

requests to Jerris by mail in January 2007.  *Id.* at 1394, 1400-01 (testimony of John Bray).  Those

discovery requests directly furthered Fiorito's attempt to *complete* the fraud by clearing the title

to Jerris's house and reselling it.  Because reselling the house was part of Fiorito's fraudulent

scheme, and because this mailing furthered that scheme and was caused by Fiorito, the jury was

entitled to find Fiorito guilty of mail fraud as charged in Count 6.

### D.  Other Objections

Fiorito makes a handful of additional objections that merit little comment.  For instance,

he complains that the government did not provide "expert testimony" about the challenged

transactions.  Def. Rule 29(c) Mot. at 6 [Docket No. 282].  He also complains that the

government's investigators "showed no curiosity" about the documents related to the transactions

at issue in this suit.  *Id.*

As far as the Court can tell, these objections largely relate to Fiorito's argument that his

victims were better off as a result of his involvement with them.  The Court has rejected this

argument before and rejects it once again.  *See United States v. Fiorito*, No. 07-CR-0212

(PJS/JSM), 2009 WL 1086518, at *1, 2009 U.S. Dist. LEXIS 34613, at *3 (D. Minn. Apr. 22,

2009) ("If, after closing a real-estate transaction, a victim did not receive all of the money to which she was entitled because Fiorito stole some of her money, then the victim most certainly suffered a 'loss,' no matter how much she benefitted from the overall transaction.").

The government's case was not complicated, and the government was not required to present expert testimony to prove its allegations. In general, the government alleged, and the jury found, that Fiorito arranged various real-estate transactions and stole a portion of the proceeds from those transactions. In some instances, Fiorito further profited from the transactions by reselling properties that he (or his wife) had bought at below-market rates or by collecting fraudulent mortgage payments. The government amply proved its case.

Fiorito also contends that the government's case was flawed because the government relied too heavily on the testimony of Kristin Jerde, Fiorito's accomplice. But it is black-letter law that

> [q]uestions involving the credibility of witnesses are for the jury to resolve, and the uncorroborated testimony of an accomplice is sufficient to sustain a conviction if it is not otherwise incredible or unsubstantial on its face. An accomplice's testimony is not discredited simply because the witness may benefit from inculpating the accused, and it is the jury's responsibility to decide whether a witness is telling the truth despite incentives to lie.

*United States v. Bounmy*, 403 F.3d 1018, 1021 (8th Cir. 2005) (quotation marks and citations omitted). Jerde's credibility — like the credibility of all the witnesses — was for the jury to assess, and the jury apparently found her sufficiently credible. Putting aside the fact that Jerde's testimony was corroborated to a significant extent by other evidence, Jerde's testimony was certainly not incredible or unsubstantial on its face, and thus the jury was entitled to believe it.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT the motion of defendant Michael Fiorito for judgment of acquittal

under Fed. R. Crim. P. 29(c) [Docket No. 282] is DENIED.


Dated:  September 22 , 2009                    s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge