UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL FIORITO, a/k/a Michael Fiori,
a/k/a Michael Fiore, a/k/a Michael Fiorto,

Defendant.

Case No. 07-CR-0212(1) (PJS/JSM)

MEMORANDUM OPINION
ON SENTENCING ISSUES

---

David J. MacLaughlin, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Michael Fiorito, pro se; Douglas B. Altman, ALTMAN & IZEK, standby counsel for
defendant.

## I. INTRODUCTION

Defendant Michael Fiorito was convicted by a jury in May 2009 of one count of

conspiracy to commit mail fraud and six counts of mail fraud. The Probation Office provided a

draft presentence-investigation report ("PSR") to the government and Fiorito on July 15, 2009.

This PSR was a revised version of a PSR that the Probation Office had prepared in late 2007 and

early 2008, after Fiorito had entered a guilty plea. Fiorito later withdrew his plea, fired his

attorney, decided to represent himself, and took his case to trial. Fiorito continues to represent

himself in connection with sentencing.

The government proposed certain amendments to the PSR in late July 2009, and Fiorito

submitted numerous objections to the PSR in mid-August 2009. The Probation Office addressed

Fiorito's objections as best it could and provided a revised PSR to the parties and the Court on

September 2, 2009. That PSR is now before the Court. According to the PSR, Fiorito's

recommended sentence under the United States Sentencing Guidelines ("USSG") is from 235 to 293 months, based on an offense level of 33 and a criminal-history category of VI.[1]

Fiorito objects to much of the PSR. Fiorito sets forth many of his objections in a lengthy sentencing memorandum, which was filed on November 4, 2009. Def. Pos. w/r/t Sent. Factors ("Def. Sent. Mem.") [Docket No. 366]. That sentencing memorandum was accompanied by multiple "exhibits" containing both argument and documentary evidence. The memorandum and exhibits — save exhibit 5 — total almost 100 pages; exhibit 5 consists of two bound volumes totaling well over 1,000 pages. Def. Sent. Mem. Ex. 5 [Docket No. 376].

Fiorito also filed on November 4, 2009 a separate motion for a downward departure or variance with eight exhibits; that motion and its exhibits total 58 pages. Def. Mot. Downward Dep. or Var. [Docket No. 369]. Fiorito filed a second motion for a downward departure under seal on November 10, 2009. Def. Second Mot. Downward Dep. or Var. [Docket No. 373]. Fiorito also filed numerous other motions and requests throughout November and December 2009.

The government filed its own 37-page sentencing memorandum on December 14, 2009. Gov't Pos. w/r/t Sent. Factors ("Gov't Sent. Mem.") [Docket No. 385]. The government also filed a 16-page response to Fiorito's first motion for a downward departure or variance on December 21, 2009. Gov't Supp. Resp. Def. Sent. Mots. [Docket No. 387].

On December 30, 2009, the Court held a pre-sentencing conference to address some of Fiorito's motions and to set a schedule and a procedure for resolving the parties' numerous

---

[1]The Court applies the Guidelines as set forth in the November 1, 2009 edition of the U.S. Sentencing Commission's Guidelines Manual. The parties do not dispute that this version of the manual applies.

sentencing-related disputes. After addressing many of Fiorito's motions in a written order issued January 4, 2010 [Docket No. 394], the Court held an all-day evidentiary hearing on January 6, 2010, and a second all-day evidentiary hearing on January 11, 2010.

After the January 11 hearing, the government submitted two additional memoranda addressing issues that had come up during the evidentiary hearings. Gov't Mem. re Guaranty Bank [Docket No. 398]; Gov't Mem. re Date of Discovery of Fraud [Docket No. 399]. Fiorito responded. Letter to Court [Docket No. 401]. Fiorito also submitted numerous sentencing-related letters to the Court, including letters about his interactions with law-enforcement officials, his experiences in jail, his codefendant's sentence, and case law that Fiorito contends is relevant to issues before the Court. Def. Letter to Court re Cooperation [Docket No. 400], Def. Letters to Court [Docket No. 402, 407, 409, 414-17]. The government submitted a letter bringing to the Court's attention a recent Eighth Circuit case that the government contends is relevant to sentencing. Gov't Letters to Court [Docket Nos. 404 & 406]. And Fiorito's wife submitted a letter about his family situation. Glatzmaier Letter to Court [Docket No. 411].

As should be evident, the parties have had ample opportunity to make arguments and present evidence with respect to sentencing. Indeed, the Court has devoted more resources to this sentencing proceeding than to any other sentencing proceeding that the Court has ever conducted. Fiorito has raised so many arguments that the Court cannot possibly address all of them in detail. Thus, the Court will discuss only Fiorito's main arguments in this opinion. To be clear, though: The Court has carefully considered all of Fiorito's arguments. If the Court does not address a particular argument, it is because the Court has rejected that argument and does not believe that the argument merits explicit discussion in this opinion.

## II. DISCUSSION

### A.  Fiorito's General Objections

Fiorito asks the Court to reject the PSR's calculation of his offense level under the Guidelines because an earlier version of the PSR calculated a lower offense level based on the same facts.  Fiorito seems to assume that the earlier PSR was "right" and that the current PSR is "wrong" — or at least that the earlier PSR somehow set a ceiling that later versions of the PSR could not exceed.  Fiorito is incorrect.

A PSR is merely a non-binding document that is prepared to assist the Court in sentencing.  There is no law or regulation of which the Court is aware that prevents the Probation Office from revisiting in a later PSR an issue that was addressed in an earlier PSR.  To the contrary, the Court would be surprised if, after a lengthy trial and more than a year of additional proceedings, the Probation Office did *not* change its mind about something in the earlier PSR.

There is really no point in debating whether an earlier PSR was more or less accurate than the current PSR.  The current PSR is the one before the Court, Fiorito has made numerous objections to that PSR, and the Court will rule on Fiorito's objections in light of the evidence submitted at trial and in connection with sentencing.

Fiorito also contends that the Court should find the relevant sentencing facts beyond a reasonable doubt rather than by the preponderance of the evidence.  That is not the law.  *See United States v. Villareal-Amarillas*, 562 F.3d 892, 897-98 (8th Cir. 2009) (rejecting suggestions in prior case law that especially important sentencing facts might need to be proved by clear and convincing evidence, and affirming the preponderance-of-the-evidence standard for proving all sentencing facts).

## B. Objections Relating to Fiorito's Criminal History

According to the PSR, Fiorito has a total of 22 criminal-history points, 9 more than the 13 points that place a defendant in category VI, the highest possible criminal-history category. PSR ¶ 82. Fiorito makes numerous objections to the PSR's treatment of his criminal history. The Court addresses Fiorito's objections in turn.[2]

### 1. Convictions that Fiorito Says Are Not His

Fiorito contends that someone who shares his name was convicted of the offenses listed in paragraphs 56, 59, 60, 61, 64, and 65 of the PSR.[3] These convictions occurred in the 1980s, when Fiorito was a teenager, and they have not been assigned any criminal-history points because of their age. *See* USSG § 4A1.2(e)(3). Fiorito's arguments about these convictions are therefore largely academic.

The Court nevertheless finds by a preponderance of the evidence that Fiorito did in fact commit the offenses listed in these paragraphs. The government has introduced into evidence a PSR prepared in 1998 in connection with mail-fraud and wire-fraud convictions for which Fiorito was sentenced by Judge Ann D. Montgomery of this District. Gov't Sent. Ex. 1. That PSR lists, as part of Fiorito's criminal history, the convictions that Fiorito now challenges.

---

[2]Fiorito contends that various paragraphs in the section of the PSR titled "Other Criminal Conduct" do not relate to him, and he asks that these paragraphs be removed from the PSR. *See* Def. Sent. Mem. Ex. 11, Docket No. 366-3 at 12 (contending that ¶¶ 83, 84, 86, 89-93, 95, and 100 do not relate to Fiorito). No criminal-history points have been attributed to any of the challenged paragraphs, and the Court will not consider them in sentencing. Under the circumstances, the Court sees no need to direct the Probation Office to remove any of the challenged paragraphs from the PSR. *See* Fed. R. Crim. P. 32(i)(3)(B).

[3]Fiorito contends that ¶ 56 relates to his cousin, not him. He does not identify anyone else to whom the other paragraphs might relate; he simply says that they do not relate to him.

Gov't Sent. Ex. 1 ¶¶ 26, 28, 29, 32, 33.  Fiorito made objections to that PSR back in 1998, but he did not dispute that the convictions were his.  Indeed, with respect to one of the convictions (found in ¶ 29 of the 1998 PSR and in ¶ 61 of the current PSR), Fiorito asked that it be consolidated with another conviction, implicitly acknowledging that the conviction was his. Gov't Sent Ex. 1 at A.2.  Based on the inclusion of the now-challenged convictions in the 1998 PSR, and based on Fiorito's failure to object to those convictions back in 1998, the Court rejects Fiorito's current challenge to those convictions.  Judge Montgomery adopted as the findings of this Court all of the unchallenged factual findings of the 1998 PSR, and this Court continues to rely on Judge Montgomery's findings.

Further, the government has introduced additional evidence that the convictions listed in ¶¶ 59, 60, and 61 of the current PSR relate to Fiorito.  At the sentencing hearing, the government elicited testimony from Probation Officer Matthew G. Tveite and placed into evidence a report that Tveite generated from the FBI's National Crime Information Center (NCIC) database. Gov't Sent. Ex. 2.  The NCIC report included an entry corresponding to the convictions in ¶¶ 59 and 60.  Gov't Sent. Ex. 2 at 4.  The government also placed into evidence a report from the Illinois Department of Corrections that had been part of Fiorito's supervision file at the Probation Office.  That report includes entries corresponding to the convictions in ¶¶ 59, 60, and 61 of the PSR.  Gov't Sent. Ex. 3 at 3-4.  This evidence further supports the Court's finding that Fiorito committed the crimes reflected in those paragraphs of the current PSR.

The Court notes again that no criminal-history points were assigned to the challenged convictions, and thus, even if Fiorito's objection were sustained, it would not reduce his criminal-history points.

### 2. A Conviction That Fiorito Says Was an Acquittal

Fiorito does not deny that the charge for unlawful use of a weapon described in ¶ 68 of the PSR relates to him. But he says that he was acquitted of the charge.

The Court finds by a preponderance of the evidence that Fiorito pleaded guilty to unlawful use of a weapon as described in ¶ 68. For one thing, that charge was described in ¶ 35 of the 1998 PSR and was assigned three criminal-history points. Gov't Sent. Ex. 1 ¶ 35. Fiorito did not contend that this conviction was really an acquittal when Judge Montgomery sentenced him, but instead argued that the conviction should be grouped with a different conviction and that the grouped convictions should be assigned only three criminal-history points. Gov't Sent. Ex. 1 at A.2-.3. Further, the NCIC report introduced into evidence at the sentencing hearing includes an entry for an arrest dated October 21, 1985 on charges of theft and "UUW," which presumably means "unlawful use of a weapon" — an arrest date and charges that correspond to the conviction listed in ¶ 68 of the current PSR. Gov't Sent. Ex. 2 at 5.

### 3. Challenges Based on Release Dates and Types of Sentences

Fiorito challenges the PSR's assignment of three criminal-history points in ¶ 70 for a 1989 Illinois conviction for burglary. He contends both that the conviction is too old to be counted and that it did not result in a countable prison sentence. The Court rejects both contentions.

Under USSG § 4A1.2(e)(1), a prior prison sentence that exceeds 13 months is countable if the sentence "resulted in the defendant being incarcerated during any part" of the 15-year period preceding the commencement of the offense for which the defendant is being sentenced. USSG § 4A1.2(e)(1). In this case, the jury convicted Fiorito on all counts of the indictment,

including count 2, which alleged that he committed mail fraud on or about July 15, 2005. The 15-year period under § 4A1.2(e)(1) therefore began to run no later than July 15, 1990.[4] Fiorito was sentenced by an Illinois court to a six-year prison term for the crime described in PSR ¶ 70, and the Court finds by a preponderance of the evidence (based on Tveite's testimony at the sentencing hearing) that Fiorito's prison term ended on August 20, 1993 — three years into the 15-year period.[5] The prison sentence in ¶ 70 is therefore countable under § 4A1.2(e)(1).

Fiorito also contends that the sentence described in ¶ 70 should not be counted because he served it concurrently with the federal sentence described in ¶ 71. That is, Fiorito says that because the sentence described in ¶ 70 ran concurrently with another sentence, he in fact never served *any* sentence for the crime described in ¶ 70. Fiorito is mistaken. Concurrent sentences are a routine feature of our justice system, and when they are imposed, the defendant serves a sentence on *every* offense of conviction. He just happens to serve the sentences at the same time. *Cf. United States v. Allen*, 50 F.3d 294, 298 (4th Cir. 1995) ("[C]oncerns about sentencing equity that may lead a court to consolidate cases informally and impose concurrent sentences do not make unrelated cases related."). Under Fiorito's argument, if a defendant is sentenced to 20 years for crime *A* and 20 years for crime *B*, and the two sentences run concurrently, then even

_____

[4]The evidence at trial established that Fiorito began defrauding victims in 2004. But at the sentencing hearing, the government proposed calculating the timeliness of prior convictions under § 4A1.2(e)(1) with reference to the later date of July 15, 2005.

[5]The PSR erroneously says that Fiorito was released from the state sentence described in ¶ 70 on September 23, 1993. PSR ¶ 70. Tveite testified at the sentencing hearing that upon further research, he learned that Fiorito finished serving that sentence on August 20, 1993. The difference does not affect the Guidelines calculations.

though the defendant spends 20 years in prison, he does not serve any time for any crime. That obviously is not the law.

Sentences are sometimes grouped under the Guidelines, but they are not grouped just because they run concurrently. Section 4A1.2(a)(2) governs the grouping of multiple sentences and provides in relevant part:

> Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest . . . . If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day.

USSG § 4A1.2(a)(2). The Court cannot determine, based on the information provided in the PSR, whether the sentences described in ¶ 70 and ¶ 71 were imposed for offenses that were separated by an intervening arrest. Even if they were not, though, those sentences did not result from offenses contained in the same charging instrument, nor were those sentences imposed on the same day. Accordingly, the sentences should not be grouped.

Fiorito also challenges the PSR's assignment of three criminal-history points for the sentence described in ¶ 74. Fiorito contends that he served no time on that sentence and that it should therefore not be counted. At the sentencing hearing, the government introduced as an exhibit various documents from the State of Illinois related to the crime and sentence described in ¶ 74. Gov't Sent. Ex. 4. Those documents show (and the government does not dispute) that an Illinois state court sentenced Fiorito in January 2002 to two years for the crime of forgery but simultaneously gave him two years of credit for time he had already served for a federal crime. Thus, Fiorito did not serve any *additional* time for the crime at issue in ¶ 74.

Such a sentence of "time served" is a kind of retroactive concurrent sentence. The court, in effect, imposes a new sentence, finds that the new sentence *should have* run concurrently with a previously imposed sentence, and thus treats the new sentence as if it *had* run concurrently with the previously imposed sentence. But a sentence of "time served" differs from an ordinary concurrent sentence in one important respect: When two sentences are running concurrently, if either sentence is vacated, the other sentence will continue to run and will thus result in actual incarceration. But if a court sentences a defendant to two years' imprisonment and credits the defendant for two years' past imprisonment, there is no way that the later sentence can result in actual incarceration.

Whether a sentence of "time served" counts as a sentence of imprisonment under the Guidelines is an open question in the Eighth Circuit. According to application note 2 to § 4A1.2, "[t]o qualify as a sentence of imprisonment, the defendant must have *actually served* a period of imprisonment on such sentence . . . ." USSG § 4A1.2 cmt. n.2 (emphasis added). Both the Sixth and the Eleventh Circuits have interpreted this language to mean that when a court imposes a sentence of imprisonment but simultaneously gives the defendant credit for time served equal to the sentence imposed, the sentence is not counted under the Guidelines because the defendant does not "actually serve" a period of imprisonment on the sentence. *United States v. Hall*, 531 F.3d 414, 419 (6th Cir. 2008) ("Cold reality informs us that a defendant who receives full credit for time served on an entirely separate conviction does not in fact 'actually serve' any time for the offense in question. Stated in mathematical terms, plus 30 (days to be served) minus 30 (days' credit) equals zero (days actually served)."); *United States v. Buter*, 229 F.3d 1077, 1078 (11th Cir. 2000) ("The essential issue to be decided herein is whether the state court sentences of

twenty-seven months, imposed to run concurrently with the previously completed federal sentence, constitute 'imprisonment' under the guidelines. We conclude they do not."). The Seventh Circuit has reached the opposite conclusion. *United States v. Staples*, 202 F.3d 992, 998 (7th Cir. 2000) ("Had [the defendant] been held without bail while awaiting trial, that time could not be counted as a sentence of imprisonment, but being given credit for time served on another offense is a different story. It reflects the seriousness of the offense and appropriately should be counted as a qualifying term of imprisonment for purposes of sec. 4A1.2(c)(1).").

Although the question is close, the Court agrees with the Sixth and Eleventh Circuits that a defendant does not "actually serve" a period of imprisonment on a new sentence when the court imposing that sentence simultaneously gives the defendant credit for time served equal to the new sentence. This is the most natural interpretation of the requirement in application note 2 to § 4A1.2 that the defendant must have "*actually served* a period of imprisonment" on a particular sentence for that sentence to be countable. The Court suggests that if the Sentencing Commission believes that sentences of "time served" should be counted like ordinary sentences — including ordinary concurrent sentences — it should say so explicitly in application note 2.

The Court therefore agrees with Fiorito that the sentence described in ¶ 74 of the PSR does not merit three criminal-history points because it does not qualify as a "sentence of imprisonment" under § 4A1.2(b). It does, however, qualify as a "prior sentence" under the Guidelines because it was a "sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." USSG § 4A1.2(a)(1). Accordingly, the sentence described in ¶ 74 merits one criminal-history point under § 4A1.1(c) because it is a "prior

sentence" that is not a countable "sentence of imprisonment" under either § 4A1.1(a) or § 4A1.1(b). USSG § 4A1.1(a)-(c).

### 4. Challenge to Recency Enhancement

Paragraph 81 of the PSR assigns two additional criminal-history points under § 4A1.1(e) on the grounds that Fiorito's criminal activity in this case began within two years of his release from imprisonment on the mail-fraud sentence imposed in 1998 by Judge Montgomery. According to the PSR, Fiorito was initially released from custody for that offense in March 2001, but he was reincarcerated after violating the terms of his supervised release. Following his reincarceration, he was released from the custody of the Bureau of Prisons on March 9, 2004. PSR ¶ 73. As noted above, Fiorito was convicted in this case on all counts of the indictment, including count 2, which alleges that he committed mail fraud on or about July 15, 2005. Because July 15, 2005 is less than two years after March 9, 2004, the two-point enhancement under § 4A1.1(e) applies. Or so says the PSR.

Fiorito contends that, before being released from the custody of the Bureau of Prisons on March 9, 2004, he served time in some kind of halfway house or community confinement. He argues that, as a result, he was "release[d] from imprisonment" sometime *before* March 9, 2004. In other words, Fiorito contends that a defendant is "release[d] from imprisonment" for purposes of § 4A1.1(e) when, as the end of his sentence nears, he is transferred from a federal prison to a halfway house or community confinement. He does not say exactly when he was so transferred, but instead argues that the government has failed to prove that he was "release[d] from imprisonment" after July 15, 2003 (two years before the July 15, 2005 offense charged in count 2 of the indictment).

It is doubtful that Fiorito is correct. Even accepting his interpretation of "release[d] from imprisonment," it seems highly unlikely that he was transferred from a prison to a halfway house or community confinement before July 15, 2003 — that is, more than *seven months* before being released from the custody of the Bureau of Prisons on March 9, 2004.

The problem is that neither the government nor Fiorito has provided the Court with the information that it needs to resolve this issue. Neither has cited any authority supporting or undermining Fiorito's assertion that a defendant is "release[d] from imprisonment" for purposes of § 4A1.1(e) when he is transferred from a federal prison to a halfway house or community confinement. Neither has provided any evidence about when — or even *whether* — Fiorito was in fact transferred to a halfway house or community confinement. And neither has provided any evidence about what conditions applied to Fiorito while he was living in a halfway house or community confinement.

In the end, though, none of this matters. Even if Fiorito is correct that he should not receive two additional criminal-history points under § 4A1.1(e), he still has more than enough criminal-history points to be placed in Category VI. For that reason, the Court will assume, for purposes of argument, that Fiorito is correct and sustain his objection.

5. Other Challenges

Fiorito challenges the PSR's assignment of one criminal-history point in ¶ 78 for a Minnesota misdemeanor conviction for harassing communications. Under § 4A1.2(c)(1), a sentence for a misdemeanor similar to "[d]isorderly conduct or disturbing the peace" is generally not counted unless "the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days . . . ." USSG § 4A1.2(c)(1). Fiorito contends that the crime

of "harassing communications" resembles disorderly conduct and thus, because he was sentenced to only one year of probation for the offense (and not to "a term of probation of *more* than one year"), his conviction should not be counted.

The government introduced the police reports related to this conviction at the sentencing hearing. Gov't Sent. Ex. 5. Those reports reveal egregious threats and harassing behavior by Fiorito toward a young woman and her family and friends. The government has proved by the preponderance of the evidence that Fiorito's misdemeanor conviction for harassing communications was for criminal conduct that was of a different nature and far more serious than disorderly conduct or disturbing the peace. The Court therefore finds that ¶ 78 of the PSR properly assigns one criminal-history point to this conviction.

Fiorito also objects to the criminal-history points assigned in ¶¶ 75 and 79 of the PSR. The Court does not entirely understand his objection. Fiorito says that the charges in these paragraphs "are from the same offense conduct involving the same people. No points should be assessed for either of them." Def. Sent. Mem. Ex. 11, Docket No. 366-3 at 7. He also asserts that he did not serve any time for the conviction described in ¶ 79 and that it is therefore not countable. *Id.* at 11.

Paragraph 75 of the PSR relates to a Minnesota felony conviction for a pattern of harassing conduct. Fiorito was convicted of this crime in July 2007 and sentenced to ten years' imprisonment, but the sentence was vacated and the case was remanded for resentencing in April 2009. Thus, when the PSR was finalized in September 2009, Fiorito's sentence for the conviction was unknown, and only one criminal-history point was assigned to the conviction in accordance with §§ 4A1.2(a)(4) and 4A1.1(c). *See* USSG § 4A1.2(a)(4) ("Where a defendant

has been convicted of an offense, but not yet sentenced, such conviction shall be counted as if it constituted a prior sentence under § 4A1.1(c) if a sentence resulting from that conviction otherwise would be countable.").

To the extent that Fiorito is arguing that he should have received no criminal-history points for this conviction because his sentence was unknown when the PSR was drafted, he misunderstands the Guidelines. Further, the government elicited testimony from Tveite at the sentencing hearing that Fiorito was in fact resentenced in December 2009 on the conviction described in PSR ¶ 75. Tveite testified that a Minnesota court sentenced Fiorito to ten years' imprisonment for this conviction. Accordingly, the Court finds by a preponderance of the evidence that the conviction merits three criminal-history points, not the one point assigned in the PSR. *See* USSG § 4A1.1(a).

Paragraph 79 of the PSR relates indirectly to Fiorito's July 2007 felony conviction for a pattern of harassing conduct. Specifically, Fiorito pleaded guilty in February 2008 to having attempted to bribe a witness not to testify in the harassing-conduct case. Obviously, engaging in a pattern of harassing conduct is not "the same offense conduct" as trying to bribe a witness not to testify about that conduct at trial. The two are separate offenses — different conduct, different victims, different crimes.

According to the PSR, the state court imposed a 30-month sentence for the bribery conviction to run concurrently with other already-imposed sentences. If the Court understands Fiorito's objection to this paragraph, he is again contending that a concurrent sentence should not count because it does not result in additional imprisonment beyond the term of the other

concurrent sentences.  For reasons already given, the Court rejects this argument and finds that ¶ 79 of the PSR properly assigns three criminal-history points to this conviction.

6.  Summary of Court's Criminal-History Calculations

The Court sustains in part Fiorito's objection to the assignment in ¶ 74 of three criminal-history points for an Illinois sentence of time served.  The Court finds that only one point should be attributed to that conviction.

The Court also sustains Fiorito's objection to the assignment in ¶ 81 of two criminal-history points under § 4A1.1(e).

The Court finds, however, that the state-law conviction for a pattern of harassing conduct described in ¶ 75 of the PSR merits three criminal-history points rather than the one criminal-history point assigned in the PSR.

The Court rejects the balance of Fiorito's challenges to the PSR's calculation of his criminal history.

The three changes that the Court finds necessary — changing three points to one in ¶ 74, changing two points to zero in ¶ 81, and changing one point to three in ¶ 75 — result in a two-point reduction to Fiorito's criminal-history score.  The Court finds that Fiorito's criminal-history score is 20 and his criminal-history category is VI.

C.  *Objections Relating to Fiorito's Offense Level*

Fiorito raises countless objections to the PSR's calculation of his offense level as 33. Many of his objections relate to his victims (e.g., the amount of their loss, whether they were vulnerable, how many there were) while other objections relate to his fraudulent scheme (e.g., how extensive it was, whether he was a leader, whether he abused a position of trust or used a

special skill). To simplify consideration of these objections, the Court begins by addressing the amount of the victims' losses. In doing so, the Court sets out factual findings that will be relevant to issues taken up later.

### 1. Amount of Victims' Losses (USSG § 2Bl.l(b)(l))

The single biggest contributor to Fiorito's offense level as set forth in the PSR is the amount of the losses that he caused his victims. The PSR asserts that Fiorito caused losses amounting to $475,861.95, an amount that — because it is between $400,000 and $1 million — results in a 14-level enhancement under § 2Bl.l(b)(l)(H). At the sentencing hearing, based on calculations slightly different from those in the PSR, the government contended that Fiorito caused losses of $495,265.07 and was therefore subject under § 2Bl.l(b)(l)(H) to the same 14-level enhancement called for in the PSR. Gov't Sent. Ex. 9.

Fiorito denies that he caused *any* loss to *any* of his victims. He makes several arguments that are applicable to multiple victims, and other arguments that are applicable only to specific victims. The Court first addresses Fiorito's generally applicable objections and then turns to a discussion of specific victims.

It is important to bear in mind that the Court is not required, under the Guidelines, to determine the precise amount of the loss caused by Fiorito. Rather, "[t]he court need only make a reasonable estimate of the loss." USSG § 2B1.1 cmt. n.3(C). The Court is confident that, by the end of its discussion, it will have made "a reasonable estimate of the loss," even if reasonable people could disagree about some of the particulars.

### a. Generally Applicable Arguments

First, Fiorito argues that many of his victims, when he met them, owed more on their houses than the houses were worth. When the sale of these "under water" houses resulted in net proceeds, those proceeds represented money that Fiorito himself generated, either by overpaying for the house (when he was the purchaser) or by negotiating a so-called "short sale" — a sale in which a lender agreed to accept less than it was due from the homeowner in full satisfaction of the homeowner's debt. Fiorito therefore caused these homeowners no loss (says Fiorito) because, when he met them, they had nothing to lose.

The Court rejects Fiorito's argument that he caused no loss when he overpaid for a house and then stole the amount that he overpaid. It may be that Fiorito agreed to pay more for a particular house than another buyer would have paid. But once he agreed to pay that amount, the *seller* — not Fiorito — was entitled to what Fiorito had agreed to pay. Buyers often overpay for houses and other things; a seller's good fortune is not a license for a buyer to steal from a seller after the sale has closed.

Moreover, to the extent that Fiorito argues that he should receive a credit for profits that he generated for homeowners — such as by "overpaying" for their homes — this argument is foreclosed by *United States v. Lange*, 592 F.3d 902 (8th Cir. 2010). The defendant in *Lange* embezzled from his employer, a credit union, in connection with car loans and contended that the employer's losses from his embezzlement should be reduced by his employer's profits on those loans. *Id.* at 906 ("Lange seeks credit for the profits made on Credit Union car loans, not for the fair market value of his services to the [Credit Union's] First Fleet Services program."). The Eighth Circuit rejected this argument. *Id.* at 907.

The Court also rejects Fiorito's argument that he caused no loss when he persuaded a lender to agree to a short sale and then stole part or all of the proceeds of that sale. If a lender agrees to take a haircut on a loan, the lender presumably does so because the borrower could threaten to default entirely, pay nothing on the loan, and force the lender to use lengthy and costly foreclosure proceedings. In effect, the borrower can use the threat of default as leverage to persuade the lender to write off part of the loan. That leverage — that is, the leverage that causes a lender to agree to a short sale — is owned by the homeowner, not Fiorito, and thus the proceeds generated through the use of that leverage belong to the homeowner, not Fiorito.

When Fiorito created new value by negotiating a short sale, then, Fiorito was like a gardener who, after being hired to till a garden, stumbled across buried treasure in the homeowner's yard. The homeowner may not have known about the treasure before the gardener dug it up — indeed, the homeowner might never have discovered the treasure but for the gardener's hard work tilling the garden — but that does not mean that the gardener is entitled to steal the treasure. If the gardener does so, the homeowner obviously suffers a loss.

Fiorito further argues that, even if he caused a loss to some homeowners, the amount of that loss should be reduced by the value of the services he provided. To continue the metaphor, if Fiorito was hired to till the homeowner's garden — and if he worked an extra hour to dig up the buried treasure that he stumbled across while tilling — then, according to Fiorito, he should get credit for the extra hour that he devoted to digging up the treasure. Specifically, to calculate the loss that Fiorito caused when he stole the treasure, the value of the extra hour of digging should be subtracted from the value of the treasure, as the homeowner could not have enjoyed the benefits of the treasure without paying someone to dig it up.

The government does not disagree with the general principle that a victim's losses, for sentencing purposes, are the victim's *net* losses. And the Guidelines themselves reflect this principle. Application note 3(E) to § 2B1.1, titled "Credits Against Loss," provides that in calculating the loss amount under § 2B1.1(b)(1):

> Loss shall be reduced by the following: . . . The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

USSG § 2B1.1 cmt. n.3(E)(i). Fiorito asks the Court to credit against his victims' losses "the fair market value . . . of the services rendered" to them by Fiorito. Specifically, he asks the Court to give him credit for the value of his work negotiating short sales and performing credit-repair services. The Court will not do so, for two reasons:

First, Fiorito seeks a credit with respect to some victims for services rendered after his fraud was detected. Such a credit is not permitted under application note 3(E)(i) to § 2B1.1.

Second, and more importantly, there is no evidence of the fair market value of Fiorito's services. There *is* evidence that Fiorito negotiated with certain lenders and persuaded them to agree to short sales, and Fiorito's efforts in these negotiations presumably had some value to the homeowner. But Fiorito provided no evidence of the value of his services. The evidence showed that Fiorito did not openly negotiate his fees with his victims or even tell some of his victims that he was negotiating a short sale on their behalf. (Telling a victim that he was negotiating a short sale would make it more difficult for Fiorito to steal the proceeds of that short

-20-

sale.)  Instead, Fiorito took it upon himself to set his own "compensation" by stealing wildly varying amounts from his victims.  Fiorito presented no evidence of what an honest mortgage broker would have charged for negotiating a short sale for a client (or for any of the other services Fiorito claims to have provided).

Fiorito also contends that he provided his victims with credit-repair services that had some value.  The evidence does not support this contention.  First, many victims denied that he provided credit-repair services at all, and, as a general matter, the Court finds that testimony credible.  Second, Fiorito presented no evidence of the fair-market value of whatever credit-repair services he may have provided.  Assertions made by Fiorito in his capacity as his own attorney are not evidence.

Although the government has the burden of proving the amount of loss, Fiorito has the burden of proving that he is entitled to a credit against the loss amount.  *See United States v. Hammer*, 3 F.3d 266, 272 (8th Cir. 1993) ("The burden of proof [at sentencing] is on the government with respect to the base offense level and any enhancing factors.  The burden of proof is on the defendant with respect to mitigating factors."); *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990) ("[T]he government should bear the burden of proof when it seeks to raise the offense level and . . . the defendant should bear the burden of proof when the defendant seeks to lower the offense level."); *see also United States v. Felix*, 561 F.3d 1036, 1043-44 (9th Cir. 2009) (quoting *Howard*).  Fiorito did not bear his burden of establishing the value of the services for which he now seeks a credit.

Fiorito also argues that the Court should treat certain amounts that he paid when buying victims' houses as credits against their losses.  For instance, Fiorito contends that when he

bought some houses, he paid various closing costs that appear on the seller's side of the HUD-1 settlement statements.  The Court rejects this argument, for two reasons:

First, as a general matter, there is insufficient evidence that Fiorito made such payments.  Again, Fiorito's assertions in his capacity as his own attorney are not evidence.

Second, and more importantly, Fiorito received *a house* in these transactions.  He did not make charitable contributions to his victims.  Prior to a real-estate closing, the buyer and seller negotiate a deal.  Sometimes the buyer pays all of the closing costs, sometimes the seller pays all of the closing costs, and sometimes the buyer and the seller split the closing costs.  If Fiorito agreed to pay certain closing costs that sellers usually bear — whether he agreed to pay them directly or indirectly, openly or under the table — those costs are just part of the deal he struck to gain ownership of a house.  Put another way, Fiorito already received value in exchange for those payments (if they were made):  He received a house.  Whether Fiorito paid the seller through the purchase price, or through paying transaction costs, or both, when the deal was done, Fiorito was entitled to the house, and the seller was entitled to the proceeds.  When Fiorito stole those proceeds, he caused the seller a loss — just as the seller would have caused a loss to Fiorito if the seller had somehow stolen back the house.

Fiorito further contends that he should receive credit for periods when some of his victims lived in their houses without paying rent or a mortgage.  This argument is frivolous to the extent that it is made about victims whose houses Fiorito did not own.  The fact that one of his victims may have cheated a *mortgage lender* is irrelevant to calculating the loss that *Fiorito* caused that victim.  To the extent that Fiorito makes this argument about victims whose houses Fiorito *did* buy, the Court rejects the argument for two reasons:  First, even if a victim withheld

rent payments from Fiorito after Fiorito bought the victim's house and stole sale proceeds from the victim, this would not affect the amount of *intended* loss caused by Fiorito. Under application note 3(A) to § 2B1.1, as a general rule, "loss is the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.3(A). Second, most victims who withheld payments from Fiorito did so after they discovered his fraud or after he should have known that the government was about to detect his fraud — a period in which credits against loss for services rendered by a defendant are unavailable. *See* USSG § 2B1.1 cmt. n.3(E)(i).

Fiorito also asks for a credit for intangible benefits he provided his victims, such as enabling them to stay in their homes. But the loss amount under § 2B1.1(b)(1) includes only "pecuniary harm" and "does not include emotional distress, harm to reputation, or other non-economic harm." USSG § 2B1.1(b)(1) cmt. n.3(A)(i) & (iii). Because the loss amount does not include intangible losses, credits against the loss amount cannot include intangible benefits.

Fiorito also argues that certain victims did not suffer losses because those victims themselves committed fraud in connection with the transactions Fiorito arranged. The Court addresses this argument below in connection with specific victims.

### b. Losses to Specific Victims

#### (1) Merle and Victoria Bieber

According to the PSR, Fiorito arranged a refinancing transaction for Merle Bieber and stole $11,387.71 of the proceeds. PSR ¶ 11. The government did not introduce any evidence about this transaction at trial because the Court granted Fiorito's motion in limine to exclude evidence about Merle Bieber and his wife Victoria. Order May 1, 2009 at 3 [Docket No. 259].

The government was not initially prepared to prove the amount of the Biebers' losses in connection with sentencing. But after the Court clarified at the sentencing hearing that its order granting Fiorito's motion in limine and excluding evidence about the Biebers applied only to trial, not to sentencing, the government introduced into evidence documents relating to the Biebers' refinancing.

Specifically, at the sentencing hearing, the government introduced a HUD-1 settlement statement dated June 30, 2005 for a refinancing transaction with respect to the Biebers' house in Prior Lake, Minnesota. According to that settlement statement, the Biebers were due $26,287.72 from the transaction. Gov't Sent. Ex. 6 at 1. A week after the transaction closed, the title company issued a check for $26,387.71 to the Biebers.[6] Gov't Sent. Ex. 6 at 3. The back of the check shows that it was endorsed to Fiori & Wagner, Fiorito's company. *Id.* The day after the Biebers' proceeds check was cut, Fiorito wrote a $15,000 check to Merle Bieber. Gov't Sent. Ex. 6 at 4. Based on this evidence, the Court finds that Fiorito stole $11,387.71 from the Biebers (the difference between the amount of the proceeds check from the refinancing transaction and the amount of Fiorito's check to the Biebers).

Because Fiorito was not entitled to this money, it counts as a loss for sentencing purposes. Fiorito argued at the sentencing hearing that he provided services such as credit repair in exchange for the money he took from the Biebers, but Fiorito did not actually testify to this.

---

[6]The record does not shed light on the roughly $100 discrepancy between the amount reported on the HUD-1 as owing to the Biebers ($26,287.72) and the amount of the proceeds check ($26,387.71). Because the Biebers were entitled to the proceeds check, the Court relies on the higher number in estimating the amount of their loss.

(Fiorito did not testify at either the trial or the sentencing hearing.)  Again, Fiorito's arguments as his own attorney are not evidence.

The evidence bearing on whether Fiorito earned the money that he took from the Biebers consists of the following:  First, Fiorito introduced into evidence at the sentencing hearing a document signed by Merle Bieber, dated June 10, 2005, in which Bieber agreed: (1) to pay "Michael Fiori [sic] of Fiori & Wagner" an undetermined fee, (2) to sign over the proceeds check from the refinance transaction "in order to pay for certain services," and (3) to accept a check from Fiorito "for the difference."  Def. Sent. Ex. 4.  Second, the government introduced into evidence at the sentencing hearing a written complaint filed by Bieber with the Minnesota Attorney General in April 2006 in which Bieber asserted that the signatures on the proceeds check were forged, that he did not receive all of the proceeds from the refinancing transaction, and that various debts that he expected to be paid off as part of the transaction were not in fact paid off.  Gov't Sent. Ex. 10 at 2-3.  Third, there was substantial evidence at trial of similar transactions by Fiorito in which he defrauded his clients by taking proceeds from a real-estate deal, depositing those proceeds into his own account, and cutting a check to clients for less than the proceeds, thereby keeping money to which he was not entitled.

Based on all of this evidence, the Court finds that the government has proved by the preponderance of the evidence that Fiorito caused Merle and Victoria Bieber an actual loss of $11,387.71.

### (2)  Glenn and Brenda Clark

Evidence at trial established that Fiorito arranged in late 2006 for Glenn and Brenda Clark to refinance their house in Golden Valley, Minnesota.  The transaction closed in December

2006. Gov. Trial Ex. 16. The title company wrote the Clarks a check for $21,701.34, which represented the proceeds due to them from the transaction. Trial Tr. (henceforth "TT") 788. Fiorito's assistant and codefendant, Kristin Jerde, forged an endorsement on the back of the check in Glenn Clark's name to Fiori & Wagner. TT 789, 1638-39. Fiorito deposited the proceeds check in the Fiori & Wagner account and subsequently provided a cashier's check in the amount of $16,187.00 to Glenn Clark. TT 798, 831, 1639; Gov't Trial Ex. 1.

Glenn Clark never deposited the cashier's check. TT 832; Talbot Aff. ¶ 8 [Docket No. 398-1]. The government contends that the Clarks' loss amount is therefore the full amount of the proceeds check stolen by Fiorito.

Fiorito makes three arguments in response. First, Fiorito contends that the Clarks' loss amount should be reduced by the amount of the cashier's check he gave the Clarks, despite their failure to deposit the check. Second, Fiorito contends that the roughly $5,000 difference between the amount of the proceeds check and the amount of the cashier's check should not count as a loss because he earned that money and retained it under a side deal between him and the Clarks. Third, Fiorito contends that Glenn Clark lied on the loan application for the transaction and that Fiorito therefore cannot be responsible for any loss connected to the Clarks' fraudulent application.

The Court rejects the second and third of these arguments. The evidence does not support Fiorito's contention that he was entitled to keep the difference between the proceeds check and the cashier's check. Glenn Clark testified that he never had any discussions with Fiorito about Fiorito's entitlement to the roughly $5,000 of proceeds that Fiorito took. TT 830. Clark testified that Fiorito never performed credit-repair services for him. TT 830. Fiorito

argued at the sentencing hearing that he was entitled to the money as compensation for doing a "risky loan" for the Clarks, but no evidence (as opposed to argument) supports this assertion.

The evidence *does* support Fiorito's contention that Glenn Clark lied about his employment on his loan application. TT 853-55. But the Court rejects Fiorito's argument that Clark's dishonesty means that Fiorito cannot be held responsible for a loss connected with the transaction. To support this argument, Fiorito relies on a case from the Second Circuit, *United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008). According to Fiorito, *Confredo* held that when a loan officer and a borrower together submit a fraudulent loan application, the borrower does not count as a victim who has losses that are relevant for sentencing purposes. But *Confredo* says no such thing.

Fiorito correctly asserts that the defendant in *Confredo* prepared loan applications that the applicants themselves knew were fraudulent. *Id.* at 145. And Fiorito also correctly asserts that the victims of the defendant for sentencing purposes were not the applicants, but the banks that funded the fraudulent loans. *Id.* at 146. But because the parties apparently agreed that the relevant victims were the lenders, *Confredo* did not discuss whether a borrower can be considered a victim if a loan officer steals part of the borrower's ill-gotten gains.

Even if the Clarks lied on their loan application and thus were complicit in Fiorito's fraud, Fiorito would not be in the clear. Indeed, Fiorito would be *worse* off: If the Clarks do not count as victims because they committed fraud, then the bank that funded their loan — and that would not have done so had the Fiorito and the Clarks been honest — likely suffered a loss equal to the *entire* amount of the loan proceeds issued at closing. And holding Fiorito responsible for this amount would be consistent with *Confredo*, which held that the face value of the fraudulent

loans in that case was presumptively the relevant loss amount, and that "the defendant should have an opportunity to persuade the sentencing judge that the loss he intended was less than the face amount of the loans." *Id.* at 152.

But the government has asked the Court to calculate the loss amount connected with the Clarks' refinance transaction as if the Clarks, rather than the lender, were the victims. Taking the government's approach — as the Court will do — can only help Fiorito.

The Court agrees with Fiorito that the amount of the Clarks' loss should be reduced by the amount of the cashier's check that he gave them. Application note 3 to § 2B1.1 provides that the relevant loss amount is "the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.3(A). And "[a]ctual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1 cmt. n.3(A)(i).

Because the Clarks did not cash the check that Fiorito gave them, they were out the entire amount of the proceeds from the refinancing transaction, or $21,701.34. But this amount is not the "actual loss" under the Guidelines because this was not the "reasonably foreseeable pecuniary harm" to the Clarks from Fiorito's fraud. Fiorito gave Glenn Clark a cashier's check for $16,187.00. The Court finds that Fiorito expected Clark to cash that check, and the Court further finds that it was not reasonably foreseeable that Clark would *not* cash the check. The reasonably foreseeable pecuniary harm to the Clarks, and therefore the Clarks' actual loss under § 2B1.1(b)(1), was thus $5,514.34 — the difference between the $21,701.34 in proceeds taken by Fiorito and the $16,187.00 cashier's check that Fiorito gave to Glenn Clark. Further, because the Court finds that Fiorito intended Glenn Clark to deposit the $16,187.00 cashier's check, the

Clarks' intended loss is the same as their actual loss. The relevant loss amount under the Guidelines for the Clark transaction is therefore $5,514.34.

### (3) Beverly Cooper

Fiorito arranged a refinancing transaction in late April 2006 for Beverly Cooper. The transaction resulted in a proceeds check from the title company to Cooper for $28,368.99. Gov't Trial Ex. 39. Kristin Jerde credibly testified that she forged Cooper's endorsement on the check and deposited it into a Fiorito-controlled bank account. TT 1660-61. Fiorito later paid Cooper $4,000 in cash ($1,000 in mid-May 2006 and the other $3,000 a few weeks later). Gov't Sent. Ex. 7. According to the government, and the PSR, Fiorito is responsible for a loss of $24,368.99 in connection with the Cooper transaction ($28,368.99 in total proceeds less $4,000).

Fiorito contends that the transaction was fraudulent because Cooper, with his help, misrepresented to the lender how much cash she had in the bank. The evidence at trial was that Fiorito loaned Cooper something close to $20,000, which she deposited into two bank accounts so that the "verification of deposit" forms completed by the banks to support the refinancing transaction would show that she had more money than she in fact had. TT 1657-59, 1788-90; Gov't Trial Ex. 39; Def. Trial Ex. 82. Fiorito contends that $20,000 of the sale proceeds that he stole from Cooper was intended to repay Fiorito for this loan and therefore should not count as a loss to Cooper.

The Court finds, by a preponderance of the evidence, that Cooper repaid the $20,000 loan *before* the refinancing transaction closed, and not out of the transaction's proceeds. With respect to $8,500 of the $20,000 that Fiorito loaned Cooper, the government introduced at trial a contract between Cooper and Fiorito. Gov't Trial Ex. 39. The contract provided:

> Michael Fiorito will give Beverly Marjean Cooper a check in the
> amount of [$8,500] [t]o be deposited into a personal account of
> Beverly Cooper's. A Verification of [Deposit] will happen and the
> money is to be immediately withdrawn back into a cashier[']s
> check and signed back over to Michael Fiorito. If money is not
> returned within 30 min[utes] of this transaction a lien in the
> amount of $10,000 will be filed against 2399 Cambridge Drive
> Mound Minnesota (the residence of Beverly Cooper). Also all
> legal action will be taken. In turn Beverly Marjean Cooper will be
> responsible for all legal fees in the amount of no less than $5,000.

*Id.* Jerde testified with respect to this $8,500 loan that as soon as the bank had executed the required verification of deposit, Cooper withdrew the money and returned it to Fiorito. TT 1658. The Court has little doubt that Cooper did so.

With respect to a second loan of around $11,000, Jerde testified that it was "possible" that Cooper repaid the loan out of the proceeds of the refinancing transaction. TT 1790. But the Court finds, by the preponderance of the evidence, that Cooper repaid that loan before the refinancing transaction and not out of the transaction proceeds. Cooper deposited the loan into a business-checking account at U.S. Bank, and U.S. Bank executed a verification-of-deposit form reflecting the loan on March 17, 2006. Def. Trial Ex. 82. The refinancing transaction did not close until roughly a month later (the proceeds check is dated April 19, 2006). Gov't Trial Ex. 39. In light of the contract with respect to the $8,500 loan (which required Cooper to repay Fiorito within *30 minutes* after the bank executed a verification-of-deposit form reflecting the loan) and in light of all of the evidence introduced at trial about Fiorito's business methods, the Court finds it highly unlikely that Fiorito would allow Cooper to have free use of his $11,000 for almost a month. The only reasonable inference from the evidence is that Cooper repaid that $11,000 loan soon after it was made, just as she repaid the $8,500 loan soon after it was made. In other word, both loans were repaid well before the closing.

Fiorito further argues that Cooper's loss can be no more than $5,100, because she agreed to accept this amount to settle her potential legal claims against Fiorito with respect to the refinancing transaction. Fiorito relies on *United States v. Gallegos*, 975 F.2d 710 (10th Cir. 1992), in support of this argument. The defendant in that case, Gallegos, was convicted of making false statements in connection with a $1.25 million loan. *Id.* at 711. Separately, the lender had filed a civil suit against Gallegos and other defendants in which Gallegos and those others raised counterclaims. The lender eventually agreed to take about $330,000 in settlement of its claims. *Id.* at 712. The Court noted that Gallegos had also given up his counterclaims as part of the settlement and said that "[i]t would be incongruous to hold," for sentencing purposes, "that the *actual loss* to the [lender] was greater than the amount" of the settlement agreement. *Id.* at 713 (emphasis added).

The Court does not agree with *Gallegos*, which seems to ignore the fact that parties routinely settle legal claims at a steep discount to avoid the uncertainties and costs of litigation. But in any event, *Gallegos* does not help Fiorito, because the court in *Gallegos* held only that the settlement agreement in that case — an agreement that Gallegos had begun to perform by paying installments — limited the lender's *actual* loss. But there is no evidence that Fiorito ever paid Cooper one penny of what she agreed to take in settlement. *See* Def. Sent Ex. 5 (letter dated October 25, 2006 "confirm[ing] that Ms. Cooper will accept a payment of $5,200.00 in full settlement of her claims against Mr. Fiorito"); Gov't Sent. Ex. 7 (records showing that a settlement check of $5,100 from Fiorito to Cooper dated April 21, 2006 bounced).

More importantly, the evidence shows that the *intended* loss in connection with the Cooper transaction was, at the very least, $24,368.99 ($28,368.99 in total proceeds less $4,000).

*See* USSG § 2B1.1 cmt. n.3(A) (the relevant amount of loss is "the greater of actual loss or intended loss"). The very fact that Fiorito agreed to pay Cooper $5,200 only after she threatened legal action with respect to the transaction demonstrates that at the time of the transaction Fiorito had no intention of giving her the $5,200 that he later promised.

Whether Fiorito also caused Cooper an *actual* loss of $24,368.99 is a more difficult question given the evidence that Cooper obtained a loan by lying about her finances. Had Cooper been honest about her finances, the transaction would likely not have happened. This suggests that Cooper's *lender* may have been an actual victim if the lender lost money on the fraudulently obtained loan. But there is no evidence in the record with respect to the lender's losses. The Court therefore finds that Fiorito is responsible for an intended loss to Cooper of $24,368.99.

(4) Constance Dang

Constance Dang owned a house in Duluth, Minnesota. Dang fell behind on the mortgage, and the house was sold at a sheriff's sale in February 2005. TT 280. As a result, Dang had to redeem the house from the sheriff's sale by early September or move out. TT 291.

In March or April 2005, Fiorito contacted Dang and offered to help her refinance the house, get cash from the refinancing, lower her monthly payments, and improve her credit. TT 282-83. Fiorito and Dang communicated over the next several months, and Dang signed some papers that she thought were related to refinancing her house. TT 285-86. Dang believed that she would continue to own her home when the transaction was done. TT 286.

Sometime in August, Fiorito proposed buying Dang's house and renting it back to her. TT 290-91. The transaction with respect to Dang's house closed on September 6, 2005.

TT 292-93.  Although Dang says that she believed that she was refinancing her home, the transaction was in fact a sale from Dang to Fiorito.  TT 295; Gov't Trial Ex. 3.  Fiorito paid $150,000 for the house, and according to the HUD-1 from the sale, Dang should have received $36,061.38.  Gov't Trial Ex. 3.

Fiorito arrived at Dang's house with a package in early October 2005, almost a month after the closing.  TT 304.  The package included a check for the $36,061.38 in proceeds from the sale, and Fiorito instructed Dang to endorse the back in favor of Fiori & Wagner.  TT 306-07; Gov't Trial Ex. 3.  She complied, and Fiorito took the proceeds check.  TT 307-08; Gov't Trial Ex. 3.  In return, Fiorito wrote Dang a check for $2,200.  TT 309; Gov't Trial Ex. 2.  According to both the PSR and the government, with respect to Dang, Fiorito is responsible for a loss of $33,861.38 (the stolen sale proceeds of $36,061.38 less the $2,200 Fiorito paid Dang).  The Court agrees with the PSR and the government.

Fiorito contends that Dang did not actually lose the sale proceeds because he overpaid for the home in the first place.  The Court rejects this argument for reasons already explained.  Once Fiorito agreed to pay $150,000 for her house, Dang was legally entitled to the proceeds of that sale.

Fiorito also argues that the amount of loss with respect to the Dang transaction should be reduced because after the sale, Dang lived rent-free in the house for roughly two years.  According to Fiorito, the value of this free rent reduces the amount of Dang's loss.  The Court agrees with Fiorito that the amount of Dang's *actual* loss might be reduced, at least in part, by some of the free rent that she received from Fiorito.

Under the Guidelines, however, the relevant amount of loss is "the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.3(A). The Court finds, by a preponderance of the evidence, that Fiorito *intended* to steal from Dang the $33,861.38 that he pocketed by taking the proceeds check and giving her $2,200 in return. Dang lived in her house without paying rent after the sale, but this was *contrary* to Fiorito's intentions. Indeed, after she failed to pay rent in November 2005, Fiorito sent Dang an eviction notice in early December 2005. Def. Trial Ex. 14; TT 390-91. Fiorito wrote: "You are in arrears for a total of $1,740.00. . . . If you fail to bring current the above agreed upon amount I will start eviction proceedings & will not stop under any circumstances." Def. Trial Ex. 14. Fiorito plainly intended to keep every penny of the money that he stole from Dang in October 2005, and accordingly, the amount of loss with respect to the Dang transaction is $33,861.38.

### (5) Barbara Doyle

Barbara Doyle lost her job in late 2005 and had to take a lower-paying job. TT 1144. As a result, Doyle began having difficulty paying the mortgage on her house in Shoreview, Minnesota. TT at 1144-45. When her lender, Fremont Investment and Loan ("Fremont"), threatened to foreclose on the house in 2006, it agreed to postpone foreclosure proceedings if Doyle paid an additional $400 per month and missed no payments for six months. TT 1145-46. Doyle was late making the sixth payment, and in late 2006, Fremont began foreclosure proceedings. TT 1146.

In late 2006, while foreclosure proceedings were ongoing, Fiorito contacted Doyle and proposed that she sell her house to a relative, stay in the house, and make payments to the relative. TT 1147-49. Doyle's son, Marlon McGee, agreed to buy the house and to finance the

transaction through Fremont.  TT 1149.  Fiorito told Doyle to avoid talking to Fremont and to make sure not to tell Fremont that McGee was her son.  TT 1149-50.

As of late 2006, when Fiorito was arranging the sale from Doyle to her son, Doyle owed roughly $257,000 to Fremont, and the house was appraised at roughly $300,000.  TT 1150.  Fiorito told Doyle that she would receive nothing from the sale.  TT 1151-52.  He did, however, promise to pay her some money under the table.  TT 1161, 1185.

The sale closed on January 23, 2007.  Gov't Trial Ex. 24.  According to the HUD-1 settlement statement, McGee agreed to pay $230,000, and Doyle owed roughly $148,000 to Fremont on her mortgage.  *Id.*  The net amount due to Doyle from the sale after paying off her mortgage and various transaction costs was $57,297.97, as reflected on the HUD-1.  *Id.*  This reflected a commission of $9,200 to I&I Realty that came out of Doyle's share of the sale price and reduced the net proceeds due to Doyle.  *Id.*  This was a fraudulent entry.  I&I Realty — which was owned by a friend of Fiorito's — did not perform any services and did not receive the $9,200 commission.  TT 1155, 1564.  Instead, that money went to Fiorito.  TT 1565.

Between the time Fremont began foreclosure proceedings on Doyle's home in late 2006 and the time McGee bought the house, the amount Doyle owed Fremont on her mortgage went down by roughly $100,000, from $257,000 to $148,000.  The evidence shows that Fiorito negotiated a short sale.  TT 1150, 1175, 1189, 1698-99.  There is no evidence that Doyle and Fiorito ever discussed what fees, if any, Fiorito would receive for negotiating the short sale.  TT 1217-18.

After the closing, Fiorito gave Doyle two checks, one for $2,000 and another for $4,000. Doyle understood these checks to be the under-the-table payments that Fiorito had promised her when he was arranging the sale to McGee.  TT 1161-62, 1185.

A few days after the sale closed, Doyle learned from the title company that it was holding a proceeds check for her.  TT 1156-57.  The check was for the $57,297.97 that was owing to her according to the HUD-1.  She picked the check up from the title company that afternoon, and when she got in her car to leave the title company, Fiorito leapt in beside her.  TT 1158-59.  He badgered her to sign the check over to him so that he could send the money to Fremont. TT 1159.  She complied.  TT 1159-60; Gov't Trial Ex. 24.

According to the government, with respect to Doyle, Fiorito is responsible for a loss of $60,497.97, which equals the amount of the proceeds check Doyle signed over to Fiorito ($57,297.97) plus the amount of the sale price paid to I&I Realty ($9,200) less the $6,000 Fiorito paid Doyle after the closing.  The Court agrees with the government.

Fiorito has no argument as to the fee to I&I Realty, and the Court finds that this fee was a pure loss to Doyle.  With respect to the balance of the loss amount, Fiorito contends that Doyle had no loss connected with the transaction because she had no equity in her home until Fiorito persuaded Fremont to do a short sale.  Fiorito also argues that the amount of Doyle's loss should be offset by the value of the services Fiorito provided in negotiating the short sale.  For reasons already given, the Court rejects Fiorito's argument that he should be credited with the value of

his services in negotiating the short sale. There is no evidence of the fair-market value of those services.[7]

The Court also rejects Fiorito's argument that Doyle suffered no loss because she did not have equity in her home. By the time she sold her house to her son, she *did* have equity in her home, because Fremont had agreed to reduce the amount it would accept in satisfaction of Doyle's mortgage. That equity belonged to Doyle, not Fiorito.

Based on the evidence at trial, the Court finds that Fremont was misled into reducing Doyle's loan payoff and would not have done so if it had known that she was selling her house to her son. TT 1149-50. Fiorito therefore caused an actual loss to *Fremont* when he misled Fremont into reducing Doyle's loan balance by roughly $100,000.

As was true with respect to the Clarks, however, the government has asked the Court to calculate the loss amount connected with the Doyle transaction as though the borrower, rather than the lender, was the victim. Taking the government's approach can only help Fiorito. Accordingly, the Court finds that Fiorito is responsible for a loss of $60,497.97 in connection with the sale, which equals the intended loss that he caused Doyle.

_____

[7]Fiorito introduced into evidence an document prepared by him and signed by Doyle, dated a day before the closing, that says that Doyle "believe[s] that Fiori & Wagner LLC should receive the lion's share of the profits from this transaction." Def. Trial Ex. 56. Doyle testified that she did not recall signing the document and did not discuss the meaning of the phrase "the lion's share" with Fiorito. TT 1181-82, 1222. In light of all of the evidence at trial, the Court finds that this document does not establish the amount of the fee that Fiorito could have appropriately charged for negotiating with Fremont in connection with Doyle's sale of her house. Instead, this document is one of a number of self-serving documents that Fiorito somehow got his victims to sign — or on which Fiorito forged a victim's signature. The Court expressly finds that Doyle did not agree in arms-length negotiations to pay Fiorito over $57,000 for negotiating the short sale with Fremont.

After her divorce in May 2005, Lori Erickson fell behind on the mortgage on her home in Prior Lake, Minnesota. TT 1053-54. In August 2005, Fiorito contacted Erickson. TT 1055. He offered to help her refinance her home and improve her credit. TT 1056. Fiorito did not suggest that she sell her home. TT 1058. Indeed, after an appraiser told Erickson that her house was going to be sold, she sought, and received, assurances from Fiorito that he was arranging a refinancing transaction and not a sale. TT 1061.

In reality, though, Fiorito arranged a transaction in which he bought Erickson's home. Gov't Trial Ex. 22. The transaction closed on December 27, 2005. Although Erickson and her ex-husband both signed a quitclaim deed in connection with the transaction, Erickson believed that her ex-husband was deeding the property to her in connection with the refinancing. TT 1062. Erickson did not understand at the closing that she was selling her house to Fiorito. TT 1063.

Fiorito paid $245,000 for the house. Gov't Trial Ex. 22. According to the HUD-1, Erickson was not entitled to any proceeds. *Id.* In fact, however, the title company issued Erickson a check for $42,890.57 on December 30, 2005, three days after the closing. *Id.* This amount is very close to an unexplained line item on the HUD-1 labeled "Escrow Mtg Payoff" in the amount of $43,587.75. *Id.*

---

[8]Documents introduced at trial have the name "Lori Erickson Campbell." Campbell was the last name of Erickson's ex-husband. TT 1092. At trial, Erickson testified that she now goes by the name "Lori Erickson." TT 1051-52. The Court refers to her as "Erickson" because this is the name used by the government in its sentencing exhibits.

Fiorito and Jerde met with Erickson at her house on December 30 and had her sign various documents. Specifically, they had her endorse the $42,890.57 proceeds check over to Fiori & Wagner. They also had her sign a document titled a "contract for deed." Def. Trial Ex. 52; TT 1120-24. Erickson did not know what she was signing. TT 1064-65, 1124-25. At the same meeting, Fiorito gave Erickson a check for $6,000, which was $2,000 less than what he had told her she would get from the transaction. TT 1065-66.

After the sale in December 2005, Fiorito charged Erickson $1,450 per month to live in his (formerly her) house. *See* Def. Trial Ex. 52 at 2. Fiorito labeled the charges to Erickson "mortgage payments," mostly likely to hide the fact that he had purchased her home. Gov't Trial Ex. 26; TT 1069. A few months after the sale, in April 2006, Fiorito wrote Erickson a check for $500 to partly reimburse her for $3,885 that she spent to replace the house's furnace. TT 1067. Erickson testified credibly that she would not have paid her own funds to replace the furnace if she had known that Fiorito owned the house. TT 1067.

According to the government, the loss with respect to the Erickson transaction is $40,275.57. Gov't Sent. Ex. 9. This equals the amount of the proceeds check Erickson signed over to Fiorito ($42,890.57) plus the amount paid by Erickson to replace the furnace in a house owned by Fiorito ($3,885), less the $6,500 that Fiorito paid her ($6,000 in December 2005 and $500 in April 2006). This differs from the amount shown in the PSR because the probation office did not treat the amount Erickson paid for the furnace as a loss to her. PSR ¶ 18. The Court agrees with the government's calculation of the loss.

Fiorito contends that Erickson did not actually lose *anything* on the sale of her house because he overpaid for it. The Court rejects that argument for reasons already given. Fiorito

also argued at the sentencing hearing that he should be given some kind of credit for a purported $8,000 option that he gave to Erickson.  Fiorito appears to be referring to a portion of a purported sales contract signed by Erickson that seems to give Erickson the option to buy back her house (at what Fiorito insists is an inflated price) and assigns a value of $8,000 to the option.  TT at 1118.  The Court declines to credit Fiorito this $8,000 for at least two reasons:  First, based on the preponderance of the evidence, the Court deems the so-called option worthless.  Fiorito cannot explain why giving Erickson the right to overpay for a house is worth $8,000 to her.  Second, Erickson testified credibly that she did not understand the document reflecting the option.[9]

Fiorito further contends that he should receive credit for allowing Erickson to miss certain rental payments to him and for making mortgage payments to *his* lender even during months that he collected no rent from Erickson.  The evidence that Erickson missed payments to Fiorito is very thin.  TT 1093-95.  But even if Erickson did miss payments to Fiorito, the Court will not credit those missed payments against the loss.

---

[9]Indeed, the Court itself does not really understand the so-called option.  The language that Fiorito appears to rely on reads:

> For the sale of [Erickson's] property I [i.e., Fiorito] will in return give [Erickson] $8000 dollars of which I will not require to be paid back, a 2 year lease with option to buy, the value of the option to purchase the property is $8000 of which I will not require to be paid at the time of sale.

Def. Trial Ex. 51 (in all capital letters in original).  This seems to embody a promise by Fiorito to pay $8,000 to Erickson, which would be consistent with her testimony about the transaction.  It is unclear how this promise is supposed to relate to the so-called option, which is also said to be valued at $8,000.

As of April 2006, Fiorito had caused all of the losses identified by the government. Fiorito had stolen the proceeds from the sale, Erickson had purchased a furnace for what was then Fiorito's house, and Fiorito had paid her only $6,500. The Court finds by a preponderance of the evidence that Fiorito *intended* to cause Erickson a net loss of $40,275.57, and the fact that he might later have allowed Erickson to miss one or more payments to him does not diminish the amount of the intended loss. Accordingly, even if Erickson's *actual* loss was less than $40,275.57, Fiorito is responsible under the Guidelines for this entire amount. *See* USSG § 2B1.1 cmt. n.3(A).

### (7) Lavonne Fitzgerald

Lavonne Fitzgerald bought her house in Vadnais Heights in 1958. TT 982. As of the middle of 2006, two loans were secured by the house, a first mortgage and a home-equity line of credit. TT 983. Around that time, Fitzgerald became interested in refinancing the home-equity line of credit. TT 983-84.

Fiorito contacted Fitzgerald in November 2006 and offered to help her refinance her home-equity line of credit. TT 984-86. He ultimately persuaded her to refinance both her first mortgage and the line of credit. TT 986. Fitzgerald expected to receive about $24,000 from the entire transaction. TT 987.

The transaction closed on January 8, 2007. Gov't Trial Ex. 19. According to the HUD-1 settlement statement, Fitzgerald should have received $24,895.74 in proceeds. *Id.* The title company issued a proceeds check to Fitzgerald in this amount on January 12, 2007, but Fiorito deposited the check into his account at Guaranty Bank after he had Fitzgerald sign a document purporting to allow "an authorized employee of Fiori and Wagner LLC" to endorse the check

and deposit it "into the corporate account of Fiori and Wagner LLC . . . ."  Gov't Trial Ex. 20a; Gov't Trial Ex. 19; TT 993-94; Talbot Aff. ¶ 5.  The jury necessarily found, and the Court agrees, that Fiorito was not entitled to this check.

Several weeks later, in early February, the title company issued a second proceeds check to Fitzgerald to replace the check that Fiorito had stolen.  Gov't Trial Ex. 19; TT 992; Talbot Aff. ¶ 5.  Fiorito relies on this replacement check to dispute the assertion in the PSR that he caused Fitzgerald any actual loss.  The Court agrees with Fiorito that the evidence presented at trial and in connection with his sentencing establishes that Fitzgerald did not, in fact, suffer any *actual* loss.

But for two reasons, Fiorito is still responsible for a loss connected with the Fitzgerald transaction.  First, and most importantly, the Court finds by a preponderance of the evidence that Fiorito *intended* to cause Fitzgerald a loss equal to the amount of the proceeds check that he stole.  It was mere happenstance that Fiorito's fraud was discovered by the bank that issued the proceeds check (Wells Fargo Bank) and by the title company on whose account the check was drawn.  As a result of that happenstance, Fitzgerald was made whole.  The fact that Fiorito did not ultimately succeed in causing a loss to Fitzgerald does not relieve him of responsibility for having tried to cause her a loss.

Second, although Fitzgerald was eventually made whole, Fiorito caused an actual loss to Guaranty Bank, which wrongly allowed Fiorito to deposit the stolen proceeds check.  When Wells Fargo, the check's issuer, informed Guaranty Bank that Fiorito was not entitled to the proceeds check, Guaranty Bank repaid $24,895.74 — the entire amount of the stolen check — to Wells Fargo.  Talbot Aff. ¶ 5.  Guaranty Bank was subsequently able to partially offset this loss

by recapturing $1,853.18 from Fiorito's account at the bank and by stopping payment on a $16,187 cashier's check to Glenn Clark bought by Fiorito, for a total offset of $18,040.18.[10] Thus, the Court finds by a preponderance of the evidence that Guaranty Bank suffered an actual loss in connection with the Fitzgerald transaction of $6,855.56.

Because the intended loss found by the Court exceeds the actual loss, Fiorito is responsible for the intended loss for sentencing purposes. USSG § 2B1.1 cmt. n.3(A) (the relevant amount of loss is "the greater of actual loss or intended loss"). Fiorito is therefore responsible for a loss of $24,895.74 in connection with the Fitzgerald transaction.

### (8) Kevin and Sharon Goettl

Kevin and Sharon Goettl bought their house in Janesville, Minnesota in 2000. TT 432. By 2004, they had encountered financial difficulties and had filed for bankruptcy protection. TT 433.

In late 2004, Fiorito contacted Kevin Goettl and offered to help him refinance his house to raise some cash. TT 435. At the time, the Goettls owed roughly $164,000 on two separate loans that were secured by the house. TT 452.

Fiorito arranged a refinancing transaction for the Goettls that closed on June 13, 2005. TT 439; Gov't Trial Ex. 4. The HUD-1 settlement statement shows that the Goettls owed only about $131,000 on the two loans secured by the house, or more than $30,000 less than they owed before they met Fiorito. Gov't Trial Ex. 4. The evidence at trial established that Fiorito

---

[10]Fiorito argued at the sentencing hearing that Guaranty Bank suffered no loss because it recovered money from an account of Fiorito's held at Wells Fargo Bank. The evidence does not support this argument.

-43-

persuaded the holder of the Goettls' second mortgage, Homecomings Financial, to agree to a short sale. TT 442-43.

Evidence at trial also established that Fiorito, to generate cash from the transaction for himself and the Goettls, caused $17,800 of the transaction's proceeds to be issued to an entity called Aiken Administrative. Gov't Trial Ex. 4; TT 445-46, 468-69. Fiorito told Kevin Goettl before the sale about the planned sham payment to Aiken Administrative. TT 468. Aiken Administrative did not perform any services in connection with the transaction and did not receive a proceeds check. TT 479-80. Instead, the check to Aiken Administrative for $17,800 in sale proceeds was deposited into the bank account of Fiori & Wagner after someone forged an endorsement on the back of the check. TT 479-80. Sometime later, Kevin Goettl received a check for $14,900 from Fiori & Wagner. Goettl understood this check to represent additional proceeds from the transaction (the Goettls received a little over $2,000 at the closing, as reflected on the HUD-1). TT 445-47. Fiorito did not explain to Goettl that he was keeping $2,900 as his fee (the difference between the $17,800 check to Aiken Administrative and the $14,900 check to Goettl). TT 447.

According to both the government and the PSR, the Goettls' loss on this transaction was $2,900 — the amount of the fraudulent fee to Aiken Administrative that Fiorito retained. Fiorito denies that this was a loss to the Goettls; he contends that the Goettls were never entitled to the money in the first place and therefore he did not cause them to lose it. And the evidence at trial did indeed establish that Fiorito and Kevin Goettl agreed that Fiorito would fraudulently cause proceeds to be issued to Aiken Administrative as a way of illicitly generating cash from the transaction.

But the issue of Kevin Goettl's complicity is irrelevant to calculating amount of loss because the Court finds, by a preponderance of the evidence, that Fiorito both intended to cause, and *did* cause, a loss of $17,800 to Homecomings Financial, the holder of the Goettls' second mortgage. Although Kevin Goettl's memory of the transaction was imperfect, he testified to having talked to Fiorito about the need to disguise the sale proceeds because otherwise, any proceeds would go to Homecomings Financial (which had agreed to accept less than it was owed in connection with the transaction). TT 468-69. Homecomings Financial thus suffered an actual loss caused by Fiorito, with Goettl's help, of $17,800.

### (9) Cynthia Jerris[11]

Cynthia Jerris bought a house in Duluth, Minnesota in 1997. TT 1237. In early 2005, she was suffering from bipolar disorder, and she lost her full-time job in March 2005. TT 1238-39. Although she later found part-time work, she fell behind on her mortgage payments. TT 1239.

Sometime in the summer of 2005, Fiorito called Jerris and said, falsely, that he was with her mortgage lender, Wells Fargo Bank. TT 1240-41. Fiorito offered to help her preserve her house, which was then in foreclosure, by helping her move into an apartment. TT 1240-41.

Jerris initially rebuffed Fiorito, and her house was sold at a sheriff's sale in October 2005. TT 1241-42. Thus, as of the fall of 2005, Jerris was facing eviction in April 2006 if she could not redeem the property from the sheriff's sale. TT 1242.

---

[11]By the time of trial, Cynthia Jerris had changed her last name to Gentry. The Court refers to her as "Jerris" because this is the name used both in the documentary evidence that was introduced at trial and in the government's sentencing exhibits.

After the sheriff's sale, Jerris accepted Fiorito's offer to help her move into an apartment. TT 1242. In January 2006, Fiorito paid Jerris $500 for moving expenses, and he also paid $990 on Jerris's behalf to her new landlord. Gov't Trial Ex. 2; TT 1243-44. Jerris moved into the apartment in February 2006. TT 1243.

Fiorito next arranged a transaction in which Jerris sold her house to Fiorito's wife, Marion Glatzmaier. The transaction closed on April 3, 2006. Glatzmaier agreed to pay $85,000 for the house, but ten percent of the sale price was actually financed by Jerris through what the HUD-1 settlement statement labeled a "second mortgage" — a purported loan of $8,500 from Jerris to Glatzmaier. *Id.*

Jerris testified credibly that she did not understand that she was selling her home to Marion Glatzmaier, that she did not know that Glatzmaier was Fiorito's wife, and that she did not know that she had agreed to, in effect, loan Glatzmaier $8,500 by way of the so-called second mortgage. TT 1245-48. Further, Jerris testified credibly that in the first half of 2006, she was significantly impaired by her bipolar disorder and that in June 2006, she underwent electroshock therapy, which impairs memory. TT 1246.

According to the HUD-1 settlement for the transaction, Jerris should have received $14,455.93 in proceeds. Gov't Trial Ex. 23. The title company issued a check to Jerris in this amount, but her signature was forged on the back of the check and the check was endorsed over to Fiorito. TT 1248. A few days after the sale closed, Fiorito wrote Jerris a check for $1,000. Gov't Trial Ex. 2.

In July 2006, Fiorito contacted Jerris and asked her to sign certain papers. TT 1250. She felt harassed by him, and she contacted the Duluth police department. TT 1251.

Also in July 2006, Fiorito arranged for Glatzmaier to sell Jerris's former house to a third party, Tyler Jacobson. TT 1291. The transaction was scheduled to close on July 27, 2006, and Jacobson agreed to pay $105,000 for the house — $20,000 more than Glatzmaier ostensibly paid (and $28,500 more than Glatzmaier actually paid, taking into account the fraudulent second mortgage of $8,500). Gov't Trial Ex. 27. As it turned out, the transaction did not close that day because Fiorito could not establish to the title company's satisfaction that the fraudulent $8,500 second mortgage had been satisfied. TT Ex. 1299, 1310-13. Fiorito found a more pliant title company, and, roughly a week later, the sale from Glatzmaier to Jacobson closed at that title company. TT 1322-23.

According to the government, the gross loss to Jerris — without taking into account any credits for amounts paid by Fiorito to or on behalf of Jerris — equals $42,955.93, calculated as (1) the proceeds of the sale from Jerris to Glatzmaier ($14,455.93), which Fiorito stole, plus (2) the fraudulent loan from Jerris to Glatzmaier ($8,500), which reduced Jerris's bottom line from the sale, plus (3) the difference between the price Jacobson paid in July 2006 for Jerris's house and the price Glatzmaier paid in April 2006 ($20,000), which reflects Fiorito's payment (through Glatzmaier) of below-market value for the house.

The Court agrees with the government that a preponderance of the evidence establishes that Fiorito caused Jerris a gross loss of $42,955.93. For reasons already given, the Court rejects Fiorito's argument that because he overpaid for the house, he did not cause Jerris a loss. Further, the fact that Fiorito sold Jerris's house for $105,000 in July 2006 suggests that, if anything, he may have *underpaid* for the house. The Court rejects Fiorito's contention that the price of the

house at a sheriff's sale in October 2005 reflects the house's market value better than the price paid in July 2006 by a private buyer.[12]

In the abstract, the Court agrees with Fiorito that, if Glatzmaier bought Jerris's house in April 2006 for $85,000, and Fiorito then spent $20,000 to upgrade the house, and Glatzmaier then sold the house to Jacobson in July 2006 for $105,000, the difference between what Jacobson paid in July 2006 and what Glatzmaier paid in April 2006 would not represent a loss to Jerris *if* all of the increased sales price was attributable to the upgrades paid for by Fiorito. But Fiorito has not introduced any evidence of how much (if anything) he spent to improve the house, what he spent that money on, or how much of the increased sales price was attributed to those improvements. As the record stands, the Court can only conclude that Glatzmaier paid $20,000 less than the house was worth, and therefore that this $20,000 is part of the loss that Jerris suffered as a result of being defrauded by Fiorito.

Fiorito also argues that he should receive a credit for amounts he paid to or on behalf of Jerris. The documentary evidence shows that Fiorito paid $990 to Jerris's landlord, $500 to

---

[12]When a court determines the losses of a *lender* who foreclosed on a house, the court subtracts the house's market value from the outstanding loan balance, and for such calculations, a sheriff's sale might be pertinent evidence of the house's market value. *See, e.g.*, *United States v. Parish*, 565 F.3d 528, 535 (8th Cir. 2009) ("In order to determine the amount of loss suffered by the *lending institutions*, the Guidelines direct courts to reduce the amount of loss by 'the fair market value of the collateral *at the time of sentencing*.'") (first emphasis added; quoting USSG § 2B1.1 cmt. n.3(E)(ii))*; United States v. Siciliano*, 601 F. Supp. 2d 623, 631-32 (E.D. Pa. 2009) (discussing Third Circuit case law about how to calculate a lender's loss on a foreclosed property).

In this case, however, a particular house's market value is irrelevant to the question of what loss Fiorito caused when he bought that house and stole the sale proceeds. And to the extent that a house's market value is relevant to the amount of loss Fiorito caused by underpaying for that house, the market value is established by Fiorito's subsequent sale of the house to a third party (such as the sale of Jerris's house from Glatzmaier to Jacobson that Fiorito arranged ).

Jerris for moving expenses, and $1,000 to Jerris a few days after Glatzmaier bought the house. Gov't Trial Ex. 2. The documentary evidence also shows that a moving company charged Jerris $715.63 to move her into her apartment in February 2006. Def. Trial Ex. 59. At trial, the government, in asking Jerris how much money it was "conceivable" that Fiorito paid Jerris, treated this $715 expense as one that Fiorito might have paid and elicited Jerris's testimony that he might have given her $3,300, but no more. TT 1281. The government then elicited hearsay from Jerris to the effect that her landlord told her that he had refunded Fiorito the $990 that Fiorito had paid the landlord in January, and Jerris then agreed that Fiorito's net payments to her were roughly $2,500. TT 1281-82. Yet in connection with sentencing, the government credits Fiorito with the $990 payment to Jerris's landlord but does not credit him with the $715 in moving expenses.

For sentencing purposes, the Court gives Fiorito the benefit of the doubt with respect to the question of what he paid to or on behalf of Jerris. Jerris testified that Fiorito might have given her as much as $3,300, and the Court accepts this testimony and credits him with this amount. Accordingly, the Court finds by the preponderance of the evidence that Fiorito is responsible for causing Jerris an actual loss of $39,655.93 (equal to $42,955.93 less $3,300).

(10) Darrell and Lorri Lastimosa

Darrell and Lorri Lastimosa bought their home in Mankato, Minnesota in 1990. TT 691. They refinanced at least once, around ten years later. TT 691. Some time in 2003 or 2004, they began having financial difficulties, and in 2005 Darrell Lastimosa filed for bankruptcy protection. TT 691. The Lastimosas were behind on their mortgage payments and were

eventually subject to foreclosure. TT 693, 740. The Lastimosas' bankruptcy lawyer referred them to Fiorito for help in keeping their home. TT 693-94.

Fiorito agreed to help the Lastimosas refinance their house. TT 695. Darrell Lastimosa did not think that Fiorito would be buying their house. TT 695. But in September 2005, the Lastimosas signed various documents, including a purchase agreement, purporting to show that the Lastimosas were selling their house to Fiorito. *See, e.g.*, Def. Trial Ex. 26.

The sale from the Lastimosas to Fiorito closed on October 14, 2005 at an Embers Restaurant in Mankato. TT 696-97; Gov't Trial Ex. 13. According to the HUD-1 settlement statement for the transaction, Fiorito agreed to pay $113,000 for their house, and the Lastimosas should have received $53,690.61 in proceeds. Gov't Trial Ex. 13. This amount reflects a deduction from the sale price of $5,652.50 for what is labeled a "seller carry back" on the HUD-1. *Id.* The Court finds by a preponderance of the evidence that this "seller carry back" was fraudulent. It purported to reflect a loan from the Lastimosas to Fiorito, but Fiorito never repaid this loan, and the Lastimosas did not understand that they were making a loan. TT 699, 704.

The HUD-1 settlement statement also shows that the holder of the Lastimosas' mortgage, CitiFinancial, accepted a little more than $40,000 in satisfaction of that mortgage. Gov't Trial Ex. 13. Darrell Lastimosa testified that before the sale to Fiorito in October 2005, the Lastimosas owed closer to $55,000 to CitiFinancial on their mortgage. TT 734. It appears that Fiorito persuaded CitiFinancial to agree to a short sale. TT 775-76. But Fiorito and the Lastimosas never discussed what fee, if any, Fiorito should receive for negotiating with CitiFinancial. TT 700-01, 776.

After the closing, Fiorito deposited the proceeds check for $53,690.61 in a bank account he controlled. Gov't Trial Ex. 13. Fiorito subsequently paid the Lastimosas $9,000 and told them that this was their share of the proceeds of the transaction. TT 704-05. For the next several months, while the Lastimosas lived in what was then Fiorito's house, they paid him $850 per month in what Fiorito led them to believe were mortgage payments. TT 702-03, 707. Darrell Lastimosa testified that he might once, with Fiorito's approval, have paid $600 rather than $850. TT 703. Lastimosa stopped making payments some time in 2007, after a postal inspector contacted him about Fiorito's fraudulent practices. TT 707, 710.

The government contends that Fiorito caused the Lastimosas a gross loss of $59,343.11, which equals the amount of the proceeds check from the October 2006 transaction ($53,690.61) plus the fraudulent "seller carryback" ($5,652.50) which reduced the amount of the sale proceeds. After crediting Fiorito for the $9,000 he paid to the Lastimosas after the sale closed, the government contends that the net loss to them is $50,343.11. Fiorito contends that he caused the Lastimosas no loss because he overpaid for their house in the first instance and because he persuaded CitiFinancial to accept less than the Lastimosas owed on their mortgage. The Court rejects Fiorito's contentions for reasons already given.

Fiorito also argues that he should receive a credit for payments that the Lastimosas withheld when they were living in what was then his house. But payments withheld by the Lastimosas do not diminish the loss amount for three reasons: First, the evidence establishes that Fiorito *intended* to cause the Lastimosas a net loss of $50,343.11; their subsequent withholding of payment does not change this fact. Second, the Lastimosas only began withholding payments after they had been alerted to Fiorito's fraud by law enforcement. *See* USSG § 2B1.1 cmt.

n.3(E)(i).  Third, the evidence shows that the Lastimosas stopped paying their mortgage sometime in 2007, but the evidence does not show how many payments they withheld, and Fiorito thus cannot show the amount of the credit that he claims to deserve.  *See United States v. Hammer*, 3 F.3d 266, 272 (8th Cir. 1993) ("The burden of proof [at sentencing] is on the government with respect to the base offense level and any enhancing factors.  The burden of proof is on the defendant with respect to mitigating factors.").  In short, the Court finds, by a preponderance of the evidence, that Fiorito is responsible for causing an actual and intended loss of $50,343.11 to the Lastimosas.

### (11)  Kimberly and Randy Smith

Kimberly and Randy Smith bought their home in Austin, Minnesota in 2000 for a little over $100,000.  TT 895.  They refinanced once, and by 2006, the house was encumbered by both a first mortgage of about $102,000 and a second mortgage of about $58,000.  TT 895.

The Smiths encountered financial problems, and in 2005 they filed for bankruptcy protection.  TT 896.  They asked their bankruptcy attorney for help saving their home, and he referred them to Fiorito.  TT 897.  The Smiths contacted Fiorito in 2005.  TT 897.  Soon afterward, Fiorito gave the Smiths $1,100 to help them pay for their bankruptcy and remain current on their mortgage payments.  TT 907-09.  Fiorito proposed buying the Smiths' house from them and then entering into a contract for deed that would allow them to stay in the house and buy it back a few years later.  TT 898.  He also said that he would try to negotiate with Irwin Mortgage, which held the Smiths' second mortgage, to accept less than the $58,000 balance in satisfaction of the Smiths' debt.  TT 899.

In December 2005, the Smiths signed a purchase agreement agreeing to sell their house to Fiorito. TT 920. In February 2006, Fiorito met with the Smiths at their house, and they signed various papers. TT 910. Among the papers was a document titled "limited power of attorney" that purported to authorize Fiorito to sign "any financial instruments related to the sale" of the Smiths' house and to deposit "said instruments" into the bank account of Fiori & Wagner. Gov't Trial Ex. 15. Fiorito did not explain the papers to the Smiths, and Randy Smith did not know what they meant. TT 910-11, 934-35.

Fiorito bought the Smiths' house from them in a transaction that closed on August 18, 2006. Gov't Trial Ex. 18. According to the HUD-1 settlement statement, Irwin Mortgage accepted $6,500 in satisfaction of what had been a $58,000 debt. *Id.* Fiorito agreed to pay $146,000 for the house, and according to the HUD-1, the Smiths were entitled to net proceeds of $28,139.82 from the transaction. *Id.*

But the Smiths did not initially receive the sale proceeds; Fiorito did. Someone forged the Smiths' signatures on the proceeds check, and the check was deposited into the account of Fiori & Wagner. *Id.*; TT 905-06. Fiorito then provided the Smiths a check for $5,000, which he said was extra money owed to the Smiths from the transaction. TT 906. Also, shortly after the sale closed, Fiorito and the Smiths went to a bank to sign and notarize documents related to the contract for deed between Fiorito and the Smiths. TT 927-30; Def. Trial Exs. 37-38.

Under the contract for deed, the Smiths agreed to pay Fiorito $1,160 per month, and they made those payments from roughly August 2006 through May 2007. TT 911-12. In the meantime, in late 2006 or early 2007, the Smiths learned that Fiorito's lender was complaining that Fiorito was behind on his payments. TT 912-13. Because Fiorito failed to make his

mortgage payments, the Smiths were eventually evicted from their former home in June or July 2008. TT 915.

The government initially argued in connection with sentencing that Fiorito caused the Smiths an actual net loss of $22,039.82, which equals the amount of the proceeds check from the August 2006 sale ($28,139.82) less $6,100 (the sum of the $1,100 Fiorito paid Randy Smith in 2005 and the $5,000 he paid Smith after the sale closed). But it became clear after the sentencing hearing that the Smiths did not, in fact, suffer this loss. After the Smiths learned that Fiorito had cashed the proceeds check from the August 2006 transaction, the Smiths hired a lawyer and asserted to Guaranty Bank — which had accepted the proceeds check and deposited it despite the forged endorsements — that it was liable to the Smiths for the amount of the proceeds check. Talbot Aff. ¶ 3. Guaranty Bank ultimately agreed with the Smiths and, in April 2008, paid them $28,139.82 (the amount of the wrongly deposited proceeds check). *Id.* ¶¶ 3-4.

Fiorito is, quite understandably, upset that this evidence did not come out at trial. Def. Letter to Court Jan. 27, 2010 [Docket No. 401]. He accuses the government of having committed fraud by not eliciting testimony from Smith about Smith's eventual receipt of the proceeds from the August 2006 sale. Fiorito also accuses the government of having knowingly put on perjurious testimony by Smith.

After careful review of the trial transcript, the Court finds that Smith did not, in fact, perjure himself for the simple reason that neither the government nor Fiorito ever *asked* Smith if he eventually recovered the sale proceeds. The government showed Smith the actual proceeds check from the August 2006 transaction and asked Smith, "Did you ever get this check?" TT 905. Smith responded, "No." TT 905. The government's question related to a specific

document that it showed Smith (the August 2006 proceeds check), not to the money that the check represented. Although the government should have been more diligent in investigating the facts surrounding the Smiths' sale, the Court finds that the government is guilty not of any ethical lapse, but only of carelessness. Further, the Court finds that Fiorito was not prejudiced by the absence of evidence at trial that Guaranty Bank eventually reimbursed the Smiths for the money Fiorito stole. This reimbursement by Guaranty Bank could not have helped Fiorito; at best, it is irrelevant to his guilt or innocence, and at worst it tends to incriminate him because it supports the government's argument that Fiorito had no right to take the proceeds check in the first place.

Further, Guaranty Bank's reimbursement of the Smiths does not affect the Court's calculation of the loss for sentencing purposes, because the preponderance of the evidence shows that Fiorito *intended* to cause the Smiths a loss of $22,039.82.[13] Fiorito did not intend for Guaranty Bank to reimburse the Smiths for the stolen proceeds check; he intended to keep that check for himself. Further, for reasons already given, the Court rejects Fiorito's argument that the loss amount should be reduced because Fiorito ostensibly overpaid for the house or because Fiorito persuaded Irwin Mortgage to agree to a short sale. And the Court will not reduce the loss amount to take into account monthly payments that the Smiths failed to make to Fiorito; any such withheld payments have no effect on the amount of intended loss.

---

[13]The evidence also shows that Fiorito caused an actual loss to Guaranty Bank of $28,139.82 — the amount that it paid the Smiths. But given the government's tardiness in proving this amount, and given Guaranty Bank's agreement to reduce the amount of restitution it seeks by the $6,100 that Fiorito paid the Smiths, the Court holds Fiorito responsible for the lower loss amount for sentencing purposes. *See* Talbot Aff. at 2 n.1.

(12)  Harold Dean Steinke

Harold Dean Steinke owned a house in Spring Lake Park, Minnesota.  When he met Fiorito, Steinke had received a letter from a lender threatening foreclosure.  TT 1577.  Steinke had earlier taken out two separate loans, totaling $180,000 or $190,000 (the record is unclear), in connection with the property.  TT 1819-20.

Fiorito discovered, however, that Steinke's lenders had made some mistake in recording the mortgages that secured the loans.  The state's title records reflected only a single mortgage on the property for roughly $30,000.  TT 1577.  Fiorito decided to buy the house, which was worth roughly $200,000, without telling Steinke about the failure of the lenders to properly record their mortgages.  TT 1578.

Fiorito bought Steinke's house for $112,000 in a transaction that closed on January 6, 2006.  Gov't Trial Ex. 21.  This was almost $100,000 below market value.  Indeed, in the course of arranging the transaction, Fiorito needed to assure his own lender that Steinke was deliberately selling his house to Fiorito for a below-market price.  TT 1580.

Jerde wrote, by hand, a note for Steinke to sign that asserted that Steinke knew that he was "leaving $93,000 in equity" on the table, but was doing so because he had built the house for his wife, his wife had died, and he was anxious to get out.  Gov't Trial Ex. 15.  Steinke, a severe alcoholic, signed the note without knowing what he was doing.  TT 1579-80.  Steinke's signature from the note was then cut and pasted onto a separate typewritten note purporting to be from Steinke that said: "I am selling my house . . . for $93,000 less than actual worth because I want out."  Gov't Trial Ex. 15; TT 1581-82.

According to the HUD-1 settlement statement, even though Fiorito was paying roughly half of market price, Steinke should nevertheless have received $103,360.81 in proceeds. Gov't Trial Ex. 21. The title company issued a proceeds check for this amount. But Jerde forged Steinke's signature on the back, and the check was deposited into an account that Fiorito controlled. TT 1583.

Fiorito bought a trailer home for Steinke and helped Steinke move into it. TT 1579. Fiorito paid a total of $39,755 to C-M Homes to purchase the trailer home. He paid an additional $10,300 directly to Steinke, and paid $695 to a company called "Sandpiper Bend" for Steinke's benefit. *See* Def. Sent. Mem. Ex. 5 (Loss Analyses II), Tab 11 [Docket No. 368].[14] All told, Fiorito paid a total of $50,750 to Steinke or on his behalf.

In late April 2006, just under four months after he bought Steinke's house for $112,000, Fiorito sold it for $199,000. Gov't Trial Ex. 15; TT 1579. The government contends that Fiorito caused Steinke a loss of $95,639.19 in connection with this second sale, calculated as the gross purchase price of the second sale ($199,000) less the net proceeds from the first sale ($103,360.81).[15] The government adds another $1,000 to the proposed loss amount for "earnest money" related to the second sale. Gov't Sent. Ex. 9.

---

[14]Copies of these checks are presumably also found in the government's trial exhibits 1 and 2, and there is no dispute over these payments. The Court cannot always easily find particular documents to cite within government exhibits 1 and 2, however, because each exhibit is a disorganized stack of hundreds of pages of bank records. Many of the pages are duplicates or even triplicates, and most of the pages are irrelevant and should have been culled by the government before it sought admission of these exhibits.

[15]The PSR asserts that Fiorito caused a loss of $91,331.07 in connection with the second sale. The Court cannot figure out where this number comes from and does not agree with it.

Although the Court agrees with the government that Fiorito's resale of Steinke's house for $199,000 is evidence of the loss that Fiorito caused Steinke, the Court disagrees with the government's calculations. With respect to the "earnest money," the HUD-1 for the second sale includes $1,000 on a line labeled "Deposit retained by seller," and that line reduced the amount of Fiorito's proceeds from the sale. The buyer did not pay Fiorito $200,000 (the $199,000 purchase price plus $1,000 in earnest money); the buyer paid only $199,000, of which $1,000 was paid before the sale happened.

More importantly, the Court finds that comparing the *gross* sale price of the second (market-rate) sale with the *net* proceeds of the first (below-market) sale does not make sense. The proper comparison is between the two gross sale prices. A buyer agreed to pay $199,000 for the house in April, while Fiorito agreed to pay only $112,000 in January. If the January sale had been a market-rate sale, Fiorito would have paid an additional $87,000 (the difference between $199,000 and $112,000). Thus, the second sale supports an inference that, in addition to stealing the cash proceeds of the January sale, Fiorito stole $87,000 from Steinke by underpaying for the house.

But there is even better evidence of the loss that Fiorito caused Steinke by underpaying for the house: the fraudulent notes that Jerde and Fiorito drafted in January to explain to Fiorito's lender why Steinke was selling the house for so little. According to those notes, Steinke was leaving $93,000 in equity on the table. Because Fiorito himself came up with that number when he bought Steinke's house, the Court finds by a preponderance of the evidence that this reflects both an intended and an actual loss to Steinke.

Fiorito contends that he caused Steinke no loss because Steinke in fact owed $180,000 or $190,000 on the house. The evidence shows that Steinke may have owed a lender this amount, but the evidence also shows that Steinke's house did not secure that debt. If Steinke had received the proceeds of the January 2006 sale plus the additional $93,000 that (according to the fraudulent note prepared by Jerde) his house was worth, he would have had $196,360.81 in cash. The fact that he might *also* have had an unsecured debt to a bank does not mean that he would not have had the cash. There is nothing remarkable about having both assets (cash) and liabilities (outstanding loans).

The Court therefore finds, by the preponderance of the evidence, that Fiorito caused Steinke both an actual and an intended loss of $145,610.81. This equals the proceeds from the January sale ($103,360.81) plus the amount by which Fiorito admittedly underpaid for the house ($93,000), less the amounts Fiorito paid to or on behalf of Steinke ($50,750).

### (13) Elaine Vallos and Jean Fjeldseth

Argery Giavasis lived in a house in Mound, Minnesota starting in 2000. TT 530, 562. In 2004 or thereabouts, Giavasis sold the house to her mother, Elaine Vallos, with the expectation that Giavasis would eventually buy it back. TT 560-62, 578. And in January 2005, in connection with a refinancing transaction, Giavasis's life partner, Jean Fjeldseth, was placed on the title along with Vallos. TT 530-31, 537. Thus, as of early 2005, Giavasis and Fjeldseth lived in the house, and Vallos and Fjeldseth owned it.

In April 2005, after experiencing financial difficulties, Giavasis and Fjeldseth moved to Ohio, where Vallos lived. TT 532. Giavasis and Fjeldseth had rented out the Mound house, but their tenant stopped paying rent after one month. TT 532. Giavasis and Fjeldseth needed cash to

make the mortgage payments, so they began looking into refinancing again. TT 533-34. An acquaintance of Giavasis's and Fjeldseth's suggested that they contact Fiorito. TT 533. Fiorito agreed to work with them to first refinance and then sell the house, which he expected to sell for around $400,000 — about twice what Vallos and Fjeldseth owed on it. TT 531, 535.

Fiorito arranged a refinancing transaction that closed on July 14, 2005. TT 537-38. Giavasis and Fjeldseth were at the closing, and Fjeldseth signed the closing documents on behalf of both herself and Vallos, who was in Ohio at the time. TT 541, 547. According to Giavasis, at the time of the closing she and Fjeldseth "were desperate and broke." TT 540.

Vallos and Fjeldseth took out two loans in connection with the refinancing transaction. The larger loan, for $228,000, went toward paying off the existing mortgage, and the title company issued Vallos and Fjeldseth a $7,243.09 check for the net proceeds of this loan. Gov't Trial Ex. 5. The smaller loan, for $42,750, generated net proceeds of $40,534.42, and the title company issued Vallos and Fjeldseth a check for this amount. Gov't Trial Ex. 5. The total net proceeds for the transaction were thus $47,777.51 ($7,243.09 plus $40,534.42).

But Vallos and Fjeldseth did not receive the two proceeds checks. Giavasis and Fjeldseth went back to Ohio immediately after the closing and gave Fiorito permission to pick up the proceeds checks. TT 563-64. They did not, however, give Fiorito permission to deposit the checks in his account. TT 550-51. But that is just what he did, after someone forged Elaine Vallos's endorsement on the back of both checks. TT 550; Gov't Trial Ex. 5.

Fiorito reluctantly gave Giavasis and Fjeldseth $500 at the closing on July 16, which they needed to get back to Ohio. TT 552. Fiorito then sent Vallos a check for $34,500 dated July 20, 2005. TT 553-54; Gov't Trial Ex. 2. Thus, Vallos and Fjeldseth together received a total of

$35,000 in proceeds from the transaction, which is what Fiorito told them the transaction would generate. TT 547. Fiorito pocketed the remaining $12,777.51 of the proceeds.

Fiorito contends that Vallos and Fjeldseth lied about their residency on their loan applications and that he therefore is not responsible, for sentencing purposes, for any loss connected to their refinancing. It does appear to the Court that Vallos and Fjeldseth refinanced the house under the false pretense that it was owner occupied. But this does not change by one penny the amount of loss Fiorito *intended* to cause them. Fiorito engineered a transaction that generated almost $48,000 in cash that nominally belonged to Vallos and Fjeldseth, and Fiorito kept almost $13,000 of that cash. He intended to cause Vallos and Fjeldseth to lose the money that he kept.

Fiorito further argues that Vallos and Fjeldseth's loss can be no more than $4,500, because they agreed to accept this amount in settlement of their potential legal claims against Fiorito. The Court rejects this argument for several reasons, not the least of which is that Fiorito, by his own admission, never actually paid Vallos and Fjeldseth anything under the settlement agreement. Fiorito's tortured logic seems to be that he *meant* to pay them $4,500 after they threatened him with litigation, which shows that he never *intended* to cause any loss at the time of the closing. But, as the Court explained when addressing a similar argument with respect to the Cooper transaction, that Fiorito agreed to pay $4,500 to settle a claim after causing a loss does not change the amount of loss he *intended* to cause in the first place. Indeed, the very fact that Fiorito agreed to pay Vallos and Fjeldseth $4,500 only after they complained demonstrates that at the time of the transaction Fiorito had no intention of paying them the $4,500 that he later promised.

In any event, the Court finds, by a preponderance of the evidence, that Fiorito caused an intended loss to Jean Fjeldseth and Elaine Vallos of $12,777.51 (the transaction proceeds of $47,777.51 less the $500 he paid Fjeldseth and the $34,500 he paid Vallos and Fjeldseth).[16] To the extent that Fiorito argues that he should get credit for an additional cash payment to them, the Court finds that the evidence does not support this argument. The Court also rejects, as unsupported both legally and factually, Fiorito's argument that the loss amount with respect to Vallos and Fjeldseth should be reduced by the value of credit-repair and negotiation services he provided them.

### c. Summary of Victims' Losses

Based on the findings set forth above, the Court calculates the loss amount under § 2B1.1 as follows:

| Transaction | Loss amount |
|---|---|
| Merle and Victoria Bieber | $11,387.71 |
| Glenn and Brenda Clark | $5,514.34 |
| Beverly Cooper | $24,368.99 |
| Constance Dang | $33,861.38 |
| Barbara Doyle | $60,497.97 |
| Lori Erickson | $40,275.57 |
| Lavonne Fitzgerald | $24,895.74 |
| Kevin and Sharon Goettl | $17,800.00 |
| Cynthia Jerris | $39,655.93 |

---

[16]The government mistakenly asserts that Fiorito caused Vallos and Fjeldseth a loss of $13,277.51. Gov't Sent. Ex. 9. The government overlooks the $500 payment that Fiorito made to Fjeldseth and Giavasis at the closing, a payment about which Giavasis credibly testified.

| Transaction | Loss amount |
|---|---|
| Darrell and Lorri Lastimosa | $50,343.11 |
| Kimberly and Randy Smith | $22,039.82 |
| Harold Dean Steinke | $145,610.81 |
| Elaine Vallos and Jean Fjeldseth | $12,777.51 |
| TOTAL | $489,028.88 |

In sum, the Court agrees with the government and the PSR that Fiorito caused losses between $400,000 and $1 million and is therefore subject to a 14-level enhancement under USSG § 2Bl.l(b)(l)(H).

The Court stresses again that it is not required to determine the precise amount of the loss caused by Fiorito. Rather, "[t]he court need only make a reasonable estimate of the loss." USSG § 2B1.1 cmt. n.3(C). It is possible — even likely — that the Court has made some errors in its calculations, given the complexity of the transactions, the huge amount of documentary and testimonial evidence, the ambiguities and contradictions in that evidence, the unhelpful way in which the parties presented some of the evidence, and the countless objections and arguments made by Fiorito. The Court is nevertheless confident that, even if it has made a few mistakes, its ultimate conclusion represents "a reasonable estimate of the loss." The Sentencing Guidelines require no more.

### 2. Acceptance of Responsibility (USSG § 3E1.1)

Fiorito contends that he should receive a reduction under § 3E1.1 for acceptance of responsibility. The Court disagrees.

Application note 2 to § 3E1.1 provides: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual

elements of guilt, is convicted, and only then admits guilt and expresses remorse." USSG § 3E1.1 cmt. n.2. Not only did Fiorito "put[] the government to its burden of proof at trial," but, to this day, Fiorito neither "admits guilt" nor "expresses remorse." Indeed, Fiorito continues to express contempt for his victims and to argue that his victims were actually better off for having met him. Rarely has the Court met a criminal defendant *less* deserving of a reduction for acceptance of responsibility.

### 3. Vulnerable Victims (USSG § 3A1.1(b))

Section 3A1.1(b)(1) of the Guidelines provides for a two-level enhancement if a defendant "knew or should have known that a victim of the offense was a vulnerable victim . . . ." USSG § 3A1.1(b)(1). Both the PSR and the government contend that this enhancement applies, and the Court agrees.

The evidence at trial (including the Court's own observation of the witnesses) established that virtually all of Fiorito's victims were financially desperate and unsophisticated, that many were elderly, and that some were mentally impaired. To cite the two most obviously vulnerable victims: Steinke was impaired by severe alcoholism, and Jerris was impaired by bipolar disorder, at the times that they dealt with Fiorito. Indeed, Fiorito himself contended that Jerris was so impaired that she was incompetent to testify at trial. Def. Mot. in Limine No. 4 ¶ 21 [Docket No. 225-5 at 3-4]. And Jerde testified that Fiorito and she, when targeting homeowners to defraud, "were looking for vulnerable, poor, dumb people so that they wouldn't be able to catch on to our scheme." TT 1551. The Court credits Jerde's testimony about Fiorito's and her intentions, and the Court finds by a preponderance of the evidence that Fiorito and Jerde succeeded in their efforts to identify and defraud vulnerable victims.

4.  Ten or More Victims (USSG § 2B1.1(b)(2)(A)(i))

Under § 2B1.1(b)(2)(A)(i), if an offense involves ten or more victims, the defendant's offense level is increased by two levels.  For purposes of § 2B1.1(b)(2)(A)(i), only a victim who suffered an *actual* loss is counted.  *United States v. Miller*, 588 F.3d 560, 567 (8th Cir. 2009).  The Court finds that the following suffered an actual loss on account of Fiorito's fraud:  Merle and Victoria Bieber, Glenn and Brenda Clark (or their lender), Beverly Cooper (or her lender), Constance Dang, Fremont (because of the Doyle transaction), Lori Erickson, Guaranty Bank (because of the Fitzgerald and Smith transactions), Homecomings Financial (because of the Goettl transaction), Cynthia Jerris, Darrell and Lorri Lastimosa, Harold Dean Steinke, and Elaine Vallos and Jean Fjeldseth (or their lender).  Thus, no fewer than 14 people or entities suffered an actual loss as a result of Fiorito's fraudulent acts, warranting a two-level enhancement under § 2B1.1(b)(2)(A)(i).

Fiorito's primary argument against applying the enhancement is the same argument that he raises in connection with the amount of loss.  According to Fiorito, he had *no* victims, let alone ten or more victims.  The Court has already explained why it rejects Fiorito's argument.

Fiorito also argues that the Court should treat couples as a single victim.  Def. Letter to Court [Docket No. 416].  He provides no authority for this argument except to say that the government agreed to treat joint homeowners as a single victim in connection with Jerde's sentencing.  Even if the government did so, the Court considers that fact irrelevant.  When negotiating a plea agreement with a defendant, the government routinely promises not to seek certain enhancements under the Guidelines in return for the defendant's plea.  The government's decision does not preclude it from seeking the enhancement in another case involving similar

facts, nor does the government's decision bind the Court. The Court finds that, when two people are entitled to the proceeds of a sale of their jointly owned house, and a defendant steals those proceeds, then two people have been victimized for purposes of § 2B1.1(b)(2)(A)(i).

Finally, Fiorito argues that anyone whose hands are not completely clean — such as Glenn Clark or Beverly Cooper, who may have helped Fiorito defraud their lenders, before Fiorito turned around and defrauded them — should not count as "victims" for purposes of § 2B1.1(b)(2)(A)(i). The Court rejects Fiorito's argument, for two reasons: First, Fiorito cites no authority supporting his argument, and the only relevant authority of which the Court is aware contradicts his position. *See United States v. Webber*, No. 07-10181-01-WEB, 2008 WL 5232738, at *2 (D. Kan. Dec. 15, 2008) ("They are properly considered 'victims' within the meaning of the guidelines, regardless of whether or not they were completely innocent."). Second, as described above, even if someone like Glenn Clark is not considered a "victim" of Fiorito because he helped Fiorito to cheat his lender, then the *lender* is certainly a victim of Fiorito. As noted above, if lenders are substituted for victims who arguably have "dirty hands," the number of Fiorito's victims still adds up to 14.

The Court therefore finds, by a preponderance of the evidence, that Fiorito had ten or more victims and is subject to a two-level enhancement under § 2B1.1(b)(2)(A)(i).

### 5. Aggravating Role (USSG § 3B1.1)

The government contends that Fiorito should receive a four-level enhancement under § 3B1.1(a) for his aggravating role in the offense. Section 3B1.1(a) calls for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." USSG § 3B1.1(a). The

preponderance of the evidence does not support a finding that Fiorito's criminal activity involved five or more "participants" within the meaning of § 3B1.1(a) — that is, persons "criminally responsible for the commission of the offense . . . ." *See* USSG § 3B1.1 cmt. n.1. Fiorito's primary accomplice was Jerde, who was "criminally responsible." A few transactions involved other people, including Fiorito's wife and brother, but the Court cannot find, based on the evidence in the record, that three or more of these people were "criminally responsible."

Whether Fiorito's operation was "otherwise extensive" is a closer question, and this aspect of § 3B1.1(a) is the focus of the government's argument for the aggravating-role enhancement. According to application note 3, "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." USSG § 3B1.1 cmt. n.3. Each of Fiorito's fraudulent real-estate transactions "used the unknowing services" of at least a few outsiders, including lenders, title companies, and notaries. On the one hand, taken in the aggregate, Fiorito's scheme was arguably extensive because many innocent parties were involved over the course of the many transactions Fiorito arranged. On the other hand, almost *any* fraudulent scheme involving more than a couple of victims is going to involve a substantial number of innocent parties, such as bankers, mail carriers, or secretaries. The "extensiveness" of Fiorito's fraudulent scheme is already captured in large part by the enhancement for the number of victims.

On balance, the Court finds by a preponderance of the evidence that Fiorito's scheme was not "otherwise extensive" within the meaning of § 3B1.1(a). This was essentially a one-man operation, with Jerde playing the role of sidekick, and everyone else playing tangential roles.

The Court does find, however, that Fiorito should receive a two-level enhancement under § 3B1.1(c), which applies to a defendant who "was an organizer, leader, manager, or supervisor in any criminal activity" that was not sufficiently extensive to warrant an enhancement under § 3B1.1(a) or (b). Without question, Fiorito organized and led the fraudulent scheme, directing Jerde, his wife, and all others who played roles in the scheme.

### 6. Position of Trust or Special Skill (USSG § 3B1.3)

Under § 3B1.3, a defendant's offense level is enhanced by two points if the defendant either "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense . . . ." USSG § 3B1.3. The government contends that this two-level enhancement is doubly warranted, because Fiorito both abused a position of trust and employed a special skill when defrauding his victims. Fiorito disagrees on both points.

The Court agrees with Fiorito that he did not use any special skills as that term is used in the Guidelines. Application note 4 to § 3B1.3 provides: "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." USSG § 3B1.3 cmt. n.4. Fiorito was a mortgage broker and a real-estate investor of sorts. Neither he nor Jerde had much education or training — certainly none comparable to that of lawyers, doctors, accountants, and chemists.[17]

---

[17]The Court admits that it knows little about the education and training of demolition experts.

But the Court nonetheless finds that a two-level enhancement is proper under § 3B1.3 because Fiorito abused a position of private trust. Fiorito contends that as a mortgage broker, he was a mere salesman and therefore did not occupy a position of private trust. Given the importance of selling or refinancing a house, and given the complexity of real-estate transactions, the Court believes that a home buyer — particularly an unsophisticated one — is likely to place a great deal of trust in real-estate professionals. But the Court need not decide whether mortgage brokers, in general, occupy a position of trust, because the evidence in this case established that Fiorito went to great lengths to place himself in a position of trust with respect to his victims. Fiorito required many of his victims to sign power-of-attorney forms that authorized him to act on their behalf.[18] Fiorito hid from many of his victims the details of the transactions that he arranged and directed victims to sign documents without first reviewing them. Fiorito's entire scheme *depended* on gaining his victims' trust, and transactions unraveled once the victims realized (after the fact) that Fiorito could not be trusted.

### 7. Sophisticated Means (USSG § 2B1.1(b)(9)(C))

Under § 2B1.1(b)(9)(C), a defendant who uses "sophisticated means" to commit a financial crime is subject to a two-level enhancement. According to the PSR, this enhancement applies because Fiorito "structured several transactions to obfuscate the money trail and to maximize the money [he] received . . . ." PSR ¶ 48. The Government agrees with the PSR.

---

[18]It is true, as Fiorito has pointed out, that many of the victims denied at trial that they *knew* that they had signed power-of-attorney forms. But this only highlights the extent to which Fiorito abused their trust: He tricked, bullied, or cajoled them into signing a document that they did not understand and that gave him power over one of the most significant financial transactions of their lives (a home sale or refinancing).

Fiorito contends that he was a simple mortgage broker and did not use sophisticated means. The Court disagrees. Under the Guidelines, the sophisticated-means enhancement applies when the offense involves "especially complex or . . . intricate offense conduct pertaining to the execution or concealment of an offense." USSG. § 2B1.1 cmt. n.8(B). An example of such "intricate offense conduct" is a defendant's "use of fictitious entities [or] corporate shells" to conceal the offense. *Id.*

Many of Fiorito's frauds were simple, but some were more complex and involved fraudulent entries on settlement statements to disguise who was receiving proceeds. Specifically, in connection with the Goettl transaction, Fiorito caused a payment of $17,800 to be issued to Aiken Administrative to disguise the fact that he and Kevin Goettl were splitting that payment. And in connection with the Doyle transaction, he caused a fraudulent payment of $9,200 to be issued to I&I Realty to disguise the fact that he was keeping this payment. Similar activity was held to support an enhancement for sophisticated means in a mortgage-fraud case in *United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009) ("Septon used a variety of business entities to facilitate his fraudulent scheme and to hide from lenders the fact that he was providing bridge loans to borrowers. . . . This is similar to hiding transactions through the use of fictitious entities — the type of conduct specifically mentioned by the Sentencing Commission as justifying a sophisticated means enhancement."). The Court therefore finds, in light of *Septon*, that a two-level enhancement is warranted under § 2B1.1(b)(9)(C).

### D. Arguments for Departure or Variance

#### 1. Criminal History Overstated

Apart from his objections to specific convictions identified as part of his criminal history, Fiorito also contends that his criminal-history score overstates the seriousness of his criminal record. The Court could not disagree more. Fiorito's criminal record is one of the worst that the Court has seen. Fiorito appears to be incapable of living in society for any length of time without stealing from people or threatening people with harm.

#### 2. Loss Amount Overstated

Fiorito contends that the amount of loss is overstated because it does not reflect the benefits that he conferred on his victims. He asks the Court to vary downward on this basis. For reasons already given, the Court rejects this argument. The Court has carefully determined the amount of loss and finds that it is not overstated.

#### 3. Extraordinary Family Obligations

Fiorito asks the Court to depart or vary downward on the basis of his obligations toward his daughter and his grandson. Downward departures for such reasons are expressly disfavored under the Guidelines, which provide in § 5H1.6 that, in general, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." USSG § 5H1.6. The Court finds no basis in this case either to depart downward under the Guidelines or to vary downward under 18 U.S.C. § 3553 on the basis of Fiorito's family obligations.

Fiorito presented evidence that his daughter has serious medical and psychological problems. The Court has great sympathy for his daughter and recognizes that her problems seem

to have gotten worse after Fiorito was jailed and could no longer support her financially.  The Court also has no doubt that Fiorito loves his daughter very much.

But Fiorito is facing such a lengthy potential prison term in this case that, unless the Court gave him a huge discount on his sentence, his daughter would be an adult by the time Fiorito is released from prison.  Anything short of a huge discount would not allow Fiorito to help raise his daughter.  Such a huge discount is out of the question, given the number and seriousness of Fiorito's crimes and especially given his long criminal record.  The Court is required to impose a sentence that, among other things, "protect[s] the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  As sympathetic as the Court is to Fiorito's daughter — and to Fiorito's wife, who must raise his daughter without Fiorito's help — the Court is not going to turn Fiorito loose anytime soon to victimize more vulnerable people.

The Court also notes that, even if Fiorito walked out of jail tomorrow, it is unlikely that he could provide his daughter the kind of financial support that he provided before his incarceration.  The income that Fiorito previously provided to his daughter was, to a substantial extent, generated through unethical and illegal business practices.  Throughout his life, Fiorito has demonstrated no ability to make an honest living over an extended period of time.  Moreover, given Fiorito's long record of unlawful and irresponsible behavior, the Court has little reason to believe that Fiorito is capable of providing his daughter with a stable and supportive home, no matter how sincere his intentions.  It is more likely that Fiorito will soon find himself in prison again.

Fiorito also presented evidence that his grandson, who lives in Illinois, is being put at risk because of an unstable home environment.  Again, the Court does not doubt that Fiorito cares

deeply about the welfare of his grandson. But Fiorito has never had custody of his grandson or any legal responsibility for him. Further, Fiorito's wife was unwilling, at the sentencing hearing, to say that she and Fiorito (from whom she is separated) are willing to seek custody of Fiorito's grandson. It is simply not realistic to believe that, if Fiorito were released from prison, he would provide a stable and supportive home for his grandson. And neither Fiorito nor his wife seems to have any idea how they would meet the considerable emotional, medical, financial, and other needs of *both* their daughter *and* Fiorito's grandson, particularly given Fiorito's bleak employment prospects and long record of illegal and irresponsible behavior.

### 4. Sentencing Disparity Compared to Jerde

The Court sentenced Fiorito's codefendant, Kristin Jerde, to a three-year term of probation after she pleaded guilty to conspiracy to commit mail fraud as charged in count 1 of the indictment. Fiorito argues that it would be unfair to give him a significant prison sentence when his codefendant received no prison time at all. Fiorito is mistaken.

Under 18 U.S.C. § 3553(a)(6), when sentencing a defendant, a court must consider "the need to avoid *unwarranted* sentence disparities among defendants with *similar records* who have been found guilty of *similar conduct* . . . ." 18 U.S.C. § 3553(a)(6) (emphasis added). Fiorito and Jerde are not similarly situated and thus should not receive similar sentences. Fiorito was convicted of conspiracy to commit mail fraud and six counts of mail fraud; Jerde pleaded guilty to a single count of conspiracy to commit mail fraud. Fiorito went to trial; Jerde pleaded guilty. Fiorito has not provided substantial assistance to the government; Jerde provided such assistance by helping the government prepare its case against Fiorito and by testifying for the government at Fiorito's trial. Fiorito's criminal record is extraordinary; Jerde's is minimal. Fiorito

orchestrated the entire criminal scheme; Jerde acted as Fiorito's sidekick. Fiorito has expressed disdain for his victims; Jerde has expressed deep remorse. By no stretch of the imagination are Fiorito and Jerde similarly situated, and by no stretch of the imagination will they receive similar sentences.

### 5. Harsh Pretrial and Presentence Incarceration

Fiorito has been held in the Anoka County jail since June 2007. He contends that conditions in the jail are worse than conditions in federal prisons and that he should therefore receive a shorter federal sentence to make up for the hard time that he has done in the Anoka County jail. Further, Fiorito claims that he has been attacked and seriously injured by white-supremacist inmates who continue to threaten him because they believe that he has been cooperating with law-enforcement officials. Def. Letter to Court [Docket No. 417]. The Court takes him at his word on this score.

The Court acknowledges that Fiorito has spent a very long time in the Anoka County jail and that the conditions at the jail are harsher than the conditions at a typical federal prison. The Court will give weight to this fact when deciding on Fiorito's sentence. The Court also notes, though, that Fiorito's long incarceration in the Anoka County jail is in large part the result of his own actions — some warranted and some not — that delayed his trial and then delayed his sentencing.

### 6. Disparity Between State and Federal Criminal Penalties

Fiorito contends that he should receive a sentence below the Guidelines range because he would have faced much lighter penalties had he been convicted in state court of mortgage fraud or equity stripping. This may be true, but it is irrelevant. Fiorito was convicted of federal

crimes, and the federal government is free to impose harsh penalties for conduct that is penalized lightly — or not at all — under state law.

### 7. Credit for Cooperation

The Court has already denied Fiorito's motion to compel the government to file a motion for a downward departure under USSG § 5K1.1 to reflect Fiorito's purported substantial assistance to the government. Order Jan. 4, 2010 [Docket No. 394]. In the absence of a § 5K1.1 motion, Fiorito asks the Court to use its discretion under 18 U.S.C. § 3553(a) to reduce his sentence in light of his assistance to the government. The Court has carefully reviewed Fiorito's submissions with respect to his cooperation with various law-enforcement officials. Def. Second Mot. Downward Dep. or Var. [Docket No. 373]; Def. Letter to Court re Cooperation [Docket No. 400]; Def. Letter to Court [Docket No. 417]. The Court will consider this information when sentencing Fiorito, and the Court will also consider Fiorito's assertions that he has been threatened and attacked by fellow inmates in retaliation for what they believe to be his cooperation with authorities.

### E. Restitution

According to the PSR, Fiorito owes restitution of $478,161.95. PSR ¶ 38. This equals the PSR's estimate of the loss amount ($475,861.95) plus an additional $2,300 that the Clarks claim to have given Fiorito for real-estate taxes that he should have paid, but did not pay, on their behalf. PSR ¶ 35.

Fiorito challenges the PSR's findings regarding restitution. The government bears the burden of establishing by a preponderance of the evidence the amount of restitution owed by Fiorito. 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution shall be

resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."). The government did not address restitution in its sentencing memorandum and did so only briefly at the sentencing hearing. The government's lack of attention to the issue is understandable, given that Fiorito is likely to serve a long prison term, and given that it is unlikely that he will find lucrative employment after being released from prison. Any order of restitution in this case will be largely symbolic.

The Court's findings with respect to restitution are based on its findings with respect to the amount of loss. The Court will not order restitution to the Smiths or Lavonne Fitzgerald, because they were made whole by Guaranty Bank. The Court will order restitution of $28,895.38 to Guaranty Bank for its losses in connection with the Fitzgerald and Smith transactions (as described in the affidavit of John W. Talbot).

The Court also will not order restitution to the Clarks, Beverly Cooper, Barbara Doyle, the Goettls, Elaine Vallos, or Jean Fjeldseth. While these individuals were victims of Fiorito, they also acted dishonestly in connection with the sale or refinancing of their homes. Restitution is an equitable remedy, and those who act inequitably should not expect to receive it. Moreover, given that Fiorito will probably be able to pay only a fraction of the restitution he owes, the Court finds that victims who acted inequitably should not be competing with victims who did not act inequitably for those limited funds.

The Court will order restitution to the following victims in the following amounts:

| Victim | Restitution amount |
| --- | --- |
| Merle and Victoria Bieber | $11,387.71 |
| Constance Dang | $7,461.38 |
| Lori Erickson | $37,375.57 |
| Cynthia Jerris | $39,655.93 |
| Darrell and Lorri Lastimosa | $50,343.11 |
| Harold Dean Steinke | $145,610.81 |
| Guaranty Bank | $28,895.38 |
| Homecomings Financial | $17,800.00 |
| TOTAL | $338,529.89 |

The restitution amounts for the Biebers, Jerris, the Lastimosas, and Steinke equal the amount of their actual losses. As to Dang and Erickson, the Court has given Fiorito the benefit of the doubt with respect to whether he provided free rent to them and has calculated the amount of restitution he owes by deducting from their losses the amount of that free rent ($26,400 for Dang and $2,900 for Erickson). The restitution amount for Guaranty Bank equals the bank's net loss in connection with the Fitzgerald transaction ($6,855.56, calculated by crediting Fiorito for money the bank seized), plus the bank's loss in connection with the Smith transaction ($22,039.82, calculated by crediting Fiorito for money he paid the Smiths). The restitution amount for Homecomings Financial equals the amount of the fraudulent payment to Aiken Administrative that Fiorito split with Kevin Goettl.

## III. CONCLUSION

The Court summarizes in the following table its conclusions with respect to the

Guidelines calculations:

| Guidelines section | Points |
|---|---|
| § 2B1.1(a)(1) — base offense level[19] | 7 |
| § 2B1.1(b)(1)(H) — loss amount | 14 |
| § 3A1.1(b) — vulnerable victim | 2 |
| § 2B1.1(b)(2)(A)(i) — ten or more victims | 2 |
| § 3B1.1(c) — organizer or leader | 2 |
| § 3B1.3 — abuse of position of trust | 2 |
| § 2B1.1(b)(9)(C) — sophisticated means | 2 |
| Total offense level | 31 |

Given an offense level of 31 and a criminal-history category of VI, Fiorito's

recommended sentencing range under the Guidelines is 188 to 235 months. USSG ch. 5, part A.

This is substantially lower than the range set forth in the PSR, a range that the government

considered appropriate. The Court will therefore entertain a motion from the government for an

upward variance. If the government decides to make such a motion, the Court asks that it be

served and filed within seven days after entry of this order, so that Fiorito has adequate time to

prepare to respond to the motion at the sentencing hearing.

---

[19]Fiorito does not appear to seriously dispute the assertion in ¶ 45 of the PSR that the base offense level in this case is 7. In any event, the Court finds that the PSR is correct on this point.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.     Defendant Michael Fiorito's motion for a downward departure or variance

[Docket No. 369] is DENIED.

2.     Defendant Michael Fiorito's objections to the September 2, 2009 Presentence

Investigation Report are SUSTAINED IN PART and OVERRULED IN PART as

set forth above.

3.     The Court finds, by a preponderance of the evidence and for the reasons set forth

above, that Fiorito's offense level is 31 and his criminal-history category is VI.

4.     The Court finds, by a preponderance of the evidence, that Fiorito must pay

restitution of $338,529.89 to the victims and in the amounts set forth above.

5.     The Probation Office is directed to revise the PSR so that it reflects the findings

made in this order.


Dated:  April 14, 2010                                s/Patrick J. Schiltz_____
                                                     Patrick J. Schiltz
                                                     United States District Judge