UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. 07-CR-0212(1) (PJS/JSM) |
| Plaintiff, | 13-CV-0522 (PJS) |
| v. | ORDER |
| MICHAEL FIORITO, | |
| Defendant. | |

David J. MacLaughlin, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Robert D. Richman, for defendant.

In October 2007, defendant Michael Fiorito pleaded guilty before Senior Judge Paul A. Magnuson to one count of aiding and abetting mail fraud.  Before sentencing, though, Fiorito sent three letters to Judge Magnuson, each asking for permission to withdraw his guilty plea. The letters were sent by Fiorito from his jail cell against the advice of his appointed counsel, who warned Fiorito that withdrawing his plea would be a mistake.  In response to the third letter, Judge Magnuson granted Fiorito's request to withdraw his plea; Judge Magnuson did so without holding a hearing or otherwise discussing the request with Fiorito or his counsel.  The next day, Judge Magnuson recused himself from further involvement in Fiorito's case, and the case was assigned to the undersigned.

After further disagreements with his appointed counsel, Fiorito sought permission to represent himself.  The Court conducted a *Faretta* hearing and, at the conclusion of that hearing, granted Fiorito's request.  *See Faretta v. California*, 422 U.S. 806 (1975).  The case proceeded to trial, and Fiorito was convicted by a jury of six counts of mail fraud and one count of conspiracy to commit mail fraud.  The Court sentenced Fiorito to 270 months' imprisonment, to be served

consecutively to a 120-month term of imprisonment that Fiorito was already serving on an unrelated state-court conviction. Fiorito's conviction and sentence were affirmed on direct appeal. *See United States v. Fiorito*, 640 F.3d 338 (8th Cir. 2011).

This matter is before the Court on Fiorito's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Fiorito raises 17 grounds for relief in his § 2255 motion. The Court appointed counsel to represent Fiorito with respect to two of those grounds. Fiorito had a falling out with that attorney and asked for a replacement. The Court granted Fiorito's request and appointed Robert D. Richman to represent him with respect to those two grounds. Richman has done excellent work, for which the Court expresses its appreciation.

Roughly speaking, the 17 grounds for relief raised by Fiorito can be grouped into three categories. First, Fiorito alleges that Judge Magnuson erred by allowing Fiorito to withdraw his guilty plea without first holding a *Faretta*-type hearing and confirming that his pro se request was made voluntarily, knowingly, and intelligently. Second, Fiorito alleges that his trial attorney provided ineffective assistance in many respects during the course of the pre-trial proceedings — especially by not doing more to persuade Judge Magnuson to deny Fiorito's request to withdraw his guilty plea. *See Strickland v. Washington*, 466 U.S. 668 (1984). Third, Fiorito raises a variety of other grounds for relief, including claims regarding juror misconduct, prosecutorial misconduct, sentencing errors, and violations of the Double Jeopardy Clause.

The Court held an evidentiary hearing over the course of four days and received post-hearing briefing from the parties. Having considered the evidence and the parties' submissions, the Court finds that Fiorito is not entitled to relief on any of his claims. Accordingly, Fiorito's § 2255 motion is denied.

## I. BACKGROUND

On June 19, 2007, the government filed an indictment charging Fiorito with three counts of mail fraud under 18 U.S.C. § 1341, one count of conspiracy to commit mail fraud under 18 U.S.C. § 371, and one count of engaging in a financial transaction with criminally derived property under 18 U.S.C. § 1957. *See* Indictment [ECF No. 1]. According to the indictment, Fiorito and a co-conspirator defrauded homeowners through an equity-stripping scheme. That scheme took two forms. In one version, the defendants caused "vulnerable homeowners to refinance their homes and then [stole] some or all of the proceeds of the refinancing . . . ." *Id.* ¶ 3. In the other version, the defendants induced "homeowners to sell their homes to the defendants or others and then [stole] the checks paid to the victims out of the closing of the sale." *Id.* The case was assigned to Judge Magnuson, who appointed attorney Douglas B. Altman to represent Fiorito. *See* ECF Nos. 13-14; 18 U.S.C. § 3006A.

Fiorito told Altman shortly after the indictment was filed that he was innocent of the crimes charged. *See* Def. Ex. 42[1] at 1 ("It probably doesn't mean a whole lot to you but I am innocent."); Evid. Hr'g Tr. 1 at 35-36.[2] At the same time, Fiorito indicated to Altman that he was amenable to pleading guilty. *Id.* In late August or early September 2007, the government offered Fiorito two different plea deals. *See* Def. Ex. 5. Under either deal, Fiorito would plead guilty to one count of mail fraud, and the remaining four counts would be dismissed. Also under

---

[1]All citations to defense exhibits are to the 54 exhibits admitted during the course of the evidentiary hearing on Fiorito's § 2255 motion. Those exhibits are on file with the Court.

[2]The transcript from Fiorito's evidentiary hearing is divided across four docket entries. *See* ECF Nos. 565 ("Evid. Hr'g Tr. 1"), 568 ("Evid. Hr'g Tr. 2"), 573 ("Evid. Hr'g Tr. 3"), & 575 (Evid. Hr'g Tr. 4"). Whenever the Court cites to testimony from these hearings, the Court will cite to the pagination in the top-right corner of the documents.

either deal, the government would promise not to prosecute Fiorito's wife for her alleged

involvement in the equity-skimming scheme.  Finally, under either deal, the government would

recommend a three-point downward adjustment in Fiorito's offense level for acceptance of

responsibility under § 3E1.1 of the United States Sentencing Guidelines — if, in fact, Fiorito

accepted responsibility for his offense.  Beyond that, however, the two plea offers differed

significantly.

Under the first option — referred to by the parties (and therefore by the Court) as the

"Column A" option — the government would recommend that Fiorito receive a 100-month term

of imprisonment;[3] such a term would equal the bottom of the range recommended by the

Sentencing Guidelines for a defendant in criminal-history category VI with an offense level of

24.[4]  In return, Fiorito would give up most of the arguments that he might otherwise make for

why the range recommended by the Sentencing Guidelines should be even lower.  Fiorito could

not, for example, dispute the amount of loss caused by his offense, or contend that he played

only a minimal or minor role in the offense, or argue that his classification in criminal-history

category VI substantially over-represented the seriousness of his criminal record.

---

[3]In the original version of this plea offer, the government represented that it would recommend an 84-month term of imprisonment.  *See* Def. Ex. 5.  The government made this offer contingent on Fiorito not going forward with a hearing on his motion to suppress evidence. Fiorito went forward with the hearing.  After that hearing, the government replaced its 84-month offer with the 100-month offer, as it had warned it would do.  *See* Def. Ex. 3.  Fiorito testified that Altman did not tell him that this offer was contingent on him withdrawing his suppression motion, but he has not presented a claim for relief on that basis.

[4]Whenever the Court refers to the Sentencing Guidelines in this order, the Court refers to the version of the Guidelines that went into effect on November 1, 2006.  That was the edition of the Guidelines that was in effect at the time that Fiorito entered his guilty plea.

The second option —  referred to by the parties (and therefore by the Court) as the "Column B" option — was "an agreement to disagree on practically everything . . . ."  Evid. Hr'g Tr. 1 at 41.  Fiorito would still plead guilty to one count of mail fraud, but under the Column B agreement, he would be permitted to dispute just about every assertion in the Presentence Investigation Report ("PSR") about his conduct and about how the Sentencing Guidelines should apply to him, including assertions about amount of loss, his role in the offense, and his criminal-history category.  There was a catch, however:  Under the Column B approach, the government would not recommend a 100-month sentence, and the government could attempt to show at the sentencing hearing that Fiorito's offense level under the Sentencing Guidelines was higher than the offense level that had been anticipated under the Column A offer.

The Column B option was obviously far riskier than the Column A option.  If Fiorito chose the Column B option and won each of his arguments at the sentencing hearing, the bottom of the range recommended by the Sentencing Guidelines might end up significantly lower than 100 months.  But if Fiorito lost most of his arguments, the Guidelines range would likely end up above the range contemplated under the Column A option — perhaps *well* above that range if Fiorito struck out completely.

Despite those risks, Fiorito chose Column B.  On October 2, 2007, Fiorito pleaded guilty to one count of mail fraud with the understanding that he would be permitted to contest nearly everything about the scope of his offense and the application of the Sentencing Guidelines.  *See* Def. Ex. 6.[5]  Indeed, the plea agreement was explicit that "[t]he government and Michael Fiorito

---

[5]As Fiorito's case well illustrates, this type of plea agreement — in which the defendant grudgingly pleads guilty to a charge, but the government and the defendant remain light years

(continued...)

disagree fundamentally about how the United States Sentencing Guidelines should apply to this case." *Id*. ¶ 6. On the government's version of events, the offense level under the Sentencing Guidelines for Fiorito's count of conviction, after taking into account the number of victims, amount of loss, and all other considerations, was 31. *Id*. ¶ 12. If Fiorito "fully acknowledge[d] complete responsibility for the offense of conviction and all relevant conduct," the government would recommend a three-point reduction for acceptance of responsibility, resulting in a final offense level of 28 and a recommended range of 140 to 175 months. *Id*. ¶ 13. However, Fiorito reserved the opportunity under the plea agreement to argue at the sentencing hearing that his recommended sentencing range should be substantially lower. *Id*. ¶ 6.

Judge Magnuson conducted a plea colloquy and verified that Fiorito understood and accepted the plea agreement as described in the written document. *See* Def. Ex. 7. The colloquy was not entirely smooth. Altman, not the prosecutor, elicited from Fiorito the factual basis for the guilty plea. *Id*. at 13. Fiorito did not admit to either of the equity-skimming schemes alleged by the indictment and described above. Instead, Fiorito admitted that, in the course of financing one victim's home, he mailed to the lender a power-of-attorney form that he suspected was forged, and that the lender likely relied on the forged form in agreeing to provide the money for the refinancing. *Id*. at 16-17. Fiorito also acknowledged that he made certain promises to one victim with respect to home-sale and credit-repair services but then failed to perform those

---

[5](...continued)
apart regarding the nature of the defendant's conduct — is a bad idea for many reasons, including the fact that it forces the Court to essentially try the case under the guise of a sentencing hearing. The undersigned will not accept such plea agreements. When the government and the defendant have dramatically different views about the nature of the defendant's conduct, the case should be tried, a jury should determine what the defendant did, and then the Court can impose a fitting sentence.

services.  *See id*. at 15-16.  Judge Magnuson initially expressed reluctance to accept the plea agreement, *see id*. at 18, but after Fiorito acknowledged that he was paid about $13,000 for credit-repair services that he did not perform, Judge Magnuson accepted Fiorito's guilty plea and ordered that U.S. Probation and Pretrial Services prepare a PSR in anticipation of Fiorito's sentencing.

The PSR largely, although not entirely, agreed with the positions set forth by the government in the plea agreement.  *See* Def. Ex. 8.  Specifically, the PSR concluded that Fiorito was responsible for over $400,000 in loss as a result of his offense; that the offense involved more than 10 victims; that Fiorito knew or should have known that some of his victims were vulnerable; that Fiorito abused a position of trust in committing the offense; and that Fiorito had obstructed the administration of justice during the course of the investigation.  *See id*. ¶¶ 42-49.  Critically, the PSR also concluded that because Fiorito had obstructed justice, he was not entitled to a three-point reduction in offense level for acceptance of responsibility.  *Id*. ¶ 40.  Based on those conclusions, the PSR calculated Fiorito's offense level at 29, which would result in a recommended imprisonment term of 151 to 188 months (assuming a criminal-history category of VI).

The government did not object to any statement in the PSR.  *See* Def. Ex. 9 at 1.  Fiorito, by contrast, objected to just about everything, contesting "the loss amount, the number of victims, the vulnerability of the victims, the adjustment for obstruction of justice, and the inapplicability of acceptance of responsibility," along with numerous factual assertions.  *Id*.; *see also* Def. Ex. 11 (raising objections to 46 paragraphs of the PSR); Def. Ex. 13.  Judge Magnuson scheduled an evidentiary hearing regarding these disputes.

Two months before the evidentiary hearing was set to occur, the government extended "an offer to settle [the] case" to Fiorito similar to the Column A plea offer that he earlier rejected. Def. Ex. 15 at 1. Specifically, the government offered "to enter into a supplemental stipulation contemplating a joint sentencing recommendation of 100 months in the custody of the bureau of prisons." *Id*. In addition, the government would recommend that this sentence be served concurrently with the 120-month term of imprisonment that Fiorito was already serving as a result of a state conviction for engaging in a pattern of harassment. *Id*. In return, Fiorito would agree not to pursue the bevy of arguments that he had made regarding his offense level.

The government set a hard deadline of about two weeks for Fiorito to accept this offer. *Id*. at 2. If Fiorito did not accept the offer by the deadline, the government warned that it would "*insist* on the evidentiary hearing" and would "be asking the District Court to impose an entirely consecutive sentence upon Mr. Fiorito at the top of whatever guideline range is determined to apply which, if the position of the probation officer is sustained, will be 188 months." *Id*.

Fiorito regarded the government's ultimatum as a breach of the plea agreement. *See* Def. Ex. 16. According to Fiorito, the government had already committed itself in the plea agreement to recommending a three-point reduction in offense level for acceptance of responsibility. By threatening to argue "the position of the probation officer," Def. Ex. 15 at 2, the government was implicitly suggesting that Fiorito was not entitled to this three-point reduction. This, said Fiorito, amounted to the government retracting one of the few concrete benefits that Fiorito received under the Column B plea agreement. *See* Def. Ex. 16. at 1. Fiorito also believed that the government's threat to recommend that his federal sentence be imposed consecutively to his state sentence violated the spirit, if not the letter, of the plea agreement. *Id*. For its part, the

government denied that it was in breach of the plea agreement and pointed out that its recommendation of the three-point acceptance-of-responsibility reduction was contingent on Fiorito "fully acknowledg[ing] complete responsibility for the offense of conviction and all relevant conduct."  Def. Ex. 6 ¶ 13.  The government told Fiorito that if he admitted that he had engaged in "equity stripping, as alleged in the Indictment, then the government would have to revisit its current disinclination to recommend the acceptance reduction."  Def. Ex. 17 at 2.

The government's response did not go over well with Fiorito, who continued to believe that the government was in breach of the plea agreement.  Altman filed a "motion to enforce [the] plea agreement, or, in the alternative, to withdraw [the] guilty plea."  Def. Ex. 19.  As Altman was drafting this motion, Fiorito was writing a pro se letter to Judge Magnuson, informing Judge Magnuson that "the Government has breached the plea agreement in my case & I want to withdraw my plea of guilty and set a date for trial."  Def. Ex. 18.  The government, for its part, agreed that "Fiorito should be allowed to withdraw from his plea agreement," as "Fiorito absolutely denies engaging in any of the conduct charged in the indictment.  He should not have pled guilty in the first place."  Def. Ex. 20.

Before Judge Magnuson could respond to any of these documents, Altman filed a motion to withdraw the two motions to withdraw Fiorito's guilty plea — that is, to withdraw both (1) the motion filed by Altman on Fiorito's behalf and (2) Fiorito's pro se "motion."  *See* Def. Ex. 21. This new motion reiterated, however, that Fiorito believed that the government was in violation of the plea agreement, and Altman again asked that Judge Magnuson enforce the plea agreement. *Id*.  In response, the government denied that it was in violation of the plea agreement and

continued to urge that Fiorito be let out of his plea agreement.  *See* Def. Ex. 22 at 3 ("Some

matters need to be tried.  This is one of them.  Mr. Fiorito should have his plea back.").

On July 23, 2008, Judge Magnuson denied the motion to enforce the plea agreement.

*See* Def. Ex. 23.  In his order, Judge Magnuson noted that a defendant who enters a guilty plea is

not necessarily entitled to a three-point reduction for acceptance of responsibility and that Fiorito

had "consistently denied some or all of the conduct described in the Indictment."  *Id*. at 2.  The

order also noted that the government had not violated the plea agreement by threatening to

recommend a sentence consecutive to Fiorito's state sentence, as the plea agreement was silent

on the issue of whether the federal sentence should be imposed concurrently with or

consecutively to the state sentence.  *Id*. at 2-3.  Finally, the order warned that "Defendant's

Motion is yet another example of Defendant's refusal to accept responsibility for his conduct in

this matter.  Should Defendant persist in this vein, the Court will *sua sponte* reject the Plea

Agreement and order Defendant to stand trial."  *Id*. at 3.

The next day, Fiorito wrote a second pro se letter to Judge Magnuson, again complaining

about the government's alleged breach of the plea agreement, and again asking to withdraw his

guilty plea.  *See* Def. Ex. 24.  (It is unclear from Fiorito's letter whether he was aware that Judge

Magnuson had found that the government was not in breach of the plea agreement.)  For a third

time, the government urged that Fiorito be allowed to withdraw his guilty plea.  *See* Def. Ex. 26

at 2 ("Mr. Fiorito's repeated denials of his guilt to the government, the probation office, and this

Court have been fundamental and unwavering.  It appears that trying this matter would therefore

be in the interests of justice.").  Judge Magnuson did not respond to Fiorito's second letter or to

the government's response.

A few weeks later, Fiorito sent a third pro se letter to Judge Magnuson and again asked to withdraw his guilty plea. *See* Def. Ex. 27. In this third letter, Fiorito indicated that Altman had recently uncovered evidence favorable to his case. *Id*. at 2. Fiorito also indicated that the terms of the plea agreement were different than he had believed at the time he entered into that agreement — likely a reference to the dispute over the reduction for acceptance of responsibility. *Id*. at 2-3. Fiorito mentioned at the end of his letter that "[m]y attorney and I are not communicating and I anticipate his withdrawl [sic] from my case as counsel," *id*. at 4 — an assertion that was somewhat inconsistent with an assertion earlier in the letter that Fiorito had recently spoken to Altman about the case, *id*. at 1.

Altman weighed in on the situation in a confidential letter mailed to Judge Magnuson on August 13, 2008. *See* Def. Ex. 28. According to Altman, his relationship with Fiorito had become strained since Judge Magnuson's denial of the motion to enforce the plea agreement, although he continued to work on Fiorito's behalf. *Id*. at 2. Altman also explained that Fiorito instructed him "to file another motion to withdraw his guilty plea on the ground that there had been a miscommunication between lawyer and client," but that Altman had refused to file such a motion — presumably because there had been no such "miscommunication." *Id*.

On August 18, 2008, Judge Magnuson finally relented and gave Fiorito permission to withdraw his guilty plea. *See* Def. Ex. 29. In his order, Judge Magnuson noted that

> [i]t appears to the Court that Defendant is asserting that he is
> innocent of the crimes charged in the Indictment. Moreover, the
> Government has agreed that Defendant should be permitted to
> withdraw his guilty plea and the case should go to trial. Thus,
> although a significant amount of time has passed since Defendant's
> guilty plea, the Court finds that Defendant has established the
> requisite fair and just reason to withdraw his plea of guilty.

*Id*. at 1-2 (quotation omitted).  The following day, Judge Magnuson recused himself from the case, and the case was assigned to the undersigned.  *See* ECF No. 97.

A few days later, Altman moved to withdraw from representing Fiorito.  *See* ECF No. 101.  The Court conducted a hearing at which it questioned both Altman and Fiorito. Following that hearing, the Court denied Altman's request, finding that "[n]either Fiorito nor Altman has alleged the existence of a conflict of interest or an irreconcilable conflict in this matter, and none is apparent from the record."  ECF No. 104 at 2.  Moreover, "[a]fter hearing the testimony of Altman and Fiorito, the Court conclude[d] that there [was] likewise no evidence of a complete breakdown in communication between the two."  *Id*. (quotation omitted).

The relationship between Fiorito and Altman continued to be strained, however. Eventually, Fiorito wrote to the Court and asked that he be appointed new counsel or, in the alternative, that he be permitted to proceed pro se.  *See* ECF No. 142.  The Court conducted a thorough *Faretta* hearing on February 3, 2009, and, following that hearing, the Court granted Fiorito's request to proceed pro se and appointed Altman as standby counsel.  *See* ECF No. 151.

The government had filed a seven-count superseding indictment on October 7, 2008, charging Fiorito with six counts of mail fraud and one count of conspiracy to commit mail fraud. *See* ECF No. 108.  Trial began on May 4, 2009 — nearly two years after the original indictment had been filed — with Fiorito representing himself and Altman appearing as standby counsel. After hearing evidence for about three weeks, the jury returned a verdict of guilty on all seven counts of the superseding indictment.  *See* ECF No. 277.

A new PSR was prepared, and that PSR differed in important respects from the previous PSR, in part because the new PSR reflected information that had come to light during the trial.

The new PSR determined that Fiorito's offense level was 33 and criminal-history category was VI, resulting in a recommended sentencing range of 235 to 293 months' imprisonment. *See* ECF No. 420 at 1-2. Fiorito objected to most of the factual statements and legal conclusions in the PSR, and the Court conducted a lengthy evidentiary hearing. After that hearing, the Court issued a 79-page order resolving Fiorito's numerous objections. *See* ECF No. 420. The Court overruled the vast majority of Fiorito's objections but did conclude that Fiorito's offense level was 31 (not 33, as proposed by the PSR), resulting in a recommended Guidelines range of 188 to 235 months. *Id.* at 79. The government asked that Fiorito be sentenced to a 293-month term of imprisonment — the top of the sentencing range determined by the PSR, and a substantial upward variance from the top of the sentencing range determined by the Court. *See* ECF No. 422. The Court granted in part the government's motion for an upward variance, imposing a sentence of 270 months' imprisonment — 240 months on each of the mail-fraud counts (with those terms to run concurrently), and 60 months on the conspiracy count (with 30 months of that term to run concurrently and 30 months to run consecutively to the mail-fraud counts). *See* ECF No. 436. That 270-month sentence was imposed consecutively to Fiorito's state conviction for engaging in a pattern of harassing conduct, as the crimes which gave rise to the federal sentence had no relationship to the crime which gave rise to the state sentence. *Id.* Fiorito's conviction and sentence were affirmed on direct appeal. *See Fiorito*, 640 F.3d at 353.

Now before the Court is Fiorito's motion to vacate, set aside, or correct his sentence under § 2255. *See* ECF No. 503. Fiorito raised 14 grounds for relief in his original motion, but he has repeatedly amended that original motion, raising an additional five grounds for relief and withdrawing two, leaving 17 in total. The vast majority of Fiorito's claims relate to whether

Altman provided effective assistance during the pre-trial proceedings in this case.  Fiorito also challenges Judge Magnuson's decision to allow him to withdraw his guilty plea without first conducting a *Faretta*-type hearing to determine whether that withdrawal was voluntary, knowing, and intelligent.  Finally, Fiorito raises miscellaneous claims for relief that relate neither to Altman's representation nor to Judge Magnuson's decision.  The Court will first address the claims regarding Judge Magnuson, then the claims regarding Altman, and finally the miscellaneous claims.

## II.  ANALYSIS

### A.  Withdrawal from the Plea Agreement

The Sixth Amendment protects a defendant's right to counsel at all critical stages of criminal proceedings.  *See, e.g.*, *United States v. Lewis*, 483 F.3d 871, 873 (8th Cir. 2007).  It also protects a defendant's right to represent himself during criminal proceedings.  *Faretta*, 422 U.S. at 835.  But a defendant does not have a "constitutional or statutory right to simultaneously proceed pro se *and* with benefit of counsel."  *United States v. Agofsky*, 20 F.3d 866, 872 (8th Cir. 1994) (emphasis added); *see also United States v. Taylor*, 652 F.3d 905, 909 n.3 (8th Cir. 2011).  For that reason, most courts force a criminal defendant to fish or cut bait:  He can be represented by counsel, or he can represent himself, but he cannot represent himself while being represented by counsel.

That said, a trial judge has discretion to permit such "hybrid representation."  *See United States v. Summage*, 575 F.3d 864, 876 (8th Cir. 2009).  That is essentially what Judge Magnuson did in this case.  When Fiorito sent letters from his prison cell asking to withdraw his plea, Judge Magnuson could have informed Fiorito that he must contact the Court only through counsel.

-14-

Judge Magnuson did not take that route.  Instead, Judge Magnuson ruled on the merits of Fiorito's pro se requests — first denying his request to withdraw his guilty plea, and then granting that request.  During the same period of time, Judge Magnuson continued to rule on motions filed by Altman.  At no point prior to withdrawing his guilty plea did Fiorito indicate that he wanted to proceed without counsel, and Altman continued to actively represent Fiorito.

The law is clear that if Fiorito *had* sought to "fire" Altman — that is, if Fiorito had sought to represent himself without any assistance from Altman — Judge Magnuson would have been required to conduct a *Faretta* hearing to ensure that Fiorito's waiver of his right to counsel was undertaken "'knowingly and intelligently.'"  *United States v. Bankoff*, 613 F.3d 358, 373 (3d Cir. 2010) (quoting *Faretta*, 422 U.S. at 835).  But the law is far from clear regarding whether Judge Magnuson was required to obtain a knowing and intelligent waiver of the right to counsel before permitting hybrid representation.  "Perhaps because the Supreme Court has rejected the right to hybrid representation, it has yet to decide whether a judge has a duty to obtain a waiver of counsel from a defendant before allowing him to act as co-counsel with his attorney.  This remains an open issue; one for which no clearly established Federal law exists."  *Howie v. Subia*, No. 2:07-CV-453-FVS, 2010 WL 3784733, at *4 (E.D. Cal. Sept. 24, 2010).

Fiorito contends that Judge Magnuson committed constitutional error when he allowed Fiorito to withdraw his guilty plea on the basis of a pro se letter without first conducting a *Faretta*-type hearing to ensure that Fiorito had voluntarily, knowingly, and intelligently waived his right to counsel.[6]  Courts of appeals have splintered over the question of whether a criminal

---

[6]Each of Fiorito's claims with respect to the withdrawal of his guilty plea is presented as a claim of ineffective assistance of counsel; Fiorito did not directly contend in his § 2255 motion

(continued...)

defendant must waive his right to counsel *at all* before being allowed to participate in a hybrid-representation scheme.  And the courts who hold that such a waiver is necessary disagree about what information must be provided to the defendant to ensure that the waiver is knowing and intelligent.

The strictest approach is typified by *United States v. Davis*, 269 F.3d 514 (5th Cir. 2001).  The defendant in *Davis* was represented by counsel at trial.  However, the defendant personally questioned 14 of the 19 witnesses who testified at the trial.  *Id*. at 517.  At no point did the judge conduct an inquiry into whether the defendant knowingly and intelligently waived his right to counsel.  The Fifth Circuit found this to be a constitutional violation.  *See id*. at 520 ("'Hybrid' or no, the representation sought by Davis entailed a waiver of his Sixth Amendment right to counsel that required the safeguards specified in *Faretta*.").

Although it does not necessarily compel such a conclusion,[7] *Davis* is most naturally read as requiring that a defendant waive his right to counsel before that defendant is permitted to

_____

[6](...continued)
that his conviction should be overturned due to Judge Magnuson's supposed errors (as opposed to Altman's errors).  But Fiorito's § 2255 motion — especially Ground Four — implicitly makes such an argument, and Fiorito explicitly makes the argument in his post-evidentiary hearing briefing.  *See* ECF No. 581 at 27-31.

Fiorito did not raise this claim on direct appeal, which would ordinarily mean that he is procedurally barred from raising it in a § 2255 proceeding.  *See Charboneau v. United States*, 702 F.3d 1132, 1136 (8th Cir. 2013).  Procedural default is an affirmative defense, however.  *See United States v. Brewer*, 766 F.3d 884, 887 n.2 (8th Cir. 2014).  Because the government has not contended that this claim is procedurally defaulted but has instead addressed the claim on the merits, the Court will likewise address the claim on the merits.

[7]The *Davis* court found a Sixth Amendment violation in the context of a defendant playing a significant role at trial.  It seems possible that the Fifth Circuit would not have found a Sixth Amendment violation if the defendant's acts of self-representation had been more limited or occurred in a pretrial setting.

undertake *any* act of self-representation.  In addition, *Davis* would appear to require that, for such a waiver to be effective, the court must give the defendant specific warnings about the dangers of self-representation to ensure that the waiver is knowing and intelligent.

Whatever the merits of *Davis*'s bright-line approach, it finds little support in the case law of other circuits.  *See United States v. Cromer*, 389 F.3d 662, 682 n.13 (6th Cir. 2004) (repudiating prior support for the *Davis* approach).  Moreover, the *Davis* approach seems inconsistent with the practice of the Eighth Circuit, which commonly considers pro se arguments raised by criminal defendants who are represented by counsel on appeal — and does so without insisting that the defendants first waive their right to counsel.  *See, e.g.*, *United States v. Wright*, 739 F.3d 1160, 1171 n.3 (8th Cir. 2014); *United States v. Akiti*, 701 F.3d 883, 888 (8th Cir. 2012).  As discussed below, it is by no means clear that a criminal defendant must waive his right to counsel *at all* before participating in a hybrid-representation scheme.  After all, a defendant in a hybrid-representation scheme remains represented by counsel; at any time, the defendant can seek the advice of counsel or ask counsel to perform tasks on his behalf.  In addition, the *Davis* approach of requiring specific *Faretta*-style warnings for any waiver of the right to counsel to be effective appears to be inconsistent with *Patterson v. Illinois*, 487 U.S. 285 (1988), in which the Supreme Court found that specific warnings about the dangers of self-representation were not necessary when a defendant represented himself during post-indictment questioning by police.

There is also reason to be concerned that the *Davis* approach, if practiced faithfully, would be unworkable.  It is common for defendants who are represented by counsel to directly contact the trial judge.  Often, such defendants simply want to complain about the conditions at

the jail at which they are being held.  Sometimes, though, such defendants raise weightier matters.  They may, for example, ask for more time to review a PSR, or ask that a spouse be permitted to speak at a sentencing hearing, or ask that a copy of a prior order be mailed to them. Requiring a judge to conduct a *Faretta* hearing before considering *any* pro se request would impose a considerable burden on the courts, add delay to criminal proceedings, and eliminate some of the grease that lubricates the gears of the criminal-justice system.  And yet *Davis* appears to compel such a practice.

A second approach is suggested in *United States v. Turnbull*, 888 F.2d 636 (9th Cir. 1989).  In contrast to *Davis* — which appears to require a waiver of the right to counsel before a defendant can engage in *any* function normally performed by counsel — *Turnbull* requires such a waiver only when the defendant "assumes any of the 'core functions' of the lawyer . . . ." *Id*. at 638; *see also United States v. Kimmel*, 672 F.2d 720, 721 (9th Cir. 1982).  This is an improvement on *Davis*, but it creates another problem:  It requires a court to distinguish the "core functions" of a lawyer from the "non-core" functions of a lawyer — a matter that is far from self-evident.  Still, despite this problem, *Turnbull* seems to reflect certain sentiments expressed by the Supreme Court in *Faretta* and its progeny.  The Supreme Court has instructed courts to take a

> pragmatic approach to the waiver question — asking what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage — to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.

*Patterson*, 487 U.S. at 298.  This is logical:  The more important a task — and the more valuable

legal training is to performing that task — the more that courts should be concerned about the

defendant attempting to undertake the task without the assistance of counsel.  *Turnbull* better

reflects this principle than *Davis*.

A third approach to the issue of whether a waiver of the right to counsel is required when

a criminal defendant engages in a hybrid-representation scheme is set forth in *United States v.*

*Leggett*, 81 F.3d 220 (D.C. Cir. 1996).  The defendant in *Leggett* (like the defendant in *Davis*)

was represented by counsel at trial, but the defendant was permitted to personally cross-examine

two government witnesses.  *Id*. at 223.  The defendant also made closing remarks to the jury.  *Id*.

The trial court confirmed that the defendant wished to proceed via this hybrid method, but did

not specifically warn the defendant about the dangers of self-representation.  *Id*.  The D.C.

Circuit found that no *Faretta* colloquy was required under these circumstances, as the defendant

never made "an articulate and unmistakable demand . . . to proceed *pro se*."  *Id*. at 224.

"Because Leggett did not waive his right to the assistance of counsel and failed to invoke his

right of self-representation, the Sixth Amendment did not require the district court to caution him

regarding the 'dangers and disadvantages of self-representation.'" *Id*. at 226 (quoting *United*

*States v. Brown*, 823 F.2d 591, 599 (D.C. Cir. 1987)).

*Leggett* differs markedly from *Davis* and *Turnbull*.  Unlike *Davis* and *Turnbull*, which

focus on the tasks undertaken by a criminal defendant, *Leggett* focuses on what the defendant

has asked of the court — and in particular on whether the defendant has clearly demanded that

he be allowed to represent himself, without the assistance of counsel.  This approach has support

from other courts of appeals.  *See, e.g.*, *Cromer*, 389 F.3d at 681, 683 (6th Cir. 2004) ("We agree

that *Faretta* procedures are only required when a defendant has clearly and unequivocally asserted his right to proceed pro se . . . .   A defendant who seeks merely to supplement his counsel's representation, as Cromer did here, has failed to avail himself of his right to self-representation and thus failed to waive his right to the assistance of counsel.").  Moreover, like *Davis* — but unlike *Turnbull* — *Leggett* sets forth a bright-line rule that is easily administered by judges.

Complicating matters further, each of the main cases discussed above — *Davis*, *Turnbull*, and *Leggett* — addresses the question of whether and under what circumstances hybrid-representation schemes are permitted at *trial*.  But Fiorito challenges Judge Magnuson's decision to permit a hybrid-representation scheme during pre-trial proceedings.  *Patterson* and subsequent cases make clear that "a more searching or formal inquiry" is required "before permitting an accused to waive his right to counsel at trial" than is required in pre-trial settings.  *Patterson*, 487 U.S. at 299; *accord Iowa v. Tovar*, 541 U.S. 77, 90-93 (2004) (finding that specific warnings about the dangers of self-representation are not necessary before defendant is allowed to represent himself at plea hearing).  Cases discussing what procedures must be followed before hybrid representation is permitted at trial are rare enough; cases discussing what is required in pre-trial settings seem to be non-existent.

That said, a few lessons can be gleaned from the cases discussed above.  Those lessons are not helpful to Fiorito.

*First*, if *Leggett* and similar cases set forth the correct standard for determining when a *Faretta*-type hearing must be conducted (as the Court believes), Fiorito's claim certainly fails. Nothing in Fiorito's pro se requests to withdraw his guilty plea can be interpreted as a clear and

unequivocal demand to represent himself without the assistance of counsel.  In fact, Fiorito's

letters implied that Altman was continuing to work on his behalf, and that Fiorito approved of

those efforts.  *See* Def. Ex. 27 at 2 ("[M]y attorney just received a Duluth Police Department

report composed in 2006 that I believe disproves one of the accusations against me . . . .").  If the

standard set forth in *Leggett* controls, no waiver of the right to counsel would have been

necessary, as Fiorito did not express a desire to represent himself.[8]

      *Second*, the importance of the stage in the proceedings is not necessarily congruous with

whether the function played by defense counsel at that stage is a "core" function requiring

waiver (to use the language of *Turnbull*).  The Supreme Court in *Patterson* tied the issue of what

is needed to obtain an effective waiver of the right to counsel not to the importance of the stage

of the proceedings, but to the "purposes a lawyer can serve at the particular stage of the

proceedings in question, and what assistance he could provide to an accused at that stage . . . ."

*Patterson*, 487 U.S. at 298; *cf. Tovar*, 541 U.S. at 89 ("'[A]t trial . . . counsel is required to help

even the most gifted layman adhere to the rules of procedure and evidence, comprehend the

subtleties of voir dire, examine and cross-examine witnesses effectively . . . , object to improper

prosecution questions, and much more.'" (quoting *Patterson*, 487 U.S. at 299 n.13)).

      At the plea stage, the role of defense counsel is relatively limited, at least as compared to

the trial stage.  The defendant alone "has the 'ultimate authority to make certain fundamental

---

[8]Fiorito did not ask to represent himself *without* the assistance of counsel until about five
months after he was allowed to withdraw his guilty plea.  *See* ECF No. 142.  In response to that
request, the undersigned conducted a full *Faretta* hearing, during which the undersigned warned
Fiorito about the dangers of self-representation and eventually concluded that Fiorito's waiver of
his right to counsel was voluntary, knowing, and intelligent.  *See* ECF No. 151.  Fiorito raises no
claim about the adequacy of the *Faretta* hearing.

decisions regarding the case,'" including whether to plead guilty. *Thomas v. United States*, 737 F.3d 1202, 1207 (8th Cir. 2013) (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). "The attorney, on the other hand, has the responsibility of making tactical decisions of trial strategy." *Id.* Little expertise or strategy is required to assist the defendant in the technical aspects of pleading guilty. Defense counsel's role is limited to ensuring that the accused is fully aware of his rights and the consequences of his decision to plead guilty.[9]  Indeed, at a typical change-of-plea hearing, the defense attorney says almost nothing.

Somewhat greater knowledge of the law may be needed to withdraw a guilty plea than to enter such a plea, as defendants are permitted to withdraw guilty pleas only in unusual circumstances. But even here, the expertise provided by an attorney pales in comparison to the expertise needed to formulate trial strategy, conduct voir dire, examine and cross-examine witnesses, introduce physical evidence, raise objections to an opponent's questions, and perform the myriad tasks required at trial. The primary concern of *Faretta* is that a defendant may not understand how difficult it is to try a case, and that the defendant may unwittingly find himself attempting (and failing) to represent himself at trial. The need for warnings is less pressing in this case. As Fiorito proved, asking a judge for permission to withdraw a guilty plea is not so difficult that a layperson is unlikely to understand how to do it. Moreover, it must be remembered that Fiorito was *successful* in accomplishing what he set out to do. Fiorito cannot complain that he would have acted differently if only he had been warned by Judge Magnuson

_____

[9]To be clear:  Fiorito remained entitled to effective assistance of counsel at the time he withdrew his guilty plea. This included a right to adequate information from Altman regarding the potential consequences of withdrawing his plea. Fiorito's claim that he did not receive effective assistance from Altman — including adequate advice about the consequences of withdrawing his plea — is discussed below.

that Altman, as an attorney, would likely do a better job at persuading Judge Magnuson to allow Fiorito to withdraw his plea.  Fiorito *did* persuade Judge Magnuson to allow him to withdraw his plea.  Given that Fiorito got exactly what he wanted, it is difficult for him now to argue that he should have been warned about the pitfalls of self-representation.

*Third*, assuming (contrary to *Leggett*) that a waiver of the right to counsel was necessary in this case, courts have found that defendants do not need to be told much in order to validly waive the right to counsel during pre-trial proceedings.  This is true even at highly important junctures in the pre-trial proceedings, such as plea hearings.  *See Tovar*, 541 U.S. at 90-93. Judge Magnuson instructed Fiorito at the original plea hearing — and Fiorito confirmed that he understood — that Fiorito had a "right to be represented by a lawyer at every stage of the proceeding."  Def. Ex. 7 at 8.  Accordingly, there is no doubt that, at the time that he asked to withdraw his guilty plea, Fiorito was fully aware of his Sixth Amendment right to counsel. Other than warning about the dangers of self-representation — a warning that may not have been necessary given the stage of the proceedings — it is hard to understand what Judge Magnuson could have told Fiorito that Fiorito did not already know.

The question is close, owing to the almost complete lack of case law regarding the specific issue raised by Fiorito.  But in light of the fact that Fiorito did not actually ask to proceed pro se before withdrawing his guilty plea; Fiorito's acknowledgment at the plea hearing that he knew that he had the right to counsel at all times during the proceedings; the relatively limited assistance that an attorney can offer to a defendant who is contemplating withdrawing a guilty plea; and the fact that at all times Fiorito *was* represented by an attorney who was advising him *not* to withdraw his guilty plea, the Court finds that Fiorito's rights under the Sixth

Amendment were not violated when Judge Magnuson did not conduct a *Faretta*-type hearing before permitting Fiorito to withdraw his guilty plea.[10]  Accordingly, any claim based on that alleged violation of the Sixth Amendment is denied.

### B.  Ineffective Assistance of Counsel

The vast majority of Fiorito's claims relate to Altman's performance as counsel during the pre-trial proceedings.  Fiorito raises a variety of ineffective-assistance claims — according to Fiorito, Altman did almost nothing right — but those claims can be grouped into three broad categories.  First, Fiorito argues that Altman made critical errors in drafting and reviewing the written plea agreement, and that these errors led Fiorito to feel forced to repudiate that plea agreement.  The Court will refer to this as the "failure to draft" claim.  Second, Fiorito argues that Altman failed to adequately explain the negative consequences that could result from withdrawing the guilty plea and proceeding to trial.  The Court will refer to this as the "failure to

---

[10]Fiorito makes two other challenges to Judge Magnuson's conduct, each of which merits only brief mention.  First, citing Fed. R. Crim. P. 47, Fiorito alleges that Judge Magnuson should not have granted his request to withdraw his guilty plea because that request was made in a letter, not a motion.  Rule 47 requires that a formal request of the court be made by motion so that the court has adequate notice that a party is making a formal request.  *See United States v. Smart*, 488 Fed. App'x 790, 793 n.2 (5th Cir. 2012) (per curiam).  But there is no doubt that Judge Magnuson knew that Fiorito was making a formal request; after all, Judge Magnuson entered a formal order granting Fiorito's request.  Moreover, Fiorito's letters otherwise met the requirements of Rule 47(b).  The fact that Fiorito did not write the word "MOTION" on the top of his letters is of no consequence.

Second, Fiorito argues that Judge Magnuson abused his discretion in allowing him to withdraw his guilty plea, as Fiorito had not established "a fair and just reason" for withdrawal.  *See* Fed. R. Crim. P. 11(d)(2)(B).  But as Judge Magnuson noted, Fiorito appeared to be asserting his factual innocence, and the government was not prejudiced by the withdrawal (indeed, the government urged Judge Magnuson to grant Fiorito's request).  *See* Def. Ex. 29.  Judge Magnuson acted well within his discretion when he permitted Fiorito to withdraw his guilty plea.

inform" claim.  Third, Fiorito argues that Altman's performance fell below an objective standard of reasonableness when Altman failed to tell Judge Magnuson that he should not grant Fiorito's request to withdraw his guilty plea, when Altman failed to demand that a hearing be conducted on Fiorito's request, and when Altman failed to undertake various other actions that might have prevented Fiorito from withdrawing his plea.  The Court will refer to this as the "failure to object" claim.

To prevail on a claim of ineffective assistance of counsel, Fiorito must show that his counsel's performance fell below an objective standard of reasonableness, *see Strickland*, 466 U.S. at 687-88, and that there is a reasonable probability that, but for his counsel's errors, the result of his proceeding would have been different, *id*. at 694.  "The first prong requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."  *White v. Dingle*, 757 F.3d 750, 752 (8th Cir. 2014) (quotations omitted).  "The second prong requires a showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 753 (quotations omitted).  Fiorito bears the burden of establishing both prongs.  *Thomas*, 737 F.3d at 1207 (objective-standard-of-reasonableness prong); *Becht v. United States*, 403 F.3d 541, 549 (8th Cir. 2005) (prejudice prong).  "'Failure to establish either *Strickland* prong is fatal to an ineffective-assistance claim.'"  *United States v. Kehoe*, 712 F.3d 1251, 1253 (8th Cir. 2013) (quoting *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011)).

As explained below, the Court finds that none of Fiorito's ineffective-assistance claims merits relief.  Accordingly, each of Fiorito's claims that Altman failed to provide effective assistance is denied.

### 1.  Failure to Draft[11]

Fiorito's plea agreement was an agreement with the government to "disagree on almost everything."  Def. Ex. 7 at 4.  Fiorito pleaded guilty to the crime of mail fraud, but the parties left until sentencing questions relating to the scope of Fiorito's relevant conduct, as well as other questions related to calculating the range recommended by the Sentencing Guidelines.  Indeed, the written plea agreement explicitly acknowledges that the parties "disagree fundamentally about how the United States Sentencing Guidelines should apply to this case."  Def. Ex. 6 ¶ 6.

Although the parties disputed almost everything about the application of the Sentencing Guidelines, they did agree about the potential application of a three-point reduction for acceptance of responsibility under § 3E1.1.  Indeed, the plea agreement cited Fiorito's being able to "retain the benefit of the full three-point reduction for acceptance of responsibility" as one of the primary benefits of the agreement to Fiorito.  Def. Ex. 6 ¶ 6.  Specifically, the plea agreement noted that "[i]n exchange for defendant Michael Fiorito's plea of guilty and acceptance of responsibility, the United States Attorney's Office for the District of Minnesota agrees . . . to recommend that the Court adjust downward defendant's offense level for acceptance of responsibility, provided the conditions set forth below are met."  *Id.* ¶ 5.  Crucially, though,

---

[11]This claim does not directly correlate to any ground for relief raised by Fiorito's § 2255 motion.  It is, however, a focal point of his post-evidentiary hearing briefing, and the Court will therefore consider the merits of that claim.

among those "conditions" was that Fiorito had to "fully acknowledge[] complete responsibility for the offense of conviction and all relevant conduct . . . ." *Id.* ¶ 13.

Fiorito contends that this condition in the written plea agreement — that he fully acknowledge complete responsibility for all relevant conduct — contradicts the verbal agreement he reached with the government, which was that he could deny virtually everything about the offense of conviction and relevant conduct and yet remain entitled to the three-point reduction for acceptance of responsibility. This drafting error by Altman, says Fiorito, set in motion the chain of events that led to his withdrawing his guilty plea and proceeding to trial.

Under § 3E1.1 of the Sentencing Guidelines,

> (a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.
>
> (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

The application notes to § 3E1.1 go on to explain that, "[i]n determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following . . . . truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1 n.1(A). In

addition, the application notes make clear that "[a] defendant who enters a guilty plea is not entitled to an adjustment under [§ 3E1.1] as a matter of right."  U.S.S.G. § 3E1.1 n.3.

The plain language of § 3E1.1 defeats Fiorito's claim that "defense counsel's representation was constitutionally deficient when he negotiated a plea agreement that forfeited acceptance of responsibility if Mr. Fiorito disputed relevant conduct, even though the entire point of the agreement was to dispute relevant conduct."  ECF No. 581 at 5.  The parties simply could not, consistent with § 3E1.1, agree that Fiorito could deny practically everything about his offense — including virtually all of the relevant conduct — and still receive a three-point reduction for acceptance of responsibility.  The condition imposed on Fiorito in ¶ 13 of the plea agreement merely reflected what the *Sentencing Guidelines themselves* required of Fiorito if he were to obtain the three-point reduction.  Altman could not have rendered ineffective assistance by including in the plea agreement a term that accurately reflected the law.

There is, to be sure, a tension within the "Column B" plea deal.[12]  Fiorito was required to navigate a narrow strait.  If Fiorito admitted "too much" conduct in order to ensure acceptance of responsibility, he risked triggering enhancements under the Sentencing Guidelines (such as for

---

[12]This is not to say that the plea agreement was ambiguous.  To the contrary, the plea agreement is consistent and clear that the government's recommendation of the three-point reduction for acceptance of responsibility was contingent on "Fiorito's plea of guilty *and acceptance of responsibility*," Def. Ex. 6 ¶ 5 (emphasis added), and that acceptance of responsibility would require Fiorito to take "complete responsibility for the offense of conviction *and all relevant conduct*," *id*. ¶ 13 (emphasis added).  Although the plea agreement does state that Fiorito "retain[ed] the benefit of the full three-point reduction for acceptance of responsibility," *id*. ¶ 6, this statement does not commit the government to arguing before the Court that Fiorito had accepted responsibility.  Instead, the statement merely acknowledges that Fiorito remained eligible for the reduction, provided he in fact accepted responsibility as contemplated by the remainder of the plea agreement (including the section of the plea agreement headed "*Acceptance of Responsibility*").  *Id*. ¶ 13.

amount of loss or number of victims).  But if Fiorito admitted "too little" conduct in an effort to forestall those sentencing enhancements, he might lose his claim to the three-point reduction for acceptance of responsibility.  But this is not Altman's fault; it was a danger that was inherent in the "Column B" approach.  Once Fiorito headed down that path — a path that Altman strongly counseled against traveling, *see* Evid. Hr'g Tr. 1 at 174-76 — disputes over acceptance of responsibility were likely inevitable.  And, again, these disputes were inevitable regardless of what the written plea agreement said, given that the Sentencing Guidelines themselves required that Fiorito "truthfully admit[] the conduct comprising the offense(s) of conviction" and "truthfully admit[] or not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)."  U.S.S.G. § 3E1.1 n.1(A).

It should also be emphasized that the Court was not bound either by the recommendations of the parties or by the recommendations of the Sentencing Guidelines.  Even if, in the plea agreement, the government had made an unconditional promise to recommend a three-point reduction for acceptance of responsibility, the Court almost surely would have denied such a reduction.  If one looks at the charges made against Fiorito in the indictment — and one compares those charges to what Fiorito admitted at the plea hearing — it becomes clear that Fiorito essentially admitted to *none* of the conduct with which he was charged.  It was almost as if Fiorito, charged with fraud, denied any fraud, but admitted to running a stop sign or littering while driving to the home of one of his alleged victims.  Come time of sentencing, the Court would not have given Fiorito a three-point reduction to which he was plainly not entitled, regardless of what the parties said about that reduction in their plea agreement.  *See also* Def. Ex. 6 ¶ 6 ("Even had the parties stipulated, the parties' views as to the sentencing factors

would not be binding on the Court.  Further, the Sentencing Guidelines are no longer binding upon the Court, but are advisory only.").

Moreover, even if Fiorito did, in fact, plead guilty only because of an incompetently drafted plea agreement, the remedy would not be to give Fiorito the benefit of a "deal" that the government never offered and that would have been inconsistent with the Sentencing Guidelines. Instead, the remedy would be to allow Fiorito to *withdraw his guilty plea*.  But, of course, Fiorito already *received* that remedy.  When Fiorito found out that the government would not recommend a three-point reduction for acceptance of responsibility, Fiorito asked to withdraw his guilty plea, and Judge Magnuson allowed him to do so.

In sum, Fiorito has not shown that Altman provided ineffective assistance by drafting a plea agreement that correctly set forth the standard for acceptance of responsibility.[13]  Moreover, Fiorito cannot show how he was prejudiced by accepting a plea agreement with this language, as the most appropriate remedy — withdrawal from the guilty plea — is exactly what Fiorito sought and received.  This aspect of Fiorito's ineffective-assistance claim is therefore denied.

---

[13]Fiorito also suggests in passing that Altman's performance with respect to drafting the plea agreement was constitutionally deficient insofar as the plea agreement did not address whether Fiorito's federal sentence would run concurrently with or consecutively to his state sentence.  According to Fiorito, Altman nevertheless assured him that this issue would be "off the table," Def. Ex. 16 at 1, which provided an additional inducement for Fiorito to accept the guilty plea.  This claim, even if adequately raised, would end up in the same place.  The evidence is clear that the government never agreed to recommend a concurrent sentence, and thus the Court cannot order that Fiorito be "returned" to a plea deal that the government never offered. Again, the most appropriate remedy would be exactly what Fiorito already received: permission to withdraw his guilty plea.

2. Failure to Inform[14]

Fiorito next alleges that Altman's representation was objectively unreasonable insofar as Altman failed to give him specific information about the Sentencing Guidelines range that he would face if he withdrew his guilty plea and was convicted at trial.  Altman concedes that he did not provide Fiorito with specific guidance about how the Sentencing Guidelines might apply if Fiorito proceeded to trial.  Instead, Altman generally warned Fiorito that, if he withdrew his plea and went to trial, he would "get hammered" and face "a bucket full of time."  *See* Evid. Hr'g Tr. 1 at 160 (Altman explaining that "I can tell you that one of the things I told him, and I probably told him right at the beginning, you go to trial and you lose, you're going to get hammered."); *id.* at 129 ("You're just looking at a bucket full of time.").

The Court will assume, for the sake of argument, that Altman's performance with respect to informing Fiorito about the possible effects of withdrawing his guilty plea fell below an objective standard of reasonableness.[15]  In order to demonstrate ineffective assistance of counsel, however, Fiorito must show there is a reasonable probability that, but for Altman's deficient performance, the result of the proceeding would have been different.  *See White*, 757 F.3d at 753.

---

[14]This claim primarily encompasses Grounds One and Seven of Fiorito's § 2255 motion.

[15]Fiorito alleges that one reason he did not receive adequate instruction from Altman was that there had been a complete breakdown in communication, leaving Fiorito effectively without counsel.  Fiorito also alleges that Judge Magnuson should have conducted a hearing once he received notice of this irreconcilable conflict.  But Fiorito's final letter to Judge Magnuson requesting to withdraw the guilty plea made clear that there had *not* been a complete breakdown, as Altman and Fiorito were still discussing the case, and as Altman continued to work on Fiorito's behalf.  *See* Def. Ex. 27 at 1-2.  Moreover, the undersigned conducted a hearing one month after Fiorito withdrew his guilty plea and found that no irreconcilable conflict or complete breakdown in communication existed.  *See* ECF No. 104 at 2.  Fiorito has never challenged that finding.

Specifically, Fiorito must show that, had Altman more specifically informed him of the possible ramifications of going to trial, Fiorito would not have asked to withdraw his guilty plea. *Cf. Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice."); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (in the context of claim that counsel's errors led to the defendant pleading guilty, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial").

Fiorito has failed to make that showing. After hearing the testimony of Altman and Fiorito, and after reviewing the record as a whole, the Court finds it unlikely that Fiorito would have decided not to withdraw his guilty plea if Altman had given him more specific information about the potential consequences of going to trial. Accordingly, this aspect of Fiorito's claim — and all grounds for relief associated with that claim — are denied.

To begin, the Court does not credit Fiorito's testimony that he would not have attempted to withdraw his guilty plea if only he had been more specifically cautioned by Altman. This Court has lived with this case for almost seven years, and if this Court has learned anything about Fiorito, it is that Fiorito will say anything that he believes will help him, regardless of the truth of what he is saying. Indeed, Fiorito admitted as much during the evidentiary hearing on his § 2255 motion. *See* Evid. Hr'g Tr. 4 at 264 ("If you wanted me to say equity stripping or that I assassinated President Kennedy, I would've said it."). At several times during the evidentiary hearing, Fiorito hesitated before answering straightforward factual questions, obviously calculating not what answer was true, but what answer would most help his cause. *See id.* at 267

("I mean, whatever Mr. Altman did — the goal of this — again, you're trying to get me to answer a question that I'm not — I'm not going to say — the reason behind this was to try and minimize relevant conduct as much as possible."). At other times, Fiorito refused to give direct responses to simple factual questions. *See id.* at 258 ("Q: I mean, you did not tell Mr. Altman I don't want to sit here for six to eight months, wherefore, let's get this case settled? You didn't write that? A: That's your opinion. The meaning of the letter is your opinion. That's fine."); *id.* at 300 ("Q: So notwithstanding that, you kept writing letters to the court that reflected a very clear intention to go to trial, didn't you? A: I don't know."). At yet other times, Fiorito's answers were directly contradicted by the record in front of him. *See id.* at 270 ("Q: Paragraph 15 here you just deny that in any way that that [sic] was a fraudulent deal. And it's a wholesale denial of not sentencing factors. You said I didn't defraud her. A: That's your opinion, but that's fine. Q: Well, let's read it. . . . 'Mr. Fiorito denies generally that the LaVonne Fitzgerald transaction was fraudulent and contests the conclusion that she was a victim.'" (internal quotation marks added)). And at still other times, Fiorito's answers, although not provably false, strained credulity. For example, Fiorito — who has obsessively flyspecked every document relevant to his case — testified that he "didn't go over" and "didn't pay attention" to paragraph 13 of the plea agreement, which discussed acceptance of responsibility. *See* Evid. Hr'g Tr. 3 at 151. It is very difficult to believe that the only document that Fiorito failed to inspect thoroughly was perhaps the most important document in his case. Simply put, Fiorito is not a credible witness on his own behalf.

Fiorito's disingenuousness does not, in and of itself, prove that he is lying or mistaken when he says that he would not have attempted to withdraw his guilty plea if only Altman had

given him a more specific accounting of what might happen should he proceed to trial.  Further,

there is some evidence in the record supporting Fiorito's claim that he was committed to his

guilty plea.  Fiorito suggested the possibility of a guilty plea to Altman at the opening stages of

the prosecution.  *See* Evid Hr'g Tr. 1 at 35-36.  Later, Fiorito did in fact enter a guilty plea.  And

just five days before Fiorito's request to withdraw his guilty plea was granted, Altman indicated

in an ex parte letter to Judge Magnuson that withdrawal of the guilty plea and a subsequent trial

would not be Fiorito's "first choice."  Def. Ex. 28 at 2.

That said, each bit of evidence that Fiorito was committed to pleading guilty is equivocal.

Although Fiorito did float the possibility of a guilty plea from the beginning, he also said in one

of his first communications to Altman that "[i]t probably doesn't mean a whole lot to you but I

am innocent."  Def. Ex. 42 at 1.  Fiorito's guilty plea was highly unusual — "an agreement to

disagree on practically everything," Evid. Hr'g Tr. 1 at 41 — and at the plea colloquy, Fiorito

just barely established a factual basis for his offense (if he accomplished even that).  And while

Altman was telling Judge Magnuson that going to trial would not be Fiorito's first choice, Fiorito

was penning *three* pro se letters demanding that he be allowed to withdraw his guilty plea and

criticizing Altman for refusing to assist him in writing those letters.  *See* Def. Exs. 18, 24, & 27.

The final letter referenced not only the government's putative breach of the plea agreement, but

also evidence that Fiorito believed would help establish his innocence of some of the conduct

alleged by the government.  *See* ECF No. 27 at 2-3.  At no point does it appear that Fiorito was

at peace with his decision to plead guilty.

Set off against Fiorito's ambiguous evidence that he would have remained committed to

his guilty plea had he been more specifically warned about the dangers of trial are several pieces

-34-

of evidence that belie any such suggestion.  *First*, Fiorito's conduct throughout this case suggests that any concern he may have had over minimizing the risk of a longer sentence was substantially outweighed by his desire to litigate nearly every aspect of his conduct.  Fiorito turned down the "Column A" offer of a recommendation from the government of 100 months' imprisonment in order to dispute the scope of his relevant conduct, despite being told by Altman that this offer was far preferable to the "Column B" approach of contesting everything.  *See* Evid. Hr'g Tr. 1 at 56.  Fiorito *again* turned down an offer of a recommendation from the government of 100 months' imprisonment despite knowing that the PSR had calculated a sentence of 151 to 188 months and that the government would be pushing for a sentence at the top of that range.  There is thus ample reason to believe that Fiorito was willing to run the risk of a substantially longer prison sentence in order to have the opportunity to present his side of the case in court.  Fiorito's repudiation of the plea agreement was fully consistent with his approach up to that point.  The contention that, *this* time, Fiorito would have flinched at the prospect of a longer sentence is hard to believe.

*Second*, even if Altman did not adequately explain the likely impact of going to trial on the Guidelines calculations, Fiorito was undoubtedly aware — with some degree of specificity — of the risks he faced.  Fiorito is very smart; he gets into trouble because he lacks self control, not because he lacks intelligence.  Fiorito is also the most legally savvy non-lawyer who has appeared before this Court.  Time and again, he has proven himself capable of researching, understanding, and arguing sophisticated legal issues, and (as noted) he reviews every jot and tittle of every document relevant to his case.  Fiorito knew full well that if the findings of the PSR were adopted, he would be facing a Guidelines range of up to 188 months, with the

government planning to seek a sentence at the top of that range.  Near the beginning of the proceedings, Fiorito had been told by Altman that he might face a Guidelines range of up to 210 months should he proceed to trial — and even higher if he were found to have obstructed justice. *See* Def. Ex. 4.  Moreover, Fiorito knew from the plea agreement itself that the Sentencing Guidelines were only advisory and that the sentencing judge might vary upward from those Guidelines.  *See* Def. Ex. 6 ¶ 6.

To be sure, Fiorito's sophistication and his knowledge of the sentencing factors did not absolve Altman of the responsibility to explain to Fiorito the potential consequences of withdrawing his plea and proceeding to trial.  These factors are, however, relevant to the prejudice prong of the failure-to-inform claim — that is, to the question of whether there was a reasonable probability that Fiorito would have abandoned his efforts to withdraw his guilty plea if he had been given more specific information about the Guidelines range that he would face if he went to trial.  Given that Fiorito already knew much of the information that he faults Altman for failing to provide, it is highly doubtful that Altman's error prejudiced Fiorito.

*Third*, Fiorito has insisted throughout these proceedings — before trial, after trial, and in his motion for post-conviction relief — that his efforts to withdraw his guilty plea were predicated on the government's supposed breach of the plea agreement by refusing to recommend a three-point offense-level reduction for acceptance of responsibility.  But the Court has found that the government did not breach the plea agreement, and that Fiorito was not entitled to the three-point reduction for acceptance of responsibility.  If it is true, as Fiorito contends, that the reduction for acceptance of responsibility was the linchpin of the entire plea

agreement, then it is almost certain that Fiorito would not have stood by quietly as he lost that essential benefit.

At bottom, Fiorito's failure-to-inform claim depends on his assertion that he would have maintained his guilty plea and accepted the prospect of a 188-month term of imprisonment if only he had been told by Altman that he would face an even higher Guidelines range if he withdrew his plea and went to trial. This claim is not backed by adequate evidence, and, as described above, it is inconsistent with other decisions made by Fiorito.

Because Fiorito cannot demonstrate prejudice, he cannot succeed on this aspect of his ineffective-assistance claim. That claim (and all associated grounds for relief) is therefore denied.

### 3. Failure to Object[16]

The bulk of the grounds for relief raised in Fiorito's § 2255 motion relate to Altman's failure to do more to keep Fiorito from withdrawing his guilty plea. According to Fiorito, if only Altman had asked for a hearing on Fiorito's requests to withdraw his plea, or had objected more vigorously to Fiorito's efforts to withdraw his plea, or had moved for reconsideration of Judge Magnuson's decision to allow Fiorito to withdraw his plea, or had done something else to stop Fiorito from shooting himself in the foot, Fiorito would not have withdrawn his plea and would have received a sentence substantially below 270 months' imprisonment.

This aspect of Fiorito's ineffective-assistance claim generally goes as follows: (1) a constitutional error was committed — by Judge Magnuson in allowing Fiorito to withdraw his

---

[16]This claim primarily encompasses Grounds Two, Three, Four, Five, Six, Twelve, Seventeen, and Nineteen of Fiorito's § 2255 motion.

guilty plea, or by Judge Magnuson in failing to hold a hearing on Fiorito's requests, or by the prosecutor in responding to Fiorito's requests, or by the prosecutor in breaching the plea agreement; (2) Altman should have objected to these constitutional errors at the time they were committed; (3) had Altman objected, Judge Magnuson and the prosecutor would not have harmed Fiorito through their unconstitutional actions; (4) therefore Altman provided ineffective assistance of counsel by failing to object to these errors.

The premise of Fiorito's argument is fatally flawed.  The Court found above that Judge Magnuson did not err by allowing Fiorito to withdraw his guilty plea without a hearing, and that the prosecutor did not breach the plea agreement.  The Court finds below that the prosecutor did not commit misconduct.  Obviously, Altman could not have been ineffective in failing to object to non-existent constitutional errors.

Fiorito's failure-to-object claim fails for a second reason.  Throughout this period, Altman was working diligently to *prevent* Fiorito from withdrawing his guilty plea.  Fiorito acknowledged in one of his letters to Judge Magnuson that Altman had refused to assist him to withdraw the plea.  *See* Def. Ex. 24.  After Fiorito wrote his first letter requesting to withdraw the plea, Altman filed a motion to withdraw Fiorito's request.  *See* Def. Ex. 21.  Indeed, at the time that Fiorito was asking to withdraw his guilty plea, Altman was the *only* person trying to prevent Fiorito's request from being granted.  Fiorito, the prosecutor, and ultimately Judge Magnuson all agreed — over Altman's opposition — that Fiorito should be permitted to withdraw his plea.[17]

---

[17]Fiorito also alleges that Altman had a conflict of interest due to his mistakes in drafting the plea agreement.  As Fiorito would have it, Altman was secretly glad to see Fiorito let out of

(continued...)

The argument that Altman should have done more to object *after* the guilty plea was withdrawn is still more fanciful. As the defendant, Fiorito was entitled to decide whether he wanted to plead guilty or not. Fiorito had demanded, time and time again, to be let out of his guilty plea. On what basis could Altman have insisted that his client be returned to the guilty plea *over the client's own objection*? (Fiorito's motion for post-conviction relief under those circumstances would write itself.)

This aspect of Fiorito's ineffective-assistance claim is predicated on constitutional errors that did not exist. It also ignores the measures Altman undertook to try to keep Fiorito from withdrawing his guilty plea. This claim, and all associated grounds for relief, must be rejected.

### C. Remaining Claims for Relief

A handful of Fiorito's claims relate neither to Judge Magnuson's granting of Fiorito's request to withdraw his guilty plea nor to Altman's performance as counsel. Like Fiorito's other claims, however, these claims do not entitle him to relief.

### 1. Juror Misconduct

In Ground Eleven, Fiorito alleges that a witness for the defense inadvertently spoke to a member of the jury during trial and informed the juror that Fiorito had a prior criminal record.

---

[17](...continued)
his plea agreement, as Altman's shoddy work in drafting the plea agreement would no longer be on display. Had this conflict not existed, says Fiorito, Altman would have done more to prevent Fiorito from withdrawing the plea.

The Court has already found that Altman's performance in drafting the plea agreement was constitutionally adequate. In any event, Fiorito's allegations are severely undercut by the fact that Altman fought to *prevent* Fiorito from withdrawing his guilty plea. It would have been quite easy for Altman to acquiesce in Fiorito's desire to withdraw his plea, especially once the government signaled its approval.

During the evidentiary hearing on his § 2255 motion, Fiorito informed the Court that he was not

pursuing this claim. *See* Evid. Hr'g Tr. 1 at 7-8. Moreover, Fiorito has not presented any

evidence that this claim is true. Accordingly, this claim is denied.

### 2. Double Jeopardy

In Ground Sixteen, Fiorito alleges that jeopardy attached when he pleaded guilty, and

thus the Double Jeopardy Clause barred the government from prosecuting him after he withdrew

his guilty plea. The Eighth Circuit has previously "assume[d], without deciding, that jeopardy

attache[s]" when a district court accepts a guilty plea. *See United States v. Rea*, 300 F.3d 952,

957 (8th Cir. 2002). "The question of when jeopardy attaches, however, only begins our

inquiry." *United States v. Baggett*, 901 F.2d 1546, 1548 (11th Cir. 1990). In many instances,

the government may reinitiate a prosecution despite the prior attachment of jeopardy. For

example, a defendant whose conviction is overturned on appeal may be tried again. *Id.* at 1548-

49. Similarly, withdrawal of a guilty plea by a defendant does not "create a double jeopardy

impediment to a subsequent prosecution." *United States v. Wampler*, 624 F.3d 1330, 1341 n.8

(10th Cir. 2010); *accord United States v. Podde*, 105 F.3d 813, 817-18 (2d Cir. 1997). Fiorito's

double-jeopardy claim is meritless.

### 3. Prosecutorial Misconduct

In Ground Nine, Fiorito contends that the prosecutor committed misconduct by

responding to his pro se requests to withdraw his guilty plea. (In response to each such request,

the prosecutor wrote to Judge Magnuson and encouraged him to allow Fiorito to withdraw his

plea.) Fiorito's claim is difficult to understand. He appears to believe that his letters to Judge

Magnuson were ex parte, and that, by responding to those letters, the government communicated

with a represented defendant outside of the presence of counsel.  But Fiorito's letters and the government's responses were filed on the public docket.  *See* ECF Nos. 86, 90, 93, & 95. Everyone involved in the case — Judge Magnuson, Altman, Fiorito, and the prosecutor — was privy to all of the communications at issue.  The Court can discern nothing remotely improper about a prosecutor responding — publicly, with full notice to the Court and defense counsel — to letters sent to the Court by a represented defendant.

Fiorito also references a phone call that he allegedly had with the prosecutor in July 2008.  *See* Petition at 34 [ECF No. 503].  Unlike the letters described above, this conversation (if it took place) was truly ex parte and outside the presence of defense counsel.  *Id.* For its part, however, the government has denied that the prosecutor in this case "engaged in substantive discussions with Fiorito about any aspect of the case in July of 2008, when Mr. Altman was still the attorney of record."  ECF No. 525 at 32.  No testimony or other evidence was submitted regarding this aspect of Fiorito's prosecutorial-misconduct claim, and thus Fiorito has not met his burden of showing that the conversation occurred.  Moreover, even if the Court took Fiorito's unsupported allegations as true, the conversation that he describes was brief, was initiated entirely by Fiorito, and concerned nothing that the government did not already know from Fiorito's previous filings.  Petition at 34.  Under the circumstances, the Court cannot find that the prosecutor committed misconduct or that any prosecutorial misconduct prejudiced Fiorito.  Fiorito's prosecutorial-misconduct claims are therefore denied.

### 4.  Sentencing Findings

In Ground Eighteen, Fiorito contends that the Court erred by finding relevant sentencing facts by a preponderance of the evidence, rather than beyond a reasonable doubt.  But as the

Court explained at the time of sentencing, Fiorito is simply incorrect in asserting that the Court must apply the reasonable-doubt standard to sentencing facts. *See United States v. Pepper*, 747 F.3d 520, 523 (8th Cir. 2014) ("The Government must prove the facts that support application of a sentencing enhancement by a preponderance of the evidence."); *United States v. Brooks*, 648 F.3d 626, 629 (8th Cir. 2011); *United States v. Villareal-Amarillas*, 562 F.3d 892, 897-98 (8th Cir. 2009) (rejecting suggestions in prior case law that especially important sentencing facts might need to be proved by clear and convincing evidence, and affirming the preponderance-of-the-evidence standard for proving all sentencing facts). Fiorito's argument is no more convincing now than it was five years ago.

Fiorito also contends that because the relevant sentencing facts in his case were found by a judge and not by a jury, his sentence was unconstitutional under the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013) (finding that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."). "There is abundant authority on which this Court can reasonably conclude that the Eighth Circuit would find that *Alleyne* is not retroactive, as *Alleyne* is explicitly an extension of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and the Eighth Circuit has consistently held that *Apprendi* and its progeny are not rules of watershed magnitude and has declined to apply those cases retroactively." *Dunklin v. Wilson*, No. 13-CV-2411 (PJS/JSM), 2014 WL 5464250, at *4 (D. Minn. Oct. 27, 2014) (citations and quotations omitted). Of course, Fiorito cannot avail himself of a rule that does not apply retroactively on collateral review.

Even if *Alleyne* applied retroactively, it would not help Fiorito, as none of the facts found by the Court at sentencing related to a mandatory minimum or statutory maximum sentence.

Instead, the Court's factual findings were relevant only to determining what range was recommended by the Sentencing Guidelines.  And "under *Alleyne*, the Sixth Amendment permits a district court to rely on facts beyond those found by the jury when the court calculates the applicable advisory sentencing guidelines range and selects a sentence within the statutorily-prescribed range."  *United States v. Bennett*, 765 F.3d 887, 897 (8th Cir. 2014).

Finally, Fiorito contends that the Court should have determined at sentencing whether his state-court conviction for making terroristic threats was a conviction for a crime of violence. This issue was not relevant to Fiorito's sentence, but after Fiorito was sentenced, the Bureau of Prisons ("BOP") determined that Fiorito's prior conviction was for violent conduct and consequently assigned a higher custody classification to Fiorito.  Fiorito asserts that the PSR includes erroneous information and that, although he was convicted for making terroristic threats and sentenced to ten years in prison, he did not engage in any violent conduct.  As noted, the issue of whether the conduct underlying Fiorito's state-court conviction was violent did not affect this Court's determination of Fiorito's sentence, and thus no decision on the issue was necessary.  *See* Fed. R. Crim. P. 32(i)(3)(B).  Moreover, because the issue does not relate to the legality of Fiorito's conviction or sentence, the issue is not cognizable on review under § 2255. *See* 28 U.S.C. § 2255(a).

For these reasons, all of Fiorito's claims regarding sentencing determinations are without merit.

5.   Ineffective Assistance of Appellate Counsel

In Grounds Thirteen, Fourteen, and Fifteen of his § 2255 motion,[18] Fiorito argues (in essence) that his appellate counsel was ineffective for failing to raise on direct appeal any of the issues addressed by this order.  The Court has already explained that each of Fiorito's arguments lacks merit.  Obviously, then, Fiorito's appellate counsel could not have been ineffective in failing to raise those issues.  *See United States v. Behrens*, 570 Fed. App'x 630 (8th Cir. 2014) (per curiam) (citing *Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994) (per curiam)).  Fiorito's claims of ineffective assistance of appellate counsel are therefore denied.

### D.   Certificate of Appealability

A defendant cannot appeal an adverse ruling on a § 2255 motion unless he is granted a certificate of appealability ("COA").  *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that Fiorito's § 2255 motion presents one question about which reasonable jurists might disagree:  Was Fiorito deprived of his Sixth Amendment right to counsel when Judge Magnuson granted Fiorito's pro se request to withdraw his guilty plea? Accordingly, the Court grants Fiorito a COA on that question.

---

[18]Fiorito also sprinkles references to ineffective assistance of appellate counsel throughout other sections of his § 2255 motion.  Because each of Fiorito's substantive claims is meritless, Fiorito's appellate counsel was not ineffective for failing to raise those claims on direct appeal.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Defendant Michael Fiorito's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 [ECF No. 503] is DENIED.

2.  Attorney John Fossum's motion to withdraw [ECF No. 549] is GRANTED.

3.  Fiorito's motion for discovery [ECF No. 510] is DENIED AS MOOT.

4.  Fiorito's motion for in camera review of evidence [ECF No. 511] is DENIED AS MOOT.

5.  Fiorito's motion to compel the government to respond [ECF No. 526] is DENIED AS MOOT.

6.  Fiorito's motion to enforce subpoena [ECF No. 536] is DENIED AS MOOT.

7.  A certificate of appealability is issued as to the following question:  Was Fiorito deprived of his Sixth Amendment right to counsel when Judge Magnuson granted Fiorito's pro se request to withdraw his guilty plea?

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: May 14, 2015                         s/Patrick J. Schiltz
                                           Patrick J. Schiltz
                                           United States District Judge